# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

JESSE HAMMONS

:

v.                          :   Civil Action No. DKC 20-2088

UNIVERSITY OF MARYLAND MEDICAL  :
SYSTEM CORPORATION, et al.

:

**MEMORANDUM OPINION**

Plaintiff Jesse Hammons ("Plaintiff" or "Mr. Hammons"), a transgender man, sued Defendants, University of Maryland Medical System Corporation ("UMMS"), UMSJ Health System, LLC ("UMSJ"), and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph") (collectively, "Defendants"), pursuant to Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a), claiming sex discrimination in Defendants' refusal to allow him to have a hysterectomy performed at their hospital to treat his gender dysphoria. Two other claims, brought under 42 U.S.C. § 1983, for violation of the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, were dismissed on Defendants' motion (ECF No. 52). The motion was filed by all three defendants, as a unit, and contended, *inter alia*, that they are private corporations that cannot be sued under 42 U.S.C. § 1983, or, alternatively, if they are found to be state

actors, they are entitled to sovereign immunity on those claims.[1] In agreeing with Defendants on the latter argument, this court found that UMMS is an arm or instrumentality of the government for the purposes of Plaintiff's assertion of claims under § 1983 as well as for the purposes of sovereign immunity. This court treated the three Defendants "as a single entity for the purposes of" the motion to dismiss because Defendants treated themselves as such in their motion and the facts supported that approach. (ECF No. 52 at 22). Mr. Hammons subsequently moved for reconsideration or, in the alternative, certification of interlocutory appeal, and this court denied that motion. (ECF Nos. 56, 64). Defendants answered, and a scheduling order was entered.

Some months later, the three defendants moved for leave to amend their answer to plead two "alternative affirmative defenses based on the ecclesiastical abstention doctrine and Religious Freedom Restoration Act ('RFRA'), 42 U.S.C. §§ 2000bb, et seq." (ECF No. 73-1 at 2). They specifically recognized that these defenses would only apply if they were "private entities." (ECF No. 73-1 at 7). Plaintiff opposed the motion, arguing that the

---

[1] Defendants did not argue that sovereign immunity applied to the Section 1557 claim. Since this court decided the motion to dismiss, the United States Court of Appeals for the Fourth Circuit confirmed that "Section 1557 of the [Affordable Care Act] unequivocally conditions the receipt of federal financial assistance upon a state's waiver of sovereign immunity against suits for money damages." *Kadel v. N.C. State Health Plan for Tchrs. and State Emps.*, 12 F.4th 422, 439 (4th Cir. 2021).

2

court had already ruled that Defendants were not private entities, so any amendment to assert these defenses would be futile. (ECF No. 74 at 8). In reply, Defendants argued that, inasmuch as discovery remained ongoing, it was seeking to preserve these "alternative" affirmative defenses. (ECF No. 77 at 3). They suggested that further proceedings in this case might alter the court's earlier ruling that all three entities were state actors. In considering the motion, the court observed that all evidence of the defendants' status, governance, and operation was, and had been, in defendants' possession, but that an appeal was indeed possible, even likely. Despite the fact that it was not at all obvious how a RFRA defense would apply to a claim by a private person, or what role the ecclesiastical abstention doctrine might play, the court granted the motion. (ECF No. 81).

Now, discovery is complete, and both parties have filed motions for summary judgment. (ECF Nos. 98, 105). Also pending are motions to file certain documents under seal and others publicly, filed by both Plaintiff and Defendants. (ECF Nos. 100, 104, 113). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's motion for summary judgment will be granted, Defendants' motion for summary judgment will be denied, Defendants' motion to seal will be granted in part and denied in part, and Plaintiff's motions to seal certain documents and file

certain documents publicly will be granted in part and denied in part.

## I.   Factual Background

Unless otherwise noted, the following facts are undisputed. UMMS was created by Maryland statute in 1984 to provide medical care to the state and region.  Md. Code, Educ. § 13-302.  It is based in the University of Maryland and operates a system comprised of hospitals and member organizations.[2]  *See About Us*, Univ. of Md. Med. Sys., https://www.umms.org/about (last visited Jan. 3, 2023).  UMMS is bound by Maryland law to "operate the medical system without discrimination based upon race, creed, sex, or national origin."  Md. Code, Educ. § 13-303(d).

St. Joseph is one of the hospitals that UMMS operates.  It is a limited liability company ("LLC") with one member—UMSJ—that is wholly owned by UMMS.  (ECF No. 99-4 at 4, 6).  Thus, St. Joseph is a wholly owned subsidiary of UMMS.  (ECF No. 105-10 at 5, 8, 23).  All parties in this case refer to UMSJ and St. Joseph together as "St. Joseph" and do not distinguish between those two defendants—this opinion will do the same unless otherwise indicated.[3]  (ECF Nos. 98-1 at 11, 105-1 at 15-16).  UMMS directly

---

[2] The materials submitted by Defendants recite that there are ten member organizations.  (ECF No. 98-4 at 3).  The website lists eleven hospitals.

[3] Unlike earlier in this litigation, Defendants now try to separate the two St. Joseph entities from UMMS when this strategy

appoints two members of St. Joseph's board, must approve the appointment and removal of the CEO and President, and must approve certain board actions.[4] (ECF No. 99-4 at 6-8, 10, 23). All three Defendants have admitted that they have received federal funds in the form of "payments for patient procedures covered by Medicare and Medicaid."[5] (ECF No. 83 at 9). However, Defendants assert, and Plaintiff does not dispute, that St. Joseph directly receives its own stream of federal funds. (ECF Nos. 98-1 at 12, 98-7 at 3).

The medical center was owned and operated as a Catholic hospital by Catholic Health Initiatives prior to being purchased by UMMS. (ECF No. 99-1 at 8, 86). When UMMS purchased the medical

---

better fits their purposes. Whether they succeed will be discussed later.

[4] The parties seem to dispute whether UMMS also has the authority to appoint the other sixteen members of St. Joseph's board. (ECF No. 111 at 19 n.1). St. Joseph's Operating Agreement provides that "The Member," UMSJ, "shall have the power and authority to elect all of the" other board members from a slate of nominees submitted by the Nomination/Governance Committee of the St. Joseph board, and at least one of the two directly-appointed UMMS directors shall serve on that committee. (ECF No. 99-4 at 10-11). However, the boards of St. Joseph LLC and UMSJ LLC consist of the same members. (ECF No. 99-1 at 86; *see also* ECF Nos. 105-6 at 13, 105-11 at 6). At a minimum, UMMS is indirectly involved in the selection of St. Joseph's entire board.

[5] While all three Defendants "admit they have received" federal funds, (ECF No. 83 at 9), it is unclear whether UMMS and UMSJ receive their own separate stream of federal funds or whether they receive federal funds indirectly through the hospitals they operate.

center in 2012, a condition of the "Asset Purchase Agreement" was that "UMMS . . . shall continue to operate [St. Joseph] in a manner consistent with Catholic values and principles," including complying with a "formal reporting mechanism" to ensure St. Joseph is held accountable for its "Catholic identity."[6] (ECF No. 99-1 at 86). Specifically, UMMS agreed to ensure that St. Joseph's board implemented the Ethical and Religious Directives for Catholic Health Services (the "ERDs"), as promulgated by the United States Conference of Catholic Bishops, in St. Joseph's provision of health care. (ECF No. 99-1 at 86). UMMS also agreed that at least one seat on St. Joseph's board would be a representative of the Archdiocese of Baltimore. (ECF No. 99-1 at 85).

Around the time of the sale, each of the defendants entered into a "Catholic Identity Agreement" with the Roman Catholic Archbishop of Baltimore, which provided a "framework within which to continue authentic Catholic traditions and practices" at St. Joseph. (ECF No. 99-2 at 2-3). This agreement provides that, every two years, St. Joseph "will undergo an audit of its adherence to the" ERDs by the National Catholic Bioethics Center. (ECF No. 99-2 at 8).

---

[6] The motion to seal this exhibit in its entirety will be denied without prejudice to the filing of a motion to redact certain portions upon a showing of need.

The ERDs provide, as relevant here, that "[d]irect sterilization of either men or women . . . is not permitted in a Catholic health care institution" but that "[p]rocedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." (ECF No. 98-18 at 20). The ERDs also provide that "[t]he functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available." (ECF No. 98-18 at 15). The National Catholic Bioethics Center, which regularly audits St. Joseph for compliance with the ERDs, has issued a guidance document that states:

> Gender transitioning of any kind is intrinsically disordered[] because it cannot conform to the true good of the human person, who is a body-soul union unalterably created male or female. Gender transitioning should never be performed, encouraged, or positively affirmed as a good in Catholic health care. This includes surgeries, the administration of cross-sex hormones or pubertal blockers, and social or behavioral modifications.

(ECF No. 107-3 at 2).

Dr. Gail Cunningham, St. Joseph's Chief Medical Officer, was designated to testify on St. Joseph's behalf, pursuant to Fed.R.Civ.P. 30(b)(6), about St. Joseph's adherence to the ERDs,

among other things.[7]  (ECF No. 105-1 at 15 n.2).  In her deposition, she testified that she did not "have any reason to believe that" the National Catholic Bioethics Center's guidance did not apply at St. Joseph.  (ECF No. 105-6 at 39).  She also testified that St. Joseph "prohibits medical personnel from participating in all gender transitions or . . . gender[-]affirming treatments for transgender patients," for "both surgical and nonsurgical treatments."  (ECF No. 105-6 at 57-58).

Mr. Hammons is a transgender man who has been diagnosed with gender dysphoria.  (ECF No. 105-3).  Gender dysphoria is a medical condition recognized by the International Classification of Diseases-10 and International Classification of Diseases-11, published by the World Health Organization, and by the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association.  (ECF No. 105-5 at ¶ 21).  The World Professional Association for Transgender Health has issued guidelines (the "WPATH Standards of Care") for the clinical management of individuals with gender dysphoria that are widely recognized among healthcare professionals in the United States.  (ECF No. 105-5 at ¶ 24).  *See also Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) (recognizing the WPATH Standards of Care as

---

[7] Defendants do not dispute this characterization of Dr. Cunningham's status as a deponent.

"represent[ing] the consensus approach of the medical and mental health community [for treating gender dysphoria that] have been recognized by various courts, including this one, as the authoritative standards of care"). According to the WPATH Standards of Care, "for many [transgender individuals], surgery is essential and medically necessary to alleviate their gender dysphoria." (ECF No. 105-5 at ¶ 28).

Mr. Hammons met with Dr. Steven Adashek, an attending physician at St. Joseph, on September 4, 2019, for a consultation regarding a hysterectomy to treat his gender dysphoria. (ECF Nos. 99-5 at 9, 107-6 at 5-7). A hysterectomy is a surgery to remove a person's uterus. (ECF No. 105-5 at ¶ 29). Dr. Adashek determined that a hysterectomy was the proper treatment for Mr. Hammons's gender dysphoria, and Dr. Adashek's office scheduled Mr. Hammons's surgery to take place at St. Joseph on January 6, 2020, based on Dr. Adashek's and Mr. Hammons's availability. (ECF No. 107-6 at 7, 9-12). To prepare for the surgery, Mr. Hammons underwent pre-operative blood tests, an echocardiogram, and other health screenings. (ECF No. 105-3 at ¶ 9).

On December 24, 2019, Dr. Adashek called Dr. Cunningham to discuss Mr. Hammons's upcoming surgery. (ECF No. 105-6 at 64). Dr. Adashek told Dr. Cunningham that he was scheduled to perform a hysterectomy on a patient for the purpose of gender transition, and Dr. Cunningham told Dr. Adashek, "[N]o, we cannot do

transgender surgery at St. [Joseph]." (ECF Nos. 105-6 at 64, 67-68). Dr. Cunningham testified that "the fact that it was a gender transition treatment . . . was enough to deny [permission to perform the surgery]." (ECF No. 105-6 at 69). On January 5, 2020, the night before the surgery, Dr. Adashek called Mr. Hammons to inform him that the surgery would have to be cancelled due to the fact that the surgery was for the purpose of treating gender dysphoria, as opposed to another medical diagnosis. (ECF Nos. 105-3 at ¶ 12, 107-6 at 13-14, 98-9 at 24, 26-27, 35). Mr. Hammons's surgery was rescheduled at another hospital, and after undergoing another round of pre-operative tests, he had a hysterectomy on June 24, 2020.[8] (ECF Nos. 99-6 at 33, 105-3 at 4).

On January 30, 2020, Dr. Adashek was asked to attend a meeting with Dr. Cunningham and other St. Joseph doctors to discuss Mr. Hammons's cancelled surgery. (ECF Nos. 105-6 at 70-71, 107-6 at 19-20). At the meeting, it was discussed that the surgery was cancelled because "[i]t was inconsistent with the ERDs." (ECF Nos. 105-6 at 74, 107-6 at 22).

Dr. Cunningham testified, on behalf of St. Joseph, that "hysterectomies are frequently performed . . . at St. Joseph to

---

[8] Mr. Hammons's rescheduled surgery was six months later in part because of the onset of the COVID-19 pandemic as well as Mr. Hammons's difficulty in taking time off from work for the surgery and recovery. (ECF Nos. 105-3 at 4, 107-6 at 32-33).

treat certain medical conditions" and that "putting aside gender dysphoria, [it is] true that so long as [a] hysterectomy is consistent with the standard of care for a given diagnosis, the hysterectomy may be performed [at St. Joseph]." (ECF No. 105-6 at 30, 57).

## II. Standard of Review

A court may grant summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)) (alteration in original). "A mere scintilla of proof . . . will not suffice to prevent summary judgment[.]" *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477

11

U.S. at 249–50 (citations omitted).    At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011).  The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (4th ed. 2022).  The court has an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

### III. Analysis

Plaintiff argues that he is entitled to summary judgment because the undisputed facts establish that Defendants have discriminated against him on the basis of his sex.  (ECF No. 105-1 at 11-12).  Defendants argue that they are entitled to summary judgment on three bases: 1) UMMS is not a proper defendant because St. Joseph was the relevant "funding recipient" under Section 1557,

not UMMS; 2) an injunction issued by the United States District Court for the District of North Dakota binds this court and requires dismissal; and 3) Defendants' conduct did not constitute intentional discrimination on the basis of sex. (ECF No. 98-1 at 8-9). Defendants also oppose Plaintiff's motion for those reasons and because 1) Plaintiff's positions rely on disputed facts about Defendants' policies and corporate relationships and 2) St. Joseph is protected by the Religious Freedom Restoration Act ("RFRA"). (ECF No. 111 at 8-9).

## A. Plaintiff's Motion for Summary Judgment

Plaintiff argues that he is entitled to summary judgment because the undisputed facts establish that his surgery was cancelled because it "was meant to treat his gender dysphoria," and Defendants have a "policy of refusing to provide gender-affirming care." (ECF No. 105-1 at 27, 29). He argues that this constitutes discrimination on the basis of sex.[9] On the other hand, Defendants argue that the undisputed facts establish that they have not engaged in intentional sex discrimination because "the ERDs apply neutrally to all patients," and "the ERDs do not allow for St. Joseph to perform sterilization procedures (for

---

[9] The question of which, if any, of the Defendants may be held responsible for any sex discrimination will be discussed in later sections.

either sex) or procedures that result in the removal of a
physically healthy organ." (ECF No. 98-1 at 28-29).

Section 1557 provides that

> an individual shall not, on the ground
> prohibited under title VI of the Civil Rights
> Act of 1964 (42 U.S.C. 2000d et seq.), title
> IX of the Education Amendments of 1972 (20
> U.S.C. 1681 et seq.), the Age Discrimination
> Act of 1975 (42 U.S.C. 6101 et seq.), or
> section 794 of Title 29, . . . be subjected to
> discrimination under[] any health program or
> activity, any part of which is receiving
> Federal financial assistance[.]

42 U.S.C. § 18116(a).[10] Therefore, as under Title IX, Section 1557
prohibits discrimination "on the basis of sex." *See* 20 U.S.C.
1681. Upon review of the parties' statements of undisputed facts
and the exhibits to their motions, the undisputed facts establish
that the cancellation was discrimination on the basis of sex
because it was pursuant to a policy against providing gender-
affirming care—a policy that in practice permits all patients to
obtain doctor-recommended, medically necessary hysterectomies,
*except* transgender patients seeking treatment for gender
dysphoria. Defendants' attempt to frame the policy as neutrally
applicable is unavailing.

---

[10] Courts look to cases brought under Title VI, Title IX,
Section 504 (section 794 of Title 29), and the Age Discrimination
Act for guidance in interpreting this section. *See* 42 U.S.C.
§ 18116(a) ("The enforcement mechanisms provided for and available
under such title VI, title IX, section 794, or such Age
Discrimination Act shall apply for purposes of violations of this
subsection.").

Dr. Cunningham, testifying as St. Joseph's Rule 30(b)(6) corporate designee, stated that St. Joseph "prohibits medical personnel from participating in all gender transitions or . . . gender[-]affirming treatments for transgender patients." (ECF No. 105-6 at 57).    Defendants have identified no evidence that contradicts this statement.    Additionally, undisputed evidence establishes that St. Joseph abides by the ERDs, as required by the Asset Purchase Agreement and Catholic Identity Agreement.    And Defendants do not dispute that St. Joseph's interpretation of the ERDs corresponds with the guidelines promulgated by the National Catholic Bioethics Center as prohibiting gender-affirming treatment—Dr. Cunningham's testimony supports this as well. (ECF No. 105-6 at 39).

It may be true that St. Joseph prohibits medical personnel from performing hysterectomies on all individuals, regardless of sex, who do not have a medical need for that surgery—i.e., individuals who seek a hysterectomy solely for the purpose of elective sterilization.    However, Mr. Hammons *did* have a medical need for his requested hysterectomy; he was not seeking a hysterectomy for the purpose of elective sterilization.    He sought a hysterectomy to treat his gender dysphoria, as recommended by his doctor.[11]    (ECF No. 98-1 at 15).    Indeed, St. Joseph

---

[11] Dr. Cunningham confirmed that St. Joseph's "policy of not permitting gender transition treatments . . . does not depend on

"frequently" performs hysterectomies, even though they result in sterilization, on patients that have a medical need for that surgery—as long as the medical need is not from gender dysphoria.[12] (ECF No. 105-6 at 30). As Dr. Cunningham confirmed, St. Joseph will allow a doctor to perform a hysterectomy on any patient "so long as [a] hysterectomy is consistent with the standard of care for a given diagnosis," aside from gender dysphoria. (ECF No. 105-6 at 57). A hysterectomy is "consistent with the standard of care" for a gender dysphoria diagnosis, (ECF No. 105-5 at ¶ 28), but unlike other patients seeking a hysterectomy consistent with the standard of care for their respective diagnoses, transgender patients seeking to treat their gender dysphoria are turned away.

Therefore, the policy at issue here is not a neutrally-applicable prohibition on all hysterectomies, or even a prohibition on hysterectomies for the purpose of elective

_____

whether the treatment in question is a sterilization procedure." (ECF No. 105-6 at 59).

[12] Defendants attempt to narrow the exception to only allowing hysterectomies to treat "life-threatening" conditions. (ECF No. 98-1 at 14, 28). There is no evidence to support this characterization of the policy. Dr. Cunningham testified that the use of the term "life-threatening" does "not reflect a medical diagnosis" and instead is "used as a means to understand the implications of the ERDs on a particular procedure." (ECF No. 98-9 at 44). Other deposition testimony that Defendants cite in connection with this term confirms that "physicians aren't required to certify or verify that a patient suffers from a life-threatening condition before scheduling a hysterectomy." (ECF Nos. 98-1 at 13-14, 98-17 at 15).

16

sterilization—it is a prohibition on hysterectomies (along with other gender-affirming surgeries) that are sought by transgender patients for the purpose of treating gender dysphoria. Defendants have not identified any other medical diagnosis that St. Joseph excludes from treatment eligibility in this way; any non-transgender patient seeking a doctor-recommended, medically necessary hysterectomy would not be turned away by Defendants. Thus, the true basis for Defendants' refusal to perform the surgery was Mr. Hammons's transgender status.

Additionally, undisputed evidence establishes that Mr. Hammons's surgery was in fact cancelled because it was for the purpose of treating his gender dysphoria. Dr. Cunningham testified that when Dr. Adashek asked her if he could perform a hysterectomy on Mr. Hammons "for the purpose of . . . transgender surgery," she said, "[N]o, we cannot do transgender surgery at St. [Joseph]." (ECF No. 105-6 at 64). She confirmed that she knew nothing about the procedure or the patient, other than the fact that Mr. Hammons was transgender and sought a hysterectomy for the purpose of gender affirmation, and she stated repeatedly that the only reason she denied permission to perform the surgery was that "it was a gender transition treatment." (ECF No. 105-6 at 67-69). Defendants have not identified evidence that suggests that Mr. Hammons's surgery was cancelled for any other reason. Therefore, Defendants' position that the denial of Mr. Hammons's surgery had nothing to

do with his sex or gender identity is simply not supported by any evidence.

The next inquiry is whether maintaining a policy against providing gender-affirming care at St. Joseph and applying that policy to Mr. Hammons when cancelling his surgery is discrimination on the basis of sex. Recent decisions of the Supreme Court, the United States Court of Appeals for the Fourth Circuit, and district courts in the Fourth Circuit confirm that it is.

The Supreme Court held in *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), that employment discrimination against transgender individuals is sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The Court explained that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 1741. Noting that discrimination occurs under Title VII if sex is one but-for cause of an alleged discriminatory act, the Court added that because "sex is necessarily a but-for *cause* when an employer discriminates against . . . transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking." *Id.* at 1739, 42. Applying that reasoning here, if a hospital has a policy against performing a surgery to treat gender dysphoria—a condition inextricably related to a person's sex—but will perform

18

that surgery to treat any other medical diagnosis, the hospital intentionally relies on sex in its decisionmaking.

Though less recent, the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), also provides a useful framework by which to analyze the present case.  Six Justices agreed in *Price Waterhouse* that discrimination based on a person's nonconformance with sex stereotypes is sex discrimination.  *Id.* at 250-51.  Here, St. Joseph's policy is guided by the National Catholic Bioethics Center's interpretation of the ERDs as prohibiting gender-affirming care because it does not "conform to the true good of the human person, who is a body-soul union unalterably created male or female." (ECF No. 107-3 at 2).  This policy, and the reasoning behind it, implicates sex stereotyping in that it prohibits treatment that facilitates patients' physical nonconformity to their sex assigned at birth.  *See Boyden v. Conlin*, 341 F.Supp.3d 979, 997 (W.D.Wis. 2018) (applying sex-stereotyping theory in determining that a health insurance plan's exclusion of coverage for gender-affirming treatment constituted sex discrimination under Section 1557).

The Fourth Circuit has extended these principles to cases involving Title IX claims, which makes them also applicable to Section 1557 claims.  In *Grimm v. Gloucester County School Board*, 972 F.3d 586, 616-17 (4th Cir. 2020), the Fourth Circuit applied the *Bostock* reasoning and held that a bathroom policy prohibiting

a transgender student from using the boys restrooms discriminated against him on the basis of sex, in violation of Title IX. The court explained that sex discrimination occurred because the school board necessarily referred to the student's sex to determine an "incongruence between sex and gender" in order to exclude him from the boys restrooms. *Id.* at 616. As part of its reasoning, the court relied on the fact that the student "had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys restroom as part of the appropriate treatment," but "[r]ather than contend with [the student's] serious medical need, the [school board] relied on its own invented classification, 'biological gender,'" to deny him access to the boys restrooms. *Id.* 619.[13] Likewise in the present case, Mr. Hammons was diagnosed with gender dysphoria, and the treatment recommended for that diagnosis was a hysterectomy. But rather than recognize Mr. Hammons's medical need, Defendants cancelled his surgery based on a policy against treating gender dysphoria.

The Supreme Court and the Fourth Circuit have yet to extend the principles they have applied in employment and school discrimination cases to discrimination against gender-affirming

---

[13] The court added that the student may have also been discriminated against under the *Price Waterhouse* sex-stereotyping theory based on its policy that "punished [the student] for not conforming to his sex-assigned-at-birth." *Id.* at 617 n.15.

treatment in a healthcare setting.[14]  However, multiple district courts in the Fourth Circuit have done so; because the facts in those cases are closely analogous to the facts in the present case, their reasoning is persuasive here.

In *Fain v. Crouch*, --- F.Supp.3d ---, No. 20-CV-0740, 2022 WL 3051015, at *1 (S.D.W.V. Aug. 2, 2022), transgender Medicaid participants sued the state agencies and officials responsible for administering the West Virginia Medicaid program for sex discrimination in the program's exclusion of the surgical treatment of gender dysphoria.  The court summarized the facts and its conclusion as follows:

> [T]he exclusion in the healthcare plan precludes coverage for [certain] surgical treatments when a person is diagnosed with gender dysphoria.  However, the same or similar surgical treatments are available to persons when the diagnosis requiring that treatment is not gender dysphoria. It is undisputed that the criteria determining whether or not such treatment is covered under

---

[14] Aside from the fact that there is no Supreme Court or Fourth Circuit precedent that directly addresses sex discrimination in the provision of gender-affirming healthcare, Defendants argue that *Bostock* and *Grimm* are distinguishable from the present case because in those cases, the application of the policy would have been different if the person's sex or transgender status were different.  (ECF No. 98-1 at 32-33).  In this case, they argue a hysterectomy still would not have been allowed if Mr. Hammons were a cisgender woman and would have been impossible if he were born with male sex organs.  However, those hypotheticals do not reflect an application of the discriminatory policy at issue here, which is a prohibition on all gender-affirming care.  Nor could any similar hypothetical do so because the policy can only apply to transgender individuals—that is what makes the policy discriminatory.

> the Medicaid Program hinges on a diagnosis—
> but when treatment is precluded for a
> diagnosis based on one's gender identity, such
> exclusion invidiously discriminates on the
> basis of sex and transgender status.

*Id.* Accordingly, the court granted the plaintiffs' motion for summary judgment, and denied the defendants' motion for summary judgment, on the plaintiffs' Section 1557 claim, among other claims. Citing *Bostock*, the court explained that because "a transgender identity is inherent in an individual who suffers from gender dysphoria," the exclusion of coverage for individuals seeking surgical treatment of gender dysphoria "cannot be understood without a reference to sex." *Id.* at 11.

Similarly, in *Kadel v. Folwell*, --- F.Supp.3d ---, No. 19-CV-272, 2022 WL 3226731, at *1 (M.D.N.C. Aug. 10, 2022), transgender individuals who receive health insurance through the North Carolina State Health Plan for Teachers and State Employees ("NCSHP") sued NCSHP—under Section 1557, Title VII, and the Equal Protection Clause—for its exclusion of coverage for gender-affirming treatments. The district court granted summary judgment on a Title VII claim in favor of one of the plaintiffs who was denied coverage by NCSHP for her gender-affirming surgery, and it denied the defendant's motion for summary judgment as to that claim. *Id.* at *29. The court explained that NCSHP covers the same or similar surgery if it is not "leading to or in connection with sex changes or modifications and related care." *Id.* at 28.

Therefore, had the plaintiff not been assigned the sex of male at birth, the treatments would not be to "change" or "modify" her sex. *Id.* The court concluded that, like in *Bostock*, the plaintiff's sex played "an unmistakable and impermissible role in the" decision to deny coverage. *Id.* (quoting *Bostock*, 140 S.Ct. at 1741-42). The court also concluded that, for those same reasons, NCSHP discriminated against the plaintiff for the purposes of Section 1557. *Id.* at 29. In a subsequent opinion, the court granted summary judgment for the plaintiffs on the Section 1557 claim. *Kadel v. Folwell*, No. 19-CV-272, 2022 WL 17415050, at *3 (M.D.N.C. Dec. 5, 2022).

Like in *Fain* and *Kadel*, at issue in the present case is a policy under which a certain surgery is available to individuals seeking treatment for medical diagnoses, as long as those diagnoses are not gender dysphoria. In other words, the criteria that St. Joseph employs in determining eligibility for hysterectomies "hinges on a diagnosis" being unrelated to transgender status. *Fain*, 2022 WL 3051015, at *1. And as the court in *Fain* explained, when treatment is prohibited because of one's diagnosis that is based on one's gender identity, the prohibition "invidiously discriminates on the basis of sex and transgender status."[15]    *Id.*

---

[15] Although the evidence is uncontroverted that Mr. Hammons's surgery was cancelled primarily because of St. Joseph's policy against providing gender-affirming care, (*see* ECF No. 105-6 at 64 ("[N]o, we cannot do transgender surgery at St. [Joseph].")), it

Defendants necessarily and intentionally relied on sex in creating and enforcing a policy that prohibits treatment if a patient's medical need for that treatment is an incongruence between the patient's gender identity and sex assigned at birth. *See Bostock*, 140 S.Ct. at 1746; *Grimm*, 972 F.3d at 608.

Defendants' citation to *Polonczyk v. Anthem BlueCross & BlueShield*, 586 F.Supp.3d 648, 656-57 (E.D.Ky. 2022), is unhelpful. In that out-of-circuit district court case, a health insurance plan excluded all "cosmetic" procedures from coverage, which included certain gender-transition-related procedures. The court dismissed the plaintiff's sex discrimination claim, finding that she "fail[ed] to identify any documents or actions that support a finding that [she] was discriminated against because of her transgender status." *Id.* at 656. It added that because the plan excluded coverage for cosmetic surgeries categorically with limited exceptions, regardless of a plan participant's transgender status, it could not be inferred that the exclusion was intentional sex discrimination. The same is not true in the present case. Unlike in that case, Plaintiff has identified undisputed evidence

---

is worth noting that the result would not change if St. Joseph were also motivated by its policy against sterilization and removing functioning body parts. In proving that sex discrimination has occurred, it is sufficient to demonstrate that sex was one but-for cause of the allegedly discriminatory action, even if other factors played a role. *See Bostock*, 140 S.Ct. at 1739.

that Defendants have a policy specifically against providing gender-affirming care. And Defendants have not identified any other medical diagnoses for which hysterectomies are prohibited other than gender dysphoria.

Defendants also rely on *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), in which the Supreme Court held that discriminating against someone based on pregnancy was not the same as discriminating against someone based on sex under Title VII. Defendants argue that an analogy should be drawn between pregnancy status and transgender status because, like pregnancy, gender-affirming care is "unique (medically, ethically, etc.) such that treating [it] differently cannot be conflated with intentional discrimination against those with a transgender identity." (ECF No. 31-32).

However, Congress amended Title VII in response to that decision, and in doing so, it "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision" by adding "pregnancy, childbirth, or related medical conditions" to the definition of "on the basis of sex." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79 (1983) (citing 42 U.S.C. § 2000e(k)). The Senate Report accompanying those amendments explained that it was the Justices who dissented in *Gilbert* that had "correctly" interpreted Title VII's meaning. S. Rep. No. 95-331, at 2-3 (1977). The dissenters'

25

conclusion, which the Senate Report endorsed, was that "a classification revolving around pregnancy," is "[s]urely," "at the minimum, strongly 'sex related.'" *Gilbert*, 429 U.S. at 149 (Brennan, J., dissenting).  The dissenters reasoned that when a company "devise[s] a policy that, but for pregnancy, offers protection for all [comparable] risks," it discriminates "on the basis of sex" in violation of Title VII.  *Id.* at 160.  The same reasoning applies here: Defendants have "devised a policy" that permits medically necessary, doctor-recommended hysterectomies for "all" diagnoses, "but for" gender dysphoria, which is surely, at the minimum, strongly sex related.  That policy is thus barred under federal anti-discrimination law.  Defendants cite no case law extending the flawed reasoning of the *Gilbert* majority to Section 1557 claims or cases involving transgender status, and given Congress's clear disapproval of that reasoning, this court will not do so here.

For the foregoing reasons, the undisputed facts establish that the decision to cancel Mr. Hammons' hysterectomy pursuant to a policy that prohibits gender-affirming care was discrimination on the basis of his sex.[16]  The question of which, if any, of the

---

[16] In reaching this conclusion, this court does not rely on HHS regulations, given the uncertainty regarding their viability. *See Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 589-95, 599-600 (8th Cir. 2022) (describing the relevant regulatory history).  However, it is notable that HHS filed a Notice of Proposed Rulemaking on August 4, 2022, which states,

Defendants is responsible for that discrimination will be discussed in the following sections.

### B. Defendants' Motion for Summary Judgment and Opposition to Plaintiff's Motion

Defendants moved for summary judgment on two other grounds: 1) UMMS is not a proper defendant and 2) Plaintiff is bound by another court's injunction. Additionally, Defendants contend that this court cannot grant summary judgment for Plaintiff because 1) Plaintiff's position relies on facts in dispute, and 2) St. Joseph is entitled to raise a RFRA defense at trial. None of Defendants' arguments are persuasive for the reasons that follow.

### 1. UMMS's Liability under Section 1557

Defendants argue that UMMS is not a proper defendant for the alleged discriminatory conduct at issue in this case. They argue that only the funding recipient for the specific discriminatory

---

"Discrimination on the basis of sex includes . . . discrimination on the basis of . . . gender identity." Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47916 (proposed Aug. 4, 2022) (to be codified at 45 C.F.R. § 92.101). It also states,

> In providing access to health programs and activities, a covered entity must not . . . [d]eny or limit health services sought for purpose of gender transition or other gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on a patient's sex assigned at birth, gender identity, or gender otherwise recorded."

*Id.* at 47918 (to be codified at 45 C.F.R. § 92.206).

program—which they argue is St. Joseph's surgery department here—can be held liable under Section 1557. (ECF No. 98-1 at 10-12). Because Section 1557, like Title VI, Title IX, and the Rehabilitation Act, is Spending Clause legislation that operates like a contract between the government and the recipient of federal funds in which the recipient agrees to comply with federally imposed conditions, they argue that "liability only attaches to the actual recipient of federal funds for its own misconduct occurring in its own program or activities." (ECF No. 98-1 at 18 (internal quotation marks and emphasis omitted)).

Defendants' argument is faulty for several reasons. It has never been established that only the entity directly responsible for the discriminatory program, and not the entity's parent corporation, can be held liable under Section 1557 or other Spending Clause legislation.[17] As previously noted, Section 1557 prohibits "discrimination under[] any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). The term "health program or activity" is defined in the HHS regulations as "all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance[.]" 45

_____

[17] Notably, Defendants do not argue that only St. Joseph's surgery department is a proper defendant here, which it maintains is the relevant "health program or activity." (ECF No. 98-1 at 19).

C.F.R. 92.3(b) (2020).[18]  UMMS is undoubtedly "principally engaged in the business of providing healthcare" through its network of hospitals; therefore, "all" of its "operations," which would seem to include the hospitals it runs, are under the umbrella of its health programs and activities.[19]  A plain reading of the statute supports a conclusion that UMMS could be held liable under Section 1557 for discrimination that occurs in any of its hospitals.

---

[18] Various litigants have challenged the 2020 HHS regulations as arbitrary and capricious, and those challenges remain pending. HHS's August 4, 2022, Notice of Proposed Rulemaking proposes a revised definition of "health program or activity," but the proposed new definition is broader in scope and includes language almost identical to the previous definition. *See* Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47844, 47912 (proposed Aug. 4, 2022) (to be codified at 45 C.F.R. § 92.4).  Recognizing the uncertainty regarding the regulations, courts have looked to the definitions in Section 504, Title VI, Title IX, and the Age Discrimination Act for additional guidance. *See T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 742-43 (7th Cir. 2022).  The definitions of "program or activity" in those statutes are very similar to definition in the 2020 regulations.  *See* 29 U.S.C. § 794(b) (defining "program or activity" as "all of the operations of"—among other entities—"an entire corporation, partnership, or other private organization, . . . which is principally engaged in the business of providing . . . health care . . . any part of which is extended Federal financial assistance."); 42 U.S.C. § 2000d-4a (same); 20 U.S.C. § 1687 (same); 42 U.S.C. § 6107(4)(same).

[19] *See T.S.*, 43 F.4th at 742-44 (interpreting "all of the operations" of a healthcare company to include an LLC it operated); *see also Doe One v. CVS Pharmacy, Inc.*, No. 18-CV-01031-EMC, 2022 WL 3139516, at *7-14 (N.D.Cal. Aug. 5, 2022) (interpreting "operations" to "encompass the activities of separate subsidiary entities of a business engaged in providing healthcare (as opposed to only such entity's internal operations)").

Defendants' position is also inconsistent with how other Spending Clause legislation is interpreted. The Supreme Court held in *Grove City College v. Bell*, 465 U.S. 555, 556 (1984), that the receipt by some students of federal financial aid triggers Title IX liability only for a college's financial aid program, not for the entire college. However, this decision prompted Congress to pass the Civil Rights Restoration Act of 1987 (the "CRRA"), which superseded *Grove City College* and clarified that "if any part of an educational institution receive[s] federal funds, the institution as a whole must comply with Title IX's provisions." Pub. L. No. 100-259, § 3(a), 102 Stat. 28, 28-29 (1988) (codified as amended at 20 U.S.C. § 1687); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004). Although a program within an entity is different from an entity's subsidiary, Title IX's legislative history undermines Defendants' position that Congress intended to limit the scope of Spending Clause legislation liability to only the parties to the federal funding "contract"—the government and the direct recipient of the funds. *See also T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 744-46 (7th Cir. 2022) (discussing the CRRA's implications for Section 1557).

None of the cases Defendants cite for a limitation on Section 1557 liability support Defendants' position. Defendants rely most heavily on *Davis v. Monroe County Board of Education*, 526 U.S. 629

30

(1999), in which the Supreme Court held that the government's enforcement power under Title IX "may only be exercised against the funding recipient," and it may not be extended to "parties outside the scope of this power." *Id.* at 641; *see also id.* at 640 ("[A] recipient of federal funds may be liable in damages under Title IX only for its own misconduct."). This holding is inapposite here. The Court's holding in *Davis* was in the context of deciding whether a school board—a recipient of federal funds—could be held liable for the discriminatory conduct of a student. The Court held that the school board could not be held liable for the conduct of third parties who did not receive federal funds (i.e., students); however, it clarified that the board *could* be held liable for its own deliberate indifference to student-student harassment. *Id.* at 640-43.

Here, Defendants have all admitted that they have received federal funds, and St. Joseph is a wholly owned subsidiary of UMMS. (ECF Nos. 83 at 9, 105-10 at 5, 8, 23). Their relationship is clearly different from that of a school board and a student. All the other cases Defendants cite for their position are in this school district or university context. *See, e.g.,* *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001); *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018 (7th Cir. 1997); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 901 (1st Cir. 1988).

Even if it were appropriate to stretch the holding in *Davis* to fit the facts of this case, Defendants' position still would fail. In *Davis*, 526 U.S. at 630, as well as *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), the Supreme Court made clear that a school district *can* be held liable under Title IX for teacher-student or student-student sexual harassment if the school district is aware of the misconduct and fails to correct it. Assuming hypothetically that those cases apply here, as Defendants urge, UMMS is not only aware of, but is also responsible for, St. Joseph's adherence to the ERDs—and audits by the National Catholic Bioethics Center—by way of entering into the Asset Purchase Agreement and Catholic Identity Agreement.[20] Further, the control UMMS exerts over the St. Joseph board—through its approval of the CEO, appointment of board members, and approval of certain board actions—suggests that UMMS could remedy this discrimination

---

[20] Defendants resist this conclusion by arguing that "UMMS's agreement to *maintain* St. Joseph's Catholic identity is different from *causing* it." (ECF No. 111 at 13). This is a distinction without a difference, as *Davis* and *Gebser* require no such causal link. Even so, the hospital known as St. Joseph may have had a Catholic identity prior to being owned by UMMS, but St. Joseph, LLC did not exist until UMMS created it and bound it contractually to comply with the ERDs. Further, the attempt to characterize UMMS's involvement in St. Joseph's Catholic identity as passive is belied by the consistently active language in the Asset Purchase Agreement. (*See, e.g.*, ECF No. 99-1 at 86 ("UMMS . . . shall continue to operate [St. Joseph] in a manner consistent with Catholic values and principles," and "UMMS . . . shall ensure that [St. Joseph] establish[es] and maintain[s] the following fundamentals to hold [St. Joseph] accountable for [its] Catholic identity[.]")).

if it chose to do so, or at least cease allowing St. Joseph to operate within its network of hospitals.[21]

Additionally, other courts have determined that a parent corporation *can* be held liable under Section 1557 and other Spending Clause legislation when its subsidiary engages in discrimination. Analogous to this case, the United States Court of Appeals for the Eleventh Circuit held in *Silva v. Baptist Health S. Fl., Inc.*, 856 F.3d 824, 842 (11th Cir. 2017), that a parent organization, which operated two hospitals where alleged discriminatory conduct occurred, could also be held liable under the Rehabilitation Act for its subsidiaries' conduct. The court explained that, because the parent "own[ed] and operate[d] the hospitals at which [the plaintiffs] presented . . . and applie[d] its various policies and procedures to" the subsidiary hospitals, liability was not limited to the "direct service-provider." *Id.*

Similarly, in *T.S.*, 43 F.4th at 738-39, the United States Court of Appeals for the Seventh Circuit held that a healthcare provider was a proper defendant in a Section 1557 suit against its self-funded employee health insurance plan—a separate limited

---

[21] Defendants contend that the extent of UMMS's control over St. Joseph's decision to engage in discriminatory practices is in dispute. (ECF No. 111 at 29-30). However, there are no disputed *facts*; the parties simply have different interpretations of the legal implications of the unchallenged agreements that establish the relationships between Defendants and their obligations to comply with the ERDs. *See infra* Part III.B.3.

liability company ("LLC")—for alleged discrimination perpetrated by the insurance plan. While only the healthcare provider, and not the LLC it operated, received federal funds in that case, the court clarified that "'program or activity' in [S]ection 1557 is not limited to the discrete portion of [a company's] operations that receives Medicare and Medicaid reimbursements." *Id.* at 743. In other words, the Section 1557 obligations imposed on a parent company through its acceptance of federal funds include a duty not to discriminate through the actions of a company that it operates. *See also Doe One v. CVS Pharmacy, Inc.*, No. 18-CV-01031-EMC, 2022 WL 3139516, at *9 (N.D.Cal. Aug. 5, 2022) (holding that parent and subsidiaries were both proper defendants in a Section 1557 suit, even if only the parent received federal funds, because "[t]o ignore the overall interrelationship among the entities which, in the case at bar, design and implement the allegedly discriminatory program . . . would exalt form over substance and impair the effectiveness of the anti-discrimination provision of the [Affordable Care Act]").

At a minimum, UMMS can be held directly liable under Section 1557 for owning and operating a hospital that adheres to discriminatory policies—and ensuring it does so, as required by the contracts entered into by UMMS. For that reason, UMMS is not

entitled to summary judgment on this basis, nor does it prevent Plaintiff from succeeding on his summary judgment motion.[22]

## 2. *Religious Sisters of Mercy* Injunction

Defendants argue that St. Joseph is shielded from Plaintiff's Section 1557 claim by an injunction issued by the United States District Court for the District of North Dakota in *Religious Sisters of Mercy v. Azar*, 513 F.Supp.3d 1113 (D.N.D. 2021), *judgment entered sub nom. Religious Sisters of Mercy v. Cochran*, No. 3:16-cv-00386, 2021 WL 1574628 (D.N.D. Feb. 19, 2021). (ECF No. 98-1 at 22-28). In that case, Catholic organizations sued the United States Department of Health and Human Services ("HHS") and its Secretary in his official capacity, challenging an implementation of Section 1557 and its regulations. *Id.* at 1122. The plaintiffs argued that interpreting or applying Section 1557 to require them to perform gender-transition procedures violates RFRA.[23]  *Id.*  The court agreed, and it issued a permanent injunction:

> PERMANENTLY ENJOIN[ING] AND RESTRAIN[ING] HHS, Secretary Azar, their divisions, bureaus,

---

[22] Plaintiff also argues that UMMS can be held indirectly liable for its subsidiary's actions under a piercing-of-the-corporate-veil theory. (ECF No. 105-1 at 38-41). Because this court concludes that UMMS can be held directly liable for its participation in the alleged discrimination under the text of Section 1557 and Spending Clause legislation case law, it need not address this argument.

[23] The case also involved other parties and other claims not relevant here.

> agents, officers, commissioners, employees,
> and anyone acting in concert or participation
> with them . . . from interpreting or enforcing
> Section 1557 of the ACA . . . or any
> implementing regulations thereto against the
> Catholic Plaintiffs in a manner that would
> require them to perform . . . gender-
> transition procedures, including by denying
> federal financial assistance because of their
> failure to perform . . . such procedures or by
> otherwise pursuing . . . other enforcement
> actions.

*Id.* at 1153-54.

The "Catholic Plaintiffs" include two separate sets of plaintiffs, one of which the court referred to as the "Catholic Benefits Association Plaintiffs." *Id.* at 1131, 33. The Catholic Benefits Association ("CBA") is a "nonprofit corporation and Catholic ministry" whose membership includes "over 1,030 employers and 5,100 Catholic parishes" who "commit to providing benefits or services consistent with Catholic values." *Id.* at 1133. These plaintiffs included the unnamed members, "present and future," of the Catholic Benefits Association that meet certain criteria. *Id.* at 1154. In addition, the "Catholic Benefits Association Plaintiffs" included three named plaintiffs, who are members of the CBA. *Id.* at 1133.

Defendants explain that St. Joseph has recently joined the CBA, having met the criteria required to do so. (ECF No. 98-1 at 24). They argue that, therefore, St. Joseph is covered by this injunction.

HHS appealed the district court's grant of permanent injunctive relief to the plaintiffs, and since the Defendants filed their motion, the United States Court of Appeals for the Eighth Circuit issued an opinion affirming the district court's ruling in all but one respect. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022). The Eighth Circuit held that the district court erred in concluding that "CBA had associational standing to sue on behalf of its unnamed members" because the CBA had not identified particular members and their injuries. *Id.* at 601-02. Accordingly, the court "affirm[ed] the district court's grant of permanent injunctive relief to the plaintiffs except to the extent it recognizes the associational standing of the CBA" and remanded for further proceedings consistent with the opinion. *Id.* at 609.

The Eighth Circuit's recent ruling that CBA lacked standing to proceed on behalf of its unnamed members in the lawsuit puts into question the viability of St. Joseph's argument that it is covered, as an unnamed member of the CBA, by the *Religious Sisters of Mercy* injunction. However, as Defendants point out, the injunction is still technically in place until the district court acts on remand from the Eighth Circuit. (ECF No. 118). Regardless of how the injunction is revised on remand, Defendants' argument lacks merit.

Mr. Hammons was not a party to the lawsuit in North Dakota and is not enjoined by the terms of the injunction—only HHS and its agents are. Defendants argue that Mr. Hammons should be considered in privity with HHS, as a "third-party beneficiary" of the Spending Clause legislation "contract between the Government and the funding recipient," because a private plaintiff's right of action is only as extensive as HHS's enforcement power. (ECF No, 98-1 at 25). However, Mr. Hammons's private right of action is different from a potential enforcement action against St. Joseph by HHS. A private litigant sues for violations of Spending Clause legislation to vindicate his own rights and to recover damages only for himself, whereas an enforcement action by the government would be to terminate federal funding based on a funding recipient's "breach" of the Spending Clause legislation "contract." *See Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 191 (4th Cir. 1999) ("Title VI creates a two-pronged attack on discrimination by federal funding recipients: direct action against those recipients by private parties and action by funding agencies to secure voluntary compliance or to terminate funds altogether." (citations omitted)). Therefore, an injunction against government enforcement is not the same as an injunction against private lawsuits.

To hold otherwise would be an improper extension of a federal court's equitable powers to individuals not party to a case who

did not have an opportunity to be heard.  *See* Fed.R.Civ.P. 65(d)
("Every order granting an injunction . . . binds only . . . (A)
the parties; (B) the parties' officers, agents, servants,
employees, and attorneys; and (C) other persons who are in active
concert or participation with any described in [(A) or (B)].");
*see also Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13 (1945)
("The courts . . . may not grant an enforcement order or injunction
so broad as to make punishable the conduct of persons who act
independently and whose rights have not been adjudged according to
law."); *Whole Woman's Health v. Jackson*, 142 S.Ct. 522, 535 (2021)
("[U]nder traditional equitable principles, no court may enjoin
the world at large, or purport to enjoin challenged laws
themselves." (internal quotation marks and citations omitted)).
And equitable considerations weigh strongly against binding Mr.
Hammons and St. Joseph under the injunction, given how different
the parties' positions are from the parties in *Religious Sisters
of Mercy*—St. Joseph's status as a state entity being a notable
difference.  *See infra* Part. III.B.4.  This court will not apply
the injunction to the parties in this case.

### 3. Disputes of Material Fact

Plaintiff contends that no material facts are in dispute with
regard to the legal relationship of all three Defendants and their
collective responsibility for the sex discrimination.  (ECF No.
114 at 10).  Defendants, however, argue that certain facts upon

which Plaintiff relies are in dispute—specifically those related
to the corporate relationships between the parties and to St.
Joseph's policies and motives.  (ECF No. 111 at 28-34).

First, Defendants argue that it remains in dispute "whether
UMMS directly 'caused' or 'forced' St. Joseph to discriminate and
whether it was the 'final decisionmaker for the challenged
practice.'"    Defendants take issue with Plaintiff's
characterization of the Asset Purchase Agreement as evidence that
UMMS caused St. Joseph to discriminate, where there is no evidence
that "St. Joseph would have abandoned its adherence to the ERDs
had UMMS not acquired the hospital."  (ECF No. 111 at 29).  This
"dispute" is neither factual nor material.  Rather, it reflects a
difference in characterization of undisputed facts.   It is
undisputed that UMMS purchased St. Joseph and that a condition of
that purchase was that UMMS continue to operate St. Joseph as a
Catholic hospital.   It is also undisputed that Defendant St.
Joseph, LLC was created by UMMS, and that UMMS signed agreements
to bind that newly created LLC to adhere to the ERDs in its
provision of medical care.  Whether that amounts to "forcing" St.
Joseph to adhere to the ERDs is more of a legal question than a
factual one.

Regardless, the answer to that question is immaterial because
it is only relevant, as explained previously, if the principles of
*Davis* are appropriately applied to this case—this court does not

accept that premise.  And even if *Davis* did apply, the Supreme Court held in that case that a school district could be held liable for merely remaining deliberately indifferent to harassment—causation is not required.  *Davis v. Monroe County Board of Education*, 526 U.S. 629, 640-43 (1999).  Purely undisputed facts establish that UMMS maintains a health program that discriminates on the basis of sex, so Defendants cannot evade summary judgment on that basis.[24]

Defendants contend that Plaintiff "also relies on disputed facts about St. Joseph's policies and motives," specifically that Mr. Hammons's surgery was "cancelled *because of* his gender dysphoria." (ECF No. 111 at 31).  They argue that record evidence supports a conclusion that St. Joseph has a policy against performing hysterectomies for the purpose of sterilization and that it only performs hysterectomies if the patient's uterus was diseased or if the patient has some other life-threatening condition, like excessive bleeding.  However, accepting the fact that St. Joseph has a policy against performing hysterectomies for the purpose of sterilization, that is irrelevant here because Mr. Hammons did not seek a hysterectomy for the purpose of

---

[24] Defendants also argue that disputed facts regarding corporate relationships exist as relevant for Plaintiff's veil-piercing theory.  As previously noted, this opinion does not rely on that theory in determining that UMMS is a proper defendant. *See supra* note 25.

sterilization.  And the evidence does not support that St. Joseph only allows hysterectomies to treat life-threatening conditions; while it certainly supports that St. Joseph *will* perform a hysterectomy to treat a life-threatening condition, the evidence conclusively shows that "life-threatening" is not a requirement. *See supra* note 15.  Rather, with the exception of procedures sought by transgender patients to treat gender dysphoria, St. Joseph will perform any hysterectomy "so long as [it] is consistent with the standard of care for a given diagnosis."  (ECF No. 105-6 at 30, 57).

More importantly, there is no evidence to support Defendants' assertion that Mr. Hammons's surgery was cancelled for either of those reasons.  The undisputed evidence establishes that Mr. Hammons's surgery was cancelled because "it was a gender transition treatment."  (ECF No. 105-6 at 67-69).  Even accepting that St. Joseph does have those policies that, in other cases, may be a relevant consideration in authorizing a hysterectomy, St. Joseph specifically denied Mr. Hammons's surgery because of its policy against providing gender-affirming care.  Defendants point to no evidence that suggests St. Joseph does not have such a policy, and St. Joseph's corporate designee admitted that it does.  (ECF No. 105-6 at 57).  And as previously noted, all that is required is that sex discrimination was one of the reasons behind a covered

entity's adverse decision, and undisputed facts establish that
that is the case here. *See supra* note 18.

### 4. RFRA Defense

Finally, Defendants argue that even if they are not entitled
to summary judgment for the reasons previously discussed,
Plaintiff is not entitled to summary judgment against St. Joseph
because St. Joseph is entitled to raise a RFRA defense at trial.
(ECF No. 111 at 34-39).

The parties have, at times, engaged in a sort of legal
gymnastics as they try to wend their way through the labyrinth of
state action, sovereign immunity, standards of review, and
statutory interpretation. Neither side has been immune to this
malady. Plaintiff, as ably pointed out by Defendants, tried to
find daylight between state action and sovereign immunity in a
vain attempt to sustain an action under 42 U.S.C. § 1983.
Defendants were content to sink or swim together when it seemed to
suit their purposes, but now seek to differentiate themselves into
two (but not three) separate entities. Pleading in the
alternative, and even making alternative arguments, is entirely
permissible. Relying on one set of facts which win the day and
then arguing the opposite may not be. The doctrine of judicial

estoppel precludes such chicanery.[25]  While the parties have not
transgressed that line, they came perilously close.

Defendants have always taken the primary position that all of
them are private corporations, not instrumentalities of the state,
and thus cannot be liable under § 1983.  They did argue, that if
they are state actors for purposes of § 1983, they are also

---

[25] The Fourth Circuit described the doctrine in *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019):

> As the Supreme Court has explained, judicial estoppel is an equitable doctrine, designed to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (internal quotation marks omitted). Typically, judicial estoppel is reserved for cases where the party to be estopped . . . has taken a later position that is "clearly inconsistent" with her earlier one; has persuaded a court to adopt the earlier position, creating a perception that "either the first or the second court was misled"; and would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51 (internal quotation marks omitted).  Finally, and central to this case, there is the longstanding principle that judicial estoppel applies only when "the party who is alleged to be estopped *intentionally* misled the court to gain unfair advantage," and not when "a party's prior position was based on inadvertence or mistake." *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995) (emphasis added) (internal quotation marks omitted); *accord New Hampshire*, 532 U.S. at 753 (quoting *John S. Clark*, 65 F.3d at 29).

entitled to sovereign immunity. So, while they succeeded in having those claims dismissed, it was not based on their primary argument. What they did argue, however, was that all three could be treated together, allowing presumably the two St. Joseph entities to benefit from the status of UMMS, and vice versa. At this stage, in contrast, Defendants seek to split the entities, so that, as discussed above, UMMS can argue that it is not responsible for discrimination by St. Joseph's, and St. Joseph's can argue that it may assert the RFRA defense. Despite this switch in strategy, Defendants' argument fails.

Because St. Joseph is a state actor, it simply may not assert this defense. As noted in connection with Defendants' motion for leave to amend answer to assert this defense, Defendants acknowledge that the defense is not available to state actors. (ECF No. 73-1 at 7). By the time Defendants sought to assert the defense, the court had ruled that they, as a single unit of three entities,[26] were entitled to sovereign immunity as to the § 1983 claims precisely because they were an instrumentality of the state. And St. Joseph has not sought reconsideration of that ruling.

---

[26] It is somewhat disingenuous for Defendants to suggest that Plaintiff or the court itself was responsible for treating the three defendants as a single entity, when their motion did precisely that, denoting the three as the "Medical System". That motion made no attempt to differentiate St. Joseph from UMMS for the purpose of state actor analysis, or any other. (*See* ECF No. 39-1).

Rather, Defendants seem to believe that they are free to dispute the facts that the court relied on earlier in this litigation. Consideration of those purported additional facts does not show that St. Joseph is not an instrumentality of the state.

The question is whether wholly owned subsidiaries of state actors are also state actors. There is very little case law addressing this issue, but the case law that does exist suggests that wholly owned subsidiaries of state actors are also state actors. *See Verdon v. Consol. Rail Corp.*, 828 F.Supp. 1129, 1132, 38 (S.D.N.Y. 1993) (holding that "a public-benefit corporation which is a wholly owned subsidiary of the" state transit authority "would clearly be a . . . 'state actor'"); *Gunter v. Long Island Power Auth./Keyspan*, No. 08-CV-498(RRM)(LB), 2011 WL 1225791, at *7-8 (E.D.N.Y. Feb. 15, 2011) (holding that a power company, which was a wholly owned subsidiary of a state power authority, was a state actor because it was "controlled by an agency of the state"); *Gherity v. Pfaff*, 216 F.Supp.3d 975, 979 (D.Minn. 2016) (holding that a county medical center, "as a subsidiary of" a county, was a state actor). This makes sense logically and for public policy reasons—the same rules that apply to a governmental entity should apply to a sub-entity that it operates.

The question is not whether some of the day-to-day operations of St. Joseph's are controlled within its own corporate structure, or who ultimately made the decision to prohibit Mr. Hammons'

surgery.  Instrumentality of the state analysis, as discussed at length in this court's earlier opinion, depends on assessment of many factors.  Defendants have not pointed to any facts that undermine the earlier conclusion.

If St. Joseph is not a state actor, the court would then need to assess a very difficult question: whether St. Joseph can assert a RFRA defense in this case brought by a private individual, given that RFRA prohibits only the "[g]overnment" from "substantially burden[ing]" a person's exercise of religion.  42 U.S.C. § 2000bb-1.  While the Supreme Court and the Fourth Circuit have never addressed the issue of whether RFRA applies to suits involving only private parties, and there is a circuit split on the issue, the weight of circuit court authority tips in favor of a conclusion that it does not.

The three circuit courts that have allowed a private defendant's RFRA defense in a suit by a private plaintiff are feeble support for Defendants' position.  The United States Court of Appeals for the Second Circuit held that a RFRA defense could apply to a suit brought by a private plaintiff in *Hankins v. Lyght*, 441 F.3d 96, 103 (2$^d$ Cir. 2006).  However, the Second Circuit has since expressed doubt about the strength of the reasoning in that case, based on the text and operation of RFRA.  *See Rweyemamu v. Cote*, 520 F.3d 198, 203-04, 203 n.2 (2$^d$ Cir. 2008).  In *In re Young*, 82 F.3d 1407, 1416-17 (8th Cir. 1996), *vacated, sub nom.*

*Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997), *reinstated, sub nom. In re Young*, 141 F.3d 854 (8th Cir. 1998), the United States Court of Appeals for the Eighth Circuit allowed a RFRA defense in a bankruptcy case. However, its reasoning in doing so was based on the fact that the bankruptcy court that heard the case was a "branch" of the government that would be implementing federal bankruptcy law—the unique bankruptcy context in that case makes it less persuasive in the present case. Finally, in *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996), the United States Court of Appeals for the District of Columbia Circuit allowed a RFRA defense in a case involving both the Equal Employment Opportunity Commission and a private plaintiff; however, it did not analyze the question, let alone state whether RFRA would apply if the private plaintiff had sued alone.

On the other hand, multiple circuit courts have explicitly rejected the notion that RFRA can apply in a suit involving only private parties. The United States Court of Appeals for the Sixth Circuit held in *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010), that "the [RFRA] defense does not apply in suits between private parties." It reasoned that "[t]he text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party." *Id.* The United States Court of Appeals for the Seventh

Circuit in *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015), held that, "[b]ased on RFRA's plain language, its legislative history, and the compelling reasons offered by our sister circuits, . . . RFRA is not applicable in cases where the government is not a party." *See also Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171 (2012) (stating that "RFRA is applicable only to suits to which the government is party" and referring to the Second Circuit's decision in *Hankins* as "unsound"). The United States Court of Appeals for the Ninth Circuit applied an "under color of law" requirement in *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834-43 (9th Cir. 1999), and concluded that, in the absence of a nexus between a private party and the government, RFRA did not apply to that party.

Additionally, several district courts in this circuit have held that RFRA cannot apply in suits where the government is not a party. *See Billard v. Charlotte Catholic High School*, No. 3:17-cv-00011, 2021 WL 4037431, at *15-22 (M.D.N.C. Sept. 3, 2021) (analyzing the question extensively and concluding "that RFRA does not apply to suits between purely private parties"); *Doe v. Catholic Relief Servs.*, No. 20-cv-1815-CCB, 2022 WL 3083439, at *5-6 (D.Md. Aug. 3, 2022) ("This court finds as a matter of law that RFRA restricts the government rather than private parties,

49

and so [the defendant] may not assert RFRA as an affirmative defense against [the plaintiff's] claims."); *Goddard v. Apogee Retail LLC*, No. 19-cv-3269-DKC, 2021 WL 2589727, at *8 (D.Md. June 24, 2021) (dismissing a claim predicated on RFRA because it "places restrictions on the government, not private parties").

Other courts have been persuaded by the dissent by then Circuit Judge Sotomayor in *Hankins*. She reasoned as follows:

> Two provisions of the statute implicitly limit its application to disputes in which the government is a party. Section 2000bb-1(c) states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a *government*" (emphasis added). In the majority's view, we should read this provision as "broadening, rather than narrowing, the rights of a party asserting the RFRA." Maj. Op. at 103. This interpretation would be questionable even if Section 2000bb-1(c) were the only provision of the statute affecting the question of whether RFRA applies to private suits. When read in conjunction with the rest of the statute, however, it becomes clear that this section reflects Congress's understanding that RFRA claims and defenses would be raised only against the government. For instance, section 2000bb-1(b) of RFRA provides that where a law imposes a substantial burden on religion, the "*government*" must "demonstrate[] . . . that application of the burden" is the least restrictive means of furthering a compelling governmental interest (emphasis added). The statute defines "demonstrate" as "meet[ing] the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). Where, as here, the government is not a party, it cannot "go[] forward" with any evidence.

50

441 F.3d at 114-15 (Sotomayor, J., dissenting) (alterations in original).  If St. Joseph were not a state actor, the growing weight of authority recited above would counsel in favor of finding that it could not assert RFRA in a case brought by a private party.

For the aforementioned reasons, RFRA is not applicable in this case.

### C. Resolution of Cross-Motions

This court has determined that undisputed facts establish that, as a matter of law, Defendants discriminated against Plaintiff on the basis of his sex; UMMS is a proper defendant—all three Defendants are health programs or activities that receive federal funds; St. Joseph is not covered by the *Religious Sisters of Mercy* injunction; there are no material facts in dispute; and St. Joseph may not assert a defense based on RFRA.  In light of those determinations, Plaintiff is entitled to summary judgment in his favor on his Section 1557 claim, and Defendants' motion for summary judgment will be denied.

Any remaining questions as to damages—to the extent that there are any—are reserved for trial.

### D. Motions to Seal and/or File Certain Documents Publicly

Finally, the following motions by the parties related to the sealing of documents are pending:

> **1.** Defendants' Motion for Leave to File Exhibits Under Seal (ECF No. 100)

51

**2.** Plaintiff's Consolidated Interim Sealing Motion, Motion for Leave to File Certain Documents Under Seal, and Motion for Leave to File Certain Documents Publicly (ECF No. 104)

**3.** Plaintiff's Consolidated Interim Sealing Motion, Motion for Leave to File Certain Documents Under Seal, and Motion for Leave to File Certain Documents Publicly (ECF No. 113)

In compliance with to the parties' Stipulated Order Regarding Confidentiality of Discovery Material, (ECF Nos. 69, 70), the parties filed certain materials designated "confidential" under seal and moved simultaneously for leave to file them under seal, pursuant to Local Rule 104.13(c). Local Rule 105.11 provides that motions to seal "shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." However, a "more rigorous First Amendment standard" applies "to documents filed in connection with a summary judgment motion in a civil case," as "summary judgment adjudicates substantive rights and serves as a substitute for a trial." *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252-53 (4th Cir. 1988). Each motion will be addressed in turn.

### 1. Defendants' Motion to Seal

Defendants moved to file Exhibits 2, 7, 10, 13, 15, and 19 to their motion for summary judgment under seal. (ECF No. 100). Exhibits 10, 15, and 19 are excerpts from depositions that contain "confidential information regarding" Plaintiff's and other

individuals' "medical history and diagnoses." Plaintiff does not oppose the filing of those documents under seal. (ECF No. 102). Accordingly, the motion will be granted as to those documents.

The other exhibits are documents related to Defendants' corporate formation, structure, and contractual obligations: Exhibit 2 is the Asset Purchase Agreement, Exhibit 7 is the Catholic Identity Agreement, and Exhibit 13 is the St. Joseph Operating Agreement. Defendants argue that those documents contain "proprietary business information including internal policies and procedures which, if made public could cause competitive harm." They add that redaction or less drastic alternatives are not possible because "redaction will not allow the [c]ourt to fully evaluate the testimony and information provided in these exhibits." Plaintiff opposes the motion because the documents "go to the heart of the dispute in this case."

This opinion relies on and quotes heavily from those three agreements. Therefore, the First Amendment requires that they remain unsealed except "on the basis of a compelling . . . interest, and only if [the sealing] is narrowly tailored to serve that interest." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4ᵗʰ Cir. 1988). Defendants' assertions of risks of "competitive harm" are too vague and overbroad, and sealing the entirety of the three documents is not narrowly tailored to serve any potential interest in doing so. And Defendants' reason for

rejecting less drastic alternatives is unpersuasive. As Plaintiff points out, Defendants could seek to file redacted versions of the documents publicly, while filing unredacted versions with the Court under seal. Therefore, Defendants' motion will be denied as to Exhibits 2, 7, and 13 to their motion for summary judgment. Should they seek to, they can file another motion to seal with proposed redactions to those documents. In doing so, however, they must clearly substantiate the basis for any requested redactions. The documents will remain under seal for another 14 days, although this memorandum is not under seal. Thus, the excerpts quoted or referenced herein must, at some point, be unsealed.

### 2. Plaintiff's First Motion to Seal and File Publicly

Plaintiff moved to file Exhibits 2, 11, 19, and 20 to his motion for summary judgment under seal. (ECF No. 104). Those documents are a letter and depositions that contain Plaintiff's medical information. Defendants do not oppose the motion as to those documents. (ECF No. 108). Accordingly, the motion to seal those documents will be granted.

Plaintiff also moved to file publicly Exhibits 13, 14, 16, and 22 to his motion for summary judgment, which were designated "confidential" under the Stipulated Order. (ECF No. 104). Exhibit 13 is a copy of a policy document from the National Catholic Bioethics Center, which is available publicly. Defendants agree

that there is no reason to seal a publicly available document, so they do not oppose Plaintiff's motion as to that document. (ECF No. 108). However, Defendants oppose the public filing of the other three documents: Exhibit 14 is a copy of the results of the National Catholic Bioethics Center's 2019 audit of St. Joseph; Exhibit 16 is an email chain among St. Joseph personnel about whether a phalloplasty could be performed on a transgender male at St. Joseph; and Exhibit 22 is an email chain among St. Joseph personnel after the events in this case about creating an alert when the word "gender" appears in a surgery scheduling request.

Defendants argue that Exhibits 14 and 22 "contain sensitive business information that is not otherwise available to the public" and that could cause "competitive harm" if disclosed. (ECF No. 108). They argue that Exhibit 16 contains sensitive personal health information about a patient, and that even though the patient's name is not included, there is still a risk that public disclosure of the document could lead to the patient being publicly identified.

Although this opinion does not rely directly on any of those three documents, they are relevant to the issues decided in the motions for summary judgment, so First Amendment considerations require careful scrutiny of the need to file them under seal. Defendants have not elaborated on what "competitive harm" could result from public access to the results of the audit or the

conversations about flagging diagnoses involving "gender." And the email conversations surrounding whether a penile reconstruction surgery could occur at St. Joseph do not contain any personally identifiable information—the personnel speak in general terms about the surgery sought and whether it would violate the ERDs. Defendants' opposition is devoid of any "specific factual representations to justify" sealing any of those three documents. Because Defendants have not made a sufficient showing as to why these documents should be sealed, Plaintiff's motion to file publicly as to those documents will be granted as well.

### 3. Plaintiff's Second Motion to Seal and File Publicly

Plaintiff moved to file Exhibit 1 to his reply memorandum, (ECF No. 114), under seal, and Exhibit 3 to that memorandum publicly. (ECF No. 113). The parties stipulated and "agreed that a public version of Exhibit 3 [to Plaintiff's Reply] containing the redactions proposed" may be filed. (ECF No. 116). They attached a proposed redacted exhibit. (ECF No. 116-1). Defendants did not file a response in opposition to filing Exhibit 1 under seal. Exhibit 1 contains additional portions of the same deposition testimony in Exhibit 10 to Defendants' motion for summary judgment, which the parties agreed to seal because it contains plaintiff's medical information. However, the single page in Exhibit 1 to Plaintiff's reply memorandum does not contain any personal medical information about anyone. Seeing no

legitimate justification for sealing the document, Plaintiff's motion will be denied as to Exhibit 1; it will be granted as to the agreed-upon redacted version of Exhibit 3.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment will be granted, Defendants' motion for summary judgment will be denied, Defendants' motion to file documents under seal will be granted in part and denied in part, Plaintiff's first motion to file certain documents under seal and certain documents publicly will be granted, and Plaintiff's second motion to file certain documents under seal and certain documents publicly will be granted in part and denied in part. A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
