**Nos. 23-1394, 23-1452**

---

# In the
# United States Court of Appeals
# for the Fourth Circuit

---

JESSE HAMMONS,

*Plaintiff-Appellant-Cross-Appellee*,

v.

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORP., ET AL.,

*Defendants-Appellees-Cross-Appellants*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND, HON. DEBORAH K. CHASANOW
(NO. 20-CV-2088)

---

## SUPPLEMENTAL APPENDIX

---

Yaakov M. Roth
  *Counsel of Record*
Brinton Lucas
Joshua S. Ha
Caleb P. Redmond
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
yroth@jonesday.com

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss | 11/23/2020 | 47 | SA1 |
| Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment | 07/25/2022 | 105-1 | SA45 |
| Reply Memorandum of Law in Further Support of Plaintiff's Cross-Motion for Summary Judgment | 09/06/2022 | 114 | SA92 |
| Joint Motion to Defer Filing of Motion Requesting Attorney's Fees | 03/14/2023 | 134 | SA121 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JESSE HAMMONS,                                    )
                Plaintiff,              )
                           )
     v.                                          )      Case No. 20-cv-2088-ELH
                           )
UNIVERSITY OF MARYLAND MEDICAL SYSTEM            )
     CORPORATION, et al.,                       )
                           )
              Defendants.                 )
_____)

## PLAINTIFF'S MEMORANDUM OF LAW IN
## <u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 2

LEGAL STANDARD ............................................................................................ 6

ARGUMENT .......................................................................................................... 7

I.    MR. HAMMONS HAS ESTABLISHED ARTICLE III STANDING ........... 7

    A.    Mr. Hammons's Injuries Are Fairly Traceable to Defendants' Conduct ........ 8

        1.    Defendants Directly Caused Mr. Hammons's Injuries ............................. 8

        2.    Mr. Hammons's Surgeon Did Not Break the Chain of Causation ............ 9

    B.    The Requested Relief Will Redress Mr. Hammons's Injuries ........................ 13

II.    DEFENDANTS CAN BE HELD LIABLE UNDER SECTION 1983 .............. 13

    A.    UMMS Is a State Actor .................................................................................. 14

        1.    UMMS Fulfills the Criteria Set Out in *Lebron* ...................................... 14

        2.    Because UMMS Satisfies *Lebron*, the Close Nexus Test Is Irrelevant ........................................................................................... 17

    B.    UMMS Does Not Enjoy Sovereign Immunity ............................................... 19

        1.    The State of Maryland Has Stripped UMMS of Sovereign Immunity .......................................................................................... 19

        2.    UMMS Is Not an Arm of the State for Eleventh Amendment Purposes ........................................................................................... 21

        3.    UMMS Is a "Person" Under 42 U.S.C. § 1983 ...................................... 22

III.    MR. HAMMONS HAS ALLEGED A VIABLE ESTABLISHMENT CLAUSE CLAIM ................................................................................................ 22

IV.    DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES THE EQUAL PROTECTION CLAUSE ........................................................... 29

    A.    The Hospital Singles Out Transgender Patients' Surgeries to Treat Gender Dysphoria for Different and Unequal Treatment ........................ 29

    B.    St. Joseph's Policy Against Providing Medically Necessary Surgery for Transgender Patients with Gender Dysphoria Facially Discriminates Based on Sex and Transgender Status ................................................... 30

V.    DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES SECTION 1557 OF THE AFFORDABLE CARE ACT ................................ 34

CONCLUSION ....................................................................................................... 35

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air Evac EMS, Inc. v. Cheatham,*
910 F.3d 751 (4th Cir. 2018) ....................................................................7, 10, 11

*Am. Legion v. Am. Humanist Ass'n,*
139 S. Ct. 2067 (2019) ..............................................................................23

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................................7

*Barghout v. Bureau of Kosher Meat & Food Control,*
66 F.3d 1337 (4th Cir. 1995) ....................................................................24

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
512 U.S. 687 (1994) ......................................................................24, 25, 27

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................................................6

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................10, 11

*Bostock v. Clayton Cty.,*
140 S. Ct. 1731 (2020) ....................................................................33, 34, 35

*Boyden v. Conlin,*
341 F. Supp. 3d 979 (W.D. Wis. 2018) ................................................33, 34

*Bradfield v. Roberts,*
175 U.S. 291 (1899) ............................................................................28, 29

*Buxton v. Kurtinitis,*
862 F.3d 423 (4th Cir. 2017) ....................................................................26

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v.
Martinez,* 561 U.S. 661 (2010) ................................................................32

*Commack Self-Serv. Kosher Meats, Inc. v. Weiss,*
294 F.3d 415 (2d Cir. 2002) ....................................................................24

*Cooksey v. Futrell,*
721 F.3d 226 (4th Cir. 2013) ......................................................................9

*Daniel v. Paul,*
395 U.S. 298 (1969) ..................................................................................12

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................7

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ...........................................................2, 7

*Evans v. B.F. Perkins Co.*,
   166 F.3d 642 (4th Cir. 1999) ................................................................6

*Faulkner v. Jones*,
   51 F.3d 440 (4th Cir. 1995) ................................................................31

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ...............................................32

*Geduldig v. Aiello*,
   417 U.S. 484 (1974) .............................................................................32

*Grimm v. Gloucester Cty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ........................................... *passim*

*Hack v. President & Fellows of Yale Coll.*,
   237 F.3d 81 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v.*
   *Sorema N.A.*, 534 U.S. 506 (2002) ....................................................15

*Harter v. Vernon*,
   101 F.3d 334 (4th Cir. 1996) ..............................................................22

*Hartmann v. Calif. Dept. of Corr. & Rehab.*,
   707 F.3d 1114 (9th Cir. 2013) ..............................................................7

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964) .............................................................................12

*Herron v. Fannie Mae*,
   861 F.3d 160 (D.C. Cir. 2017) ............................................................17

*Hess v. Port Auth. Trans-Hudson Corp.*,
   513 U.S. 30 (1994) ...............................................................................22

*Horvath v. Westport Library Ass'n*,
   362 F.3d 147 (2d Cir. 2004) ................................................................18

*Hutto v. S.C. Ret. Sys.*,
   773 F.3d 536 (4th Cir. 2014) ..................................................19, 21, 22

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.*
   *Johnson Controls, Inc.*, 499 U.S. 187 (1991) ....................................35

*Kadel v. Folwell*,
    446 F. Supp. 3d 1 (M.D.N.C. 2020) ........................................31, 33, 34

*Kerpen v. Metro. Washington Airports Auth.*,
    907 F.3d 152 (4th Cir. 2018) ........................................15, 16, 18

*Lambeth v. Bd. of Comm'rs of Davidson Cty.*,
    407 F.3d 266 (4th Cir. 2005) ........................................28

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ........................................12

*Lange v. Houston Cty.*,
    No. 5:19-cv-392, 2020 WL 6372702 (M.D. Ga. Oct. 30, 2020) ..........32

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982) ........................................24, 28

*Larson v. Valente*,
    456 U.S. 228 (1982) ........................................24

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ........................................32

*Lawson v. Union Cty. Clerk of Court*,
    828 F.3d 239 (4th Cir. 2016), *as amended* (July 8, 2016) ..........21

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ........................................ *passim*

*Lee v. Weisman*,
    505 U.S. 577 (1992) ........................................25

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ........................................ *passim*

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (4th Cir. 2013) ........................................8, 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................7, 8

*Lund v. Rowan Cty.*,
    863 F.3d 268 (4th Cir. 2017) ........................................23, 26, 28

*Mackey v. Dorsey*,
    104 Md. App. 250 (Md. 1995) ........................................9

*Md. Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020), *as amended* (Aug. 31, 2020) ...................................8

*McCreary Cty. v. ACLU of Ky.*,
    545 U.S. 844 (2005) ...........................................................................................24, 26

*MedSense, LLC v. Univ. Sys. of Md.*,
    420 F. Supp. 3d 382 (D. Md. 2019) ...........................................................................20

*Mellen v. Bunting*,
    327 F.3d 355 (4th Cir. 2003) ...................................................................................27

*Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp.*,
    855 F.3d 573 (4th Cir. 2017) ...............................................................15, 16, 17, 18

*Moore v. Williamsburg Reg'l Hosp.*,
    560 F.3d 166 (4th Cir. 2009) ...........................................................................17, 18

*Mueller v. Allen*,
    463 U.S. 388 (1983) .................................................................................................28

*Myers v. Loudoun Cty. Pub. Sch.*,
    418 F.3d 395 (4th Cir. 2005) ...................................................................................25

*Napata v. Univ. of Md. Med. Sys. Corp.*,
    417 Md. 724 (Md. 2011) .....................................................................................16, 20

*Nev. Dep't of Human Res. v. Hibbs*,
    538 U.S. 721 (2003) .................................................................................................33

*NVR, Inc. v. Harry A. Poole, Sr. Contractor, Inc.*,
    No. ELH–14–00241, 2014 WL 2215857 (D. Md. May 28, 2014) ...........................7

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    804 F.3d 646 (4th Cir. 2015) ...................................................................................22

*Pac. Shores Properties, LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) .................................................................................32

*Philips v. Pitt Cty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009) ...................................................................... *passim*

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) .................................................................................................14

*Prescott v. Rady Children's Hosp. San Diego*,
    265 F. Supp. 3d 1090 (S.D. Cal. 2017) ...................................................................34

*Rich v. William Penn Life Ins. Co. of New York*,
   No. GLR-17-2026, 2018 WL 4599675 (D. Md. Sept. 25, 2018)...........................13

*Rose v. Harloe Mgmt. Corp.*,
   No. GLR-16-761, 2017 WL 193295 (D. Md. Jan. 17, 2017) ...................................23

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017)............................................................................................30

*Sierra Club v. Dept. of the Interior*,
   899 F.3d 260 (4th Cir. 2018) .....................................................................................8

*Simon v. E. Kentucky Welfare Rights Org.*,
   426 U.S. 26 (1976)...................................................................................................12

*Smith v. Jefferson Cty. Bd. of Sch. Commissioners*,
   788 F.3d 580 (6th Cir. 2015) ...................................................................................28

*Snider Int'l Corp. v. Town of Forest Heights*,
   906 F. Supp. 2d 413 (D. Md. 2012) .........................................................................13

*Spacco v. Bridgewater Sch. Dep't*,
   722 F. Supp. 834 (D. Mass. 1989) ...........................................................................24

*Sprauve v. W. Indian Co.*,
   799 F.3d 226 (3d Cir. 2015)..........................................................................15, 16, 18

*Stone v. Trump*,
   356 F. Supp. 3d 505 (D. Md. 2018) .........................................................................31

*Toomey v. Arizona*,
   No. CV-19-00035-TUC-RM, 2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ..............31, 32, 34

*Tovar v. Essentia Health*,
   342 F. Supp. 3d 947 (D. Minn. 2018) .......................................................................34

*United States v. Va.*,
   518 U.S. 515 (1996)........................................................................................30, 33

*Walz v. Tax Commission*,
   397 U.S. 664 (1970).................................................................................................26

*Weinreb v. Xerox Business Services, LLC Health & Welfare Plan*,
   323 F. Supp. 3d 501 (S.D.N.Y. 2018), *adhered to on denial of reconsideration
   sub nom.*, *Weinreb v. Xerox Business Services*, No. 16-cv-6823, 2020 WL
   4288376 (S.D.N.Y. July 27, 2020) ...........................................................................30

*Wernsing v. Thompson,*
    423 F.3d 732 (7th Cir. 2005) ...................................................................13

*White Coat Waste Project v. Greater Richmond Transit Co.,*
    No. 3:17-cv-719, 2020 WL 2813402 (E.D. Va. May 30, 2020)....................18

*Will v. Michigan Dep't of State Police,*
    491 U.S. 58 (1989)....................................................................................22

*Wood v. Arnold,*
    915 F.3d 308 (4th Cir. 2019) ...................................................................26

*Wynne v. Town of Great Falls, S.C.,*
    376 F.3d 292 (4th Cir. 2004) ..............................................................23, 24

**Statutes**

20 U.S.C. § 1681 .........................................................................................34

42 U.S.C. § 1983 ................................................................................... *passim*

42 U.S.C. § 18116 ................................................................................. *passim*

Md. Code Educ. § 13-301 ........................................................................4, 15

Md. Code Educ. § 13-302 ....................................................................4, 15, 17

Md. Code Educ. § 13-303 ...................................................................... *passim*

Md. Code Educ. § 13-304 ....................................................................4, 15, 17

Md. Code Educ. § 13-310 .............................................................................21

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)...................................................................................6

Fed. R. Civ. P. 12(b)(6).............................................................................6, 7

H.R.Rep. No. 914, 88th Cong., 1st Sess., 18 ...............................................12

Reva B. Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 108
    Georgetown L.J. 167 (2020) ...................................................................32

S. Rep. No. 872, 88th Cong., 2d Sess., 16 ...................................................12

Plaintiff Jesse Hammons respectfully submits this Memorandum of Law in opposition to the Motion to Dismiss (ECF No. 39, "MTD") submitted by Defendants University of Maryland Medical System Corporation, UMSJ Health System, LLC, and University of Maryland St. Joseph Medical Center, LLC (collectively, "Defendants").

## PRELIMINARY STATEMENT

The government has no business owning a Catholic hospital or discriminating against transgender patients based on Catholic religious doctrine. But for almost ten years, the University of Maryland Medical System ("UMMS"), and its wholly owned subsidiaries, UMSJ Health System, LLC ("UMSJ LLC") and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC")—state actors bound by the First and Fourteenth Amendments—have operated the University of Maryland St. Joseph Medical Center ("St. Joseph" or the "Hospital") as a Catholic institution. Citing Catholic religious doctrine, the Hospital discriminated against Mr. Hammons earlier this year by canceling his medically necessary hysterectomy related to his diagnosis of gender dysphoria. The Hospital will provide hysterectomies when they are medically necessary to treat *other* medical conditions, but the Hospital refuses to perform the same surgery for transgender patients like Mr. Hammons when it is medically necessary to treat gender dysphoria.

Defendants' Motion to Dismiss suggests that UMMS has been operating under the misapprehension that it is a purely private entity, unconstrained by constitutional requirements. But the Supreme Court's decision in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), makes clear that UMMS is, in fact, part of the Maryland government and bound by its constitutional obligations under the First and Fourteenth Amendments. *Lebron* established a simple three-part test for determining when the Constitution applies to an ostensibly private corporation created by the government: "Where, as here, the Government [1] creates a

1

corporation by special law, [2] for the furtherance of governmental objectives, and [3] retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government." *Id.* at 400. *Lebron* also made clear that such an ostensibly private corporation is *not* protected from suit by the government's sovereign immunity. Even though the government cannot disavow a government corporation's constitutional *obligations*, the government can disavow that corporation's entitlement to the *benefits* of sovereign immunity through a statutory "disclaimer of agency status." *Id.* at 392.

Defendants do not—and cannot—dispute that UMMS satisfies all three elements of *Lebron*'s test. Defendants are, therefore, state actors. And, as state actors, Defendants are flagrantly violating the Establishment Clause and Equal Protection Clause by operating a Catholic hospital and discriminating against transgender patients based on Catholic religious doctrine. Defendants' discrimination against Mr. Hammons also violates Section 1557 of the Affordable Care Act, which prohibits any hospital receiving federal funding from discriminating on the basis of sex and transgender status.

Defendants' Motion to Dismiss fails to rebut these controlling legal principles. Instead, Defendants make a variety of factual assertions that are either legally irrelevant under *Lebron* or that conflict with the allegations of the Complaint. Because *Lebron* controls this case, and because the well-pled allegations of the Complaint state claims upon which relief can be granted, Defendants' Motion to Dismiss should be denied.

## STATEMENT OF FACTS

Plaintiff Jesse Hammons is a man who is transgender. Compl. ¶ 2 (ECF No. 1).[1] This

---

[1] On a motion to dismiss, the well-pled allegations of the Complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

means he was assigned "female" at birth, but has a male gender identity.  Compl. ¶¶ 41-43, 51.

Transgender people may require treatment for gender dysphoria, a serious medical condition

involving clinically significant emotional distress, experienced as a result of the incongruence of

their gender identity with their assigned sex and the physiological developments associated with

that assigned sex.[2]  Compl. ¶ 44.  The widely accepted standards of care for treating gender

dysphoria provide that treatment may require medical steps—such as hormone therapy or

surgery—to affirm one's gender identity and transition from living as one gender to another.

Compl. ¶¶ 45-46.  Depending on the patient, medically necessary treatment (sometimes called

"gender-affirming care" or "transition-related care") may also include a hysterectomy, a

procedure which removes the patient's uterus.  Compl. ¶¶ 47-49.

In Mr. Hammons's case, his physicians, acting in accordance with the applicable

standards of care, recommended a hysterectomy as a medically necessary treatment for gender

dysphoria.  Compl. ¶ 52.  The procedure was scheduled to be performed on January 6, 2020,

during a break from Mr. Hammons's school, when Mr. Hammons was able to arrange to take off

time from work for his surgery and recovery.  Compl. ¶¶ 53, 54.  In planning for his surgery,

Mr. Hammons underwent various health screenings with his treating physician.  Compl. ¶ 54.  In

addition, Mr. Hammons worked diligently over several months to prepare himself mentally for

the experience.  Compl. ¶ 55.

Mr. Hammons's surgeon scheduled the procedure to be performed at St. Joseph.  Compl.

¶¶ 2, 53.  St. Joseph is owned and operated by Defendant UMMS, through its wholly owned

subsidiaries Defendant UMSJ LLC and Defendant St. Joseph LLC.  Compl. ¶¶ 1, 9-13.  UMMS,

---

[2] The Fourth Circuit recently reviewed and analyzed these concepts in *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594-97 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

in its present form, was created by the State of Maryland by statute in 1984. Compl. ¶ 16; Md. Code Educ. § 13-301, *et seq*. The statute declared UMMS to be an independent corporation and "not . . . a State agency." Compl. ¶ 17; Md. Code Educ. § 13-303(a)(2). At the same time, the statute reaffirmed that UMMS would serve "the highest public interest" by providing healthcare to the public, and mandated that UMMS would "meet the needs of the State and region." Compl. ¶¶ 17-18; Md. Code Educ. §§ 13-302 & 13-303. The statute also provided that the Governor would appoint all voting members on UMMS's Board of Directors. Compl. ¶¶ 20-21; Md. Code Educ. § 13-304.

UMMS bought St. Joseph in 2012. Compl. ¶ 33. St. Joseph had historically operated as a private Catholic institution, and adhered to the "Ethical and Religious Directives for Catholic Health Care Services" established by the U.S. Conference of Catholic Bishops (the "Catholic Directives") in administering care. Compl. ¶¶ 25-27.[3] When UMMS purchased St. Joseph in 2012, UMMS signed an agreement with the Catholic Church promising to run the Hospital in accordance with the Catholic Directives. Compl. ¶¶ 27, 31-32. Defendants continue to operate St. Joseph in accordance with the Catholic Directives through today. Compl. ¶ 34. At present, the Hospital's website advertises both its religious nature and its affiliation with the government: It proclaims that St. Joseph is a "Catholic acute care hospital that observes the [Catholic Directives]," and provides a link directly to the Catholic Directives, while simultaneously underscoring that the Hospital is an "integral member of University of Maryland Medical System." Compl. ¶¶ 1, 34, 35.

---

[3] *See* About UM SJMC, University of Maryland St. Joseph Medical Center, http://www.umms.org/sjmc/about (last accessed October 12, 2020). The Catholic Directives are available at https://www.usccb.org/about/doctrine/ethical-and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf (last accessed October 12, 2020).

The Catholic Directives proclaim that they are "animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church."  Compl. ¶¶ 1, 28.  They reflect Catholic religious ideals pertaining to healthcare, which prohibit certain types of care that would ordinarily be available to patients in secular facilities.  Compl. ¶¶ 28-29.  For example, the Catholic Directives prohibit rape victims from receiving any treatment that may "interfer[e] with the implantation of a fertilized ovum," ban abortions without exception, and generally forbid the use of contraception.  Compl. ¶ 29.

As relevant here, the Catholic Directives bar sterilization procedures "unless their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available."  Compl. ¶ 30.  The Catholic Directives also command that the "functional integrity" of the human body be preserved, except that "[t]he functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available."  Compl. ¶ 58.  When applying these directives, the Hospital does not prohibit *all* procedures that result in sterilization or that remove health body tissue.  For example, the Hospital provides hysterectomies when they are medically necessary to treat certain medical conditions, and surgeons at the Hospital will remove otherwise healthy tissue to prevent cancer or other diseases.  Compl. ¶¶ 57-58.  Purely cosmetic surgeries have also been performed at the Hospital.  Compl. ¶ 58.

About a week before Mr. Hammons's surgery was scheduled to take place, St. Joseph's Senior Vice President for Medical Affairs and Chief Medical Officer, Gail Cunningham, ordered the surgery canceled.  Compl. ¶ 56.  Dr. Cunningham banned the surgery because it conflicted with the Hospital's Catholic religious beliefs.  Compl. ¶¶ 56-58.  Dr. Cunningham explicitly informed Mr. Hammons's surgeon that, according to the Hospital's religious beliefs, Mr.

Hammons's gender dysphoria did not qualify as a sufficient medical reason to authorize a sterilization procedure under the Catholic Directives. Compl. ¶ 57. Dr. Cunningham also stated that the Hospital did not consider Mr. Hammons's gender dysphoria to be a valid basis under the Catholic Directives to justify disrupting the body's "functional integrity." Compl. ¶ 58. Even though the Hospital provides hysterectomies when they are medically necessary to treat *other* medical conditions, Dr. Cunningham refused to allow Mr. Hammons's surgeon to perform the same when it is medically necessary to treat gender dysphoria. Compl. ¶¶ 57, 58.

Defendants' prohibition of Mr. Hammons's medically necessary care caused Mr. Hammons to suffer significant damages. Compl. ¶¶ 59, 60. As a result of the cancelation, Mr. Hammons was not able to have his hysterectomy performed until June 24, 2020. Compl. ¶ 60. Because of this delay, Mr. Hammons had to spend more money on an additional round of pre-operative tests; he had to spend another six months experiencing gender dysphoria without the therapeutic benefits of the surgery; and he had to spend another six months carrying the stress and anxiety of having to mentally prepare himself for the surgery all over again. Compl. ¶ 60.

On July 16, 2020, Mr. Hammons filed this suit, for violations of the Establishment Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"). Compl. ¶¶ 61-93.

## LEGAL STANDARD

A motion to dismiss under Federal Rule Civil Procedure 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

A complaint cannot be dismissed under Rule 12(b)(6) unless it fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see*

*also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).  In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *NVR, Inc. v. Harry A. Poole, Sr. Contractor, Inc.*, No. ELH–14–00241, 2014 WL 2215857, at *2 (D. Md. May 28, 2014) (quoting *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013)).

## ARGUMENT

## I.    MR. HAMMONS HAS ESTABLISHED ARTICLE III STANDING

The allegations in the Complaint demonstrate that Mr. Hammons has Article III standing for his claims.  "To have standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (cleaned up); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Complaint satisfies each of these requirements.  First, Mr. Hammons suffered an injury in fact in the form of financial harm, as well as significant emotional and physical strain.  Compl. ¶¶ 59, 60.  Second, his injuries are fairly traceable to Defendants, who instituted the policy of adhering to the Catholic Directives, and who directly ordered the cancelation of his surgery based on those religious views.  Compl. ¶¶ 56-58.  Third, his injuries are redressable through an award of monetary damages.  Compl. at 24-25.

Defendants do not dispute that Mr. Hammons suffered an injury in fact.  Nor could they. Mr. Hammons suffered, *inter alia*, financial harm, "a classic and paradigmatic form of injury in fact," fulfilling this requirement.  *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir.

2018). But Defendants argue that Mr. Hammons has not satisfied the traceability and redressability prongs of standing. The facts alleged in the Complaint, however, plainly suffice to meet both criteria.

### A.    Mr. Hammons's Injuries Are Fairly Traceable to Defendants' Conduct

#### 1.    Defendants Directly Caused Mr. Hammons's Injuries

To satisfy traceability, "there must be a causal connection between the injury and the [defendant's] conduct." *Id.* at 760 (quoting *Lujan*, 504 U.S. at 560). Traceability does not require the challenged action to be "the sole or even immediate cause of th[e] injury." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020), *as amended* (Aug. 31, 2020) (quoting *Sierra Club v. Dept. of the Interior*, 899 F.3d 260, 283-84 (4th Cir. 2018)). A defendant's action need only be "at least in part responsible" for the plaintiff's injury. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013).

Traceability is easily met here. As set out in the Complaint, Defendants agreed to operate St. Joseph as a Catholic institution, in accordance with the Catholic Directives. Compl. ¶ 32. The Hospital's Senior Vice President for Medical Affairs and Chief Medical Officer, Gail Cunningham, canceled Mr. Hammons's surgery *because* of the Catholic Directives. Compl. ¶ 56. Dr. Cunningham told Mr. Hammons's surgeon that the procedure conflicted with the Hospital's Catholic religious beliefs and the Catholic Directives—specifically, she stated that, according to St. Joseph's religious beliefs, gender dysphoria did not qualify as a sufficient medical reason to authorize a sterilization procedure, or to permit a compromise of the "functional integrity" of the body under the Catholic Directives. Compl. ¶¶ 56-58.

By imposing the Catholic Directives on the Hospital, and subsequently ordering that Mr. Hammons's surgery be canceled because of those religious views, Defendants "caused directly"

8

the injuries that flowed from the delayed procedure—namely, the costs associated with new pre-operative tests, and the emotional toll of deferred treatment. *Cooksey v. Futrell*, 721 F.3d 226, 438 (4th Cir. 2013). Thus, traceability is satisfied.

### 2. Mr. Hammons's Surgeon Did Not Break the Chain of Causation

Misstating the facts, Defendants try to evade responsibility for their conduct by relying on the actions of Mr. Hammons's surgeon. Defendants argue that Mr. Hammons's injuries "stem directly from his surgeon's mis-scheduling a procedure that he knew could not be performed at St. Joseph," and Defendants are simply not part of the "direct causal chain." MTD at 10. Defendants are wrong for at least five reasons.

*First*, Defendants' argument about "severing" the causal chain makes no sense on its own terms. A defendant arguing that the causal chain has been severed typically argues that the actions of a third party intervened between the time that the defendant acted and the time that the plaintiff was injured. *See Mackey v. Dorsey*, 104 Md. App. 250, 270 (Md. 1995) (argued before Hollander, J.) ("When more than one act . . . is arguably responsible for an injury, the question presented is whether the second . . . act constitutes a sufficient break in the chain of causation so that it super[s]edes the first, thereby terminating its role in the chain of causation."). But in this case, Defendants point to the alleged actions of Mr. Hammons's surgeon that occurred *before* Defendants injured Mr. Hammons by canceling his surgery. Even if the causal chain had been severed at some earlier point in time, Defendants picked the chain back up again and *were the final actors in the causal chain* who ordered Mr. Hammons's surgery canceled. Compl. ¶¶ 56-58.

*Second*, to the extent that Defendants are attempting to separate UMMS's decision to sign an agreement maintaining the Hospital's Catholic identity from the ultimate injury caused by

9

administrators at St. Joseph, that argument fares no better.  Without Defendants' imposition and

enforcement of the Catholic Directives on the Hospital's patients and staff, it would not be

possible to "mis-schedule" transition-related care at the Hospital.  *See Air Evac*, 910 F.3d at 760

("The effect of the state's chosen course of action must be considered as an integrated whole.");

*see also Bennett v. Spear*, 520 U.S. 154, 169 (1997) ("While . . . it does not suffice if the injury

complained of is the result of the *independent* action of some third party not before the court,

*that does not exclude injury produced by determinative or coercive effect upon the action of*

*someone else*.") (cleaned up; second emphasis added).  Thus Mr. Hammons's injuries would not

have occurred absent Defendants' imposition of the Catholic Directives on the Hospital's

operations.

   *Third*, Defendants' argument rests on the false premise that Mr. Hammons's surgeon

"knew" that the surgery could not be performed at St. Joseph, and "mis-scheduled" it to take

place there.  This is factually incorrect: Mr. Hammons surgeon did not know that the surgery

would be barred—and no allegations supporting such an assertion appear in the Complaint.[4]  In

their attempt to obfuscate the relevant facts, Defendants suggest that Mr. Hammons's surgeon

should have known that St. Joseph would not allow the procedure because of his familiarity with

---

[4] Other instances of Defendants misstating applicable facts abound.  For example, Defendants incorrectly assert that after the scheduled procedure was canceled in January 2020, Mr. Hammons "voluntarily delayed" the procedure until June 2020.  MTD at 7 & n.15, 11 n.16.  Again, there are no allegations to this effect in the Complaint.  To the contrary, the Complaint alleges that Mr. Hammons "*was not able* to have his hysterectomy performed until June 24, 2020."  Compl. ¶ 60 (emphasis added).  Defendants also cite an article outside the Complaint as purportedly showing that Mr. Hammons voluntarily delayed the procedure.  MTD at 7 & n.1 (citing Samantha Schmidt, *Transgender Man Sues University of Maryland Hospital After It Canceled His Hysterectomy*, WASH. POST (July 17, 2020), https://www.washingtonpost.com/dc-mdva/2020/07/17/transgender-hysterectomy-lawsuit-maryland/). Even if this material were appropriately considered on a motion to dismiss, it does not indicate voluntary delay: The article reports that Mr. Hammons was initially forced to "wait to reschedule the surgery until his next break from school, in mid-May," and then his surgeon further "postponed [the procedure] because of the pandemic."  Schmidt, *Transgender Man Sues*, WASH. POST.  Rescheduling the surgery for his first available date and then being forced to wait further still because of a global health crisis hardly amounts to "voluntarily delay[ing]" the procedure.  MTD at 7 & n.15.

the Catholic Directives, or his relationship with the Hospital.  The Catholic Directives, however, *permit* sterilization procedures such as hysterectomies "when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available"; they similarly condone treatments that disrupt the "functional integrity" of the human body, if the treatment would "maintain the health or life of the person when no other morally permissible means is available."  Compl. ¶¶ 30, 57-58.  Mr. Hammons's surgery fits comfortably within both provisions, as a medically necessary procedure to treat a serious medical condition. Accordingly, there is no basis to presume that Mr. Hammons's surgeon knew that St. Joseph would have barred Mr. Hammons's procedure.

*Fourth*, by attempting to remove themselves from the "direct causal chain," MTD at 10, Defendants "wrongly equate injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation," *Libertarian Party of Va.*, 718 F.3d at 316 (quoting *Bennett*, 520 U.S. at 168-69) (cleaned up).  As courts have repeatedly explained, a defendant's conduct need not "be the last link in the causal chain" to satisfy traceability, *Air Evac*, 910 F.3d at 760, because traceability does not look to "the stringent proximate cause standard, derived from principles of tort law," *Libertarian Party of Va.*, 718 F.3d at 315-16.[5]

*Fifth*, at bottom, Defendants' argument is that Mr. Hammons simply should have realized that his medically necessary care would be considered inappropriate at St. Joseph—and that he should have known to go elsewhere.  But it is no defense to discrimination to argue that the victim should have realized that they were not welcome.  Indeed, the very purpose of

---

[5] As noted above, even if proximate causation were required, this standard would be met: Defendants themselves *were the final actors in the causal chain*, who ordered Mr. Hammons's surgery canceled.  Compl. ¶¶ 56-58.

antidiscrimination laws is to address the "daily affront and humiliation involved in

discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v.

Paul*, 395 U.S. 298, 307-08 (1969) (quoting H.R.Rep. No. 914, 88th Cong., 1st Sess., 18); *see

also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 291-92 (1964) (Goldberg, J.,

concurring) ("[D]eprivation of personal dignity . . . surely accompanies denials of equal access to

public establishments.  Discrimination is not simply dollars and cents, hamburgers and movies; it

is the humiliation, frustration, and embarrassment that a person must surely feel when he is told

that he is unacceptable as a member of the public.") (quoting S. Rep. No. 872, 88th Cong., 2d

Sess., 16).

Attempting to buttress their "mis-scheduling" claim, Defendants also contend that their

imposition of the Catholic Directives amounts only to "regulation" of the surgeon, with no direct

impact on Mr. Hammons.  MTD at 10.  This argument is meritless.  Defendants specifically

ordered that *Mr. Hammons's surgery* be canceled, and thus directly curtailed his access to care.

Compl. ¶¶ 56-58.  The two cases that Defendants cite in support of their "regulation"

argument—*Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) and *Lane v. Holder*,

703 F.3d 668 (4th Cir. 2012)—in fact cement this point:

- In *Simon*, indigent plaintiffs alleged that a specific tax regulation "encouraged"
  hospitals to deny them service; the Supreme Court held that it was "purely
  speculative whether the denials of service specified in the complaint fairly [could] be
  traced" to the challenged regulation or "instead result[ed] from decisions made by the
  hospitals without regard to the tax implications." *Simon*, 426 U.S. at 43.  Here, by
  contrast, there is no uncertainty about the reason why Mr. Hammons was denied care:
  Defendants specifically cited the Catholic Directives when they ordered Mr.
  Hammons's surgery be canceled.  Compl. ¶¶ 56-58.

- Similarly, in *Lane*, would-be handgun purchasers challenged regulations affecting
  distributors, complaining that the regulations made purchases more expensive; the
  Fourth Circuit found that any increased price was too far removed from the
  regulations, noting that "[n]othing in the challenged legislation or regulations directs
  [distributors] to impose such charges." *Lane*, 703 F.3d at 674.  Quite the opposite is

true here: Defendants literally did "direct" the cancelation of Mr. Hammons's surgery, pursuant to the challenged policy of adhering to the Catholic Directives. *Id.*; *see also* Compl. ¶¶ 56-58.

Thus Defendants' attempt to cast themselves as mere "regulators" conflicts with the controlling allegations in the Complaint, and should be disregarded.

## B.     The Requested Relief Will Redress Mr. Hammons's Injuries

Mr. Hammons has also established that his injuries are redressable. Mr. Hammons alleges financial and other injuries, and seeks compensatory damages. Compl. ¶ 60, p.24. Defendants assert that "[f]orcing St. Joseph to abandon its Catholic legacy would . . . not redress injuries that his surgeon caused." MTD at 12. But Mr. Hammons is not seeking injunctive relief "[f]orcing St. Joseph to abandon its Catholic legacy." Instead, he is seeking damages, and "injuries compensable in monetary damages can always be redressed by a court judgment." *Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005); *see also Snider Int'l Corp. v. Town of Forest Heights*, 906 F. Supp. 2d 413, 422–23 (D. Md. 2012) (where "complaint prays for damages [and] a declaration that defendants have deprived plaintiffs of their due process rights," "plaintiffs' alleged injuries would be redressed by defendants' payment of monetary damages"); *Rich v. William Penn Life Ins. Co. of New York*, No. GLR-17-2026, 2018 WL 4599675, at *6 (D. Md. Sept. 25, 2018) ("A favorable decision . . . would compensate [plaintiffs] for the financial losses they suffered, establishing the redressability prong.").

## II.     DEFENDANTS CAN BE HELD LIABLE UNDER SECTION 1983

Defendants next argue that UMMS is not a state actor for purposes of Section 1983 liability, and that, if it is, UMMS would enjoy Maryland's sovereign immunity.[6] Defendants are

---

[6] Defendants' motion on these points is only relevant to UMMS. Defendants generally do not differentiate between UMMS, UMSJ LLC, and St. Joseph LLC. MTD at 1. With regard to state action and sovereign immunity, their arguments discuss only the allegations relevant to UMMS (such as its board     *(note continues on next page)*

wrong on both counts, under *Lebron*, 513 U.S. 374.

**A.      UMMS Is a State Actor**

**1.      UMMS Fulfills the Criteria Set Out in *Lebron***

In *Lebron*, the Supreme Court held that Amtrak, as a "government-created and -controlled corporation[]," was part of the federal government for purposes of the First Amendment. *Id.* at 397. The Court began by observing:

> It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form. On that thesis, *Plessy v. Ferguson*, 163 U.S. 537 (1896), can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak.

*Id.* The Court then examined several of Amtrak's attributes. First, Amtrak was "created by a special statute, explicitly for the furtherance of federal governmental goals"—specifically, to benefit "the public convenience and necessity," and to serve certain transportation-related benchmarks. *Id.*; *id.* at 384. In addition, "six of the corporation's eight externally named directors . . . are appointed directly by the President of the United States," giving the federal government "control" over Amtrak, "as a policymaker." *Id.* at 385, 399. The Court found these factors sufficient for constitutional restrictions to attach, summarizing in a clear test: "We hold that where, as here, the Government [1] creates a corporation by special law, [2] for the furtherance of governmental objectives, and [3] retains for itself permanent authority to appoint a

---

composition and creation statute), rather than the other two actors. And, throughout this section, Defendants consistently refer to a singular entity—"a private corporation"—rather than three separate corporate entities. MTD at 12-15. As a result, Defendants have not made any motion on these points relevant to UMSJ LLC or St. Joseph LLC. In any event, because UMMS is a state actor under *Lebron*, and because it is pervasively entwined with UMSJ LLC and St. Joseph LLC, *see* Compl. ¶¶10-11, 36-40, the actions of UMSJ LLC and St. Joseph LLC are "fairly attributable to the State," thus satisfying the under color of law requirement of Section 1983. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 181-82 (4th Cir. 2009) (cleaned up). And, given that they are incorporated as separate entities, UMSJ LLC and St. Joseph LLC have an even weaker to claim to sovereign immunity than UMMS—which, as discussed below, fails. Thus, all Defendants are subject to suit under Section 1983, and do not enjoy sovereign immunity.

majority of the directors of that corporation, the corporation is part of the Government." *Id.* at 399.[7]

Because *Lebron*'s three-part test applies both to federally created entities and state-created ones, a corporation that satisfies *Lebron*'s three-part test is a state actor for purposes 42 U.S. § 1983. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 185-86 (4th Cir. 2009) (recognizing *Lebron*'s three-part framework); *Sprauve v. W. Indian Co.*, 799 F.3d 226, 230 (3d Cir. 2015) (applying *Lebron* to determine whether entity is "subject to claims under the United States Constitution and under section 1983"); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 83–84 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("*Lebron* . . . set forth a three-prong standard [to determine if] the corporation [will] be deemed a government entity for the purpose of the state action requirement.").

UMMS plainly satisfies these criteria. First, the State of Maryland created UMMS by special law. Compl. ¶ 16; Md. Code Educ. § 13-301, *et seq.* Second, the State of Maryland provided that UMMS would further governmental objectives by serving "the highest public interest," and "meet[ing] the needs of the State and region," by providing healthcare to Maryland citizens and community members. Compl. ¶¶ 17-18; *see also* Md. Code Educ. § 13-302(4) & 13-303(c)(2). Third and finally, the Governor of Maryland has the sole authority to appoint *all* voting members (rather than a simple majority as was the case in *Lebron*), and fill any vacancies, on UMMS's Board of Directors. Compl. ¶ 20; Md. Code Educ. § 13-304(b)-(d). Accordingly, applying *Lebron* here, UMMS qualifies as a state actor under Section 1983. *See Lebron*, 513

---

[7] The Fourth Circuit has sometimes described this as a two-part test assessing whether an entity is "both created and controlled" by government, with the first two requirements—created by a special law, in furtherance of government purposes—merged into a single prong. *Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152, 158 (4th Cir. 2018); *Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 578 (4th Cir. 2017).

U.S. at 399; *cf. Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 736-37 (Md. 2011) (holding that, for certain state law purposes, "[t]hese facts compel the conclusion that UMMS is an instrumentality of the State").

Incredibly, Defendants assert that "*Lebron* is not determinative of, *or even relevant to*, whether or not [UMMS] is a state actor."  MTD at 15 (emphasis added).  In making this argument, Defendants make no attempt to discuss the actual holding of *Lebron*.  Instead, they vaguely assert that *Lebron* shouldn't be followed,[8] and raise several purported factual distinctions: (1) UMMS allegedly holds greater independence from Maryland than did Amtrak from the federal government; (2) Maryland owns "no stock" in UMMS; and (3) UMMS enjoys no "attributes of sovereignty," "namely, eminent domain powers."  MTD at 15.

None of these proffered distinctions is relevant under *Lebron*.  The relevant governmental control in *Lebron* is determined exclusively based on whether the government appoints a majority of the corporation's board of directors, not based on governmental interference in daily operations, stock ownership, eminent domain powers, or any other criteria.  *See Lebron*, 513 U.S. at 399; *Sprauve*, 799 F.3d at 233-34 (collecting cases regarding board appointments and *Lebron*); *cf. Kerpen v. Metro. Washington Airports Auth., 907 F.3d 152, 159 (4th Cir. 2018)* (*Lebron* test not satisfied where "the federal government appoints just three out of seventeen members of [entity]'s Board of Directors") (internal quotation marks omitted).  Here, *all* of UMMS's voting Board members are appointed by the Governor, rather than the simple majority

---

[8] Oddly, Defendants contend that the Fourth Circuit has placed only "limited reliance" on *Lebron*, and "has only invoked *Lebron* twice in the twenty five years since it was decided."  MTD at 15 & n.18.  In fact, the Fourth Circuit has "invoked" *Lebron* on more than two occasions—in their brief, Defendants themselves cite three*: Philips*, 572 F.3d 176, *Kerpen*, 907 F.3d 152, and *Meridian Investments*, 855 F.3d 573.  In any event, as these cases attest, *Lebron* continues to be binding precedent.  Any paucity of authority is due to the atypicality of *Lebron*-compliant government entities—not any disavowal of *Lebron*.

appointed by the President for Amtrak.  Compl. ¶ 20; Md. Code Educ. § 13-304(b)-(d); *Lebron*,

513 U.S. at 397-99.  As to stock, UMMS is a "nonstock corporation," Md. Code Educ. §§ 13-

302(7) & 13-303(m), and, in any event, the Supreme Court in *Lebron* explicitly described stock

ownership as a type of "temporary control" that does not much affect the determination, *Lebron*,

513 U.S. at 398; *see also Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp., 855 F.3d

573, 579 (4th Cir. 2017)* (applying *Lebron* and explaining that, "[t]he Supreme Court has long

held that, when the government acquires an ownership interest in a corporation, it acts—and is

treated—as any other shareholder").  And eminent domain was not even discussed in *Lebron*, let

alone a basis for its holding.

      Because UMMS satisfies each element of *Lebron*'s three-part test, *Lebron* controls here.

### 2.    Because UMMS Satisfies *Lebron*, the Close Nexus Test Is Irrelevant

      Instead of applying the three-part test established by *Lebron*, Defendants argue that Mr.

Hammons must show that UMMS meets the "close nexus" test for state action test applied in

*Philips*, 572 F.3d 176, and *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166 (4th Cir. 2009).

The "close nexus" test and the *Lebron* test, however, are separate and alternative paths for

satisfying Section 1983's color of law requirement—which is why the *Philips* court analyzed

them both as "alternate ground[s]."  *Philips*, 572 F.3d at 185.  The "close nexus" test considers

whether "*a private entity's action* . . . may fairly be treated as that of the State itself."  *Moore*,

560 F.3d at 179 (emphasis added).  By contrast, *Lebron* analyzes whether an entity is "by its very

nature, what the Constitution regards as the Government."  *Lebron*, 513 U.S. at 392.  It is

"unnecessary to traverse th[e] difficult terrain" of the "close nexus" test when a corporation "is

not a private entity but Government itself."  *Id.* at 378; *accord Herron v. Fannie Mae*, 861 F.3d

160, 167 (D.C. Cir. 2017) (where claim is based on *Lebron*, it is not necessary to "'traverse the

difficult terrain' of the state action doctrine") (quoting *Lebron*, 513 U.S. at 378); *see also White Coat Waste Project v. Greater Richmond Transit Co.*, No. 3:17-cv-719, 2020 WL 2813402, *19-24 (E.D. Va. May 30, 2020) (finding that entity satisfied close nexus test and, "[i]n the alternative," that entity "qualifies as a government actor under" *Lebron*).  For purposes of this motion, satisfaction of the *Lebron* test suffices for the case to proceed against Defendants.

For these same reasons, Defendants miss the mark in arguing that Mr. Hammons must plead not only that the government appointed UMMS's board, but also that those appointees were specifically involved in canceling Mr. Hammons's surgery.  Again, "pursuant to *Lebron*," it is the government's "authority to appoint" board members—not their specific roles in the challenged decision—"that is relevant to the state action inquiry."  *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004); *see also Kerpen*, 907 F.3d at 159 (considering composition of the board—and not the board's actions—in applying *Lebron*); *Meridian Investments*, 855 F.3d at 579 (same); *Sprauve*, 799 F.3d at 233-34 (same).  Defendants lean heavily on *Philips* and its analysis of the specific roles of various state actors in the challenged decision.  But Defendants fail to note that this discussion related to the *"close nexus"* test, *not* the *Lebron* test.  *See Philips*, 572 F.3d at 183-84.  In its *Lebron* discussion, the *Philips* court made no mention that such facts would bear on the analysis, instead reasoning only that the entity did not comport with *Lebron* because it "was not created by special statute."  *Id.* at 185-86.[9]  In any event, Mr. Hammons *has* alleged that UMMS's board was specifically involved in the adoption of the Catholic Directives at the Hospital, Compl. ¶ 37, and that an officer of the

---

[9] Similarly, in *Moore*, there was no indication that the entity was created by a special statute (though its assets were transferred in accordance with various provisions of South Carolina law).  *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 179 (4th Cir. 2009).  Nor was the *Lebron* test invoked.  *Moore*, therefore, sheds no light on the *Lebron* inquiry or this case.

Hospital ordered the surgery canceled, based on the Hospital's religious beliefs, Compl. ¶¶ 56-58.

**B.    UMMS Does Not Enjoy Sovereign Immunity**

Defendants further contend that, if UMMS is a state actor, then, *ipso facto*, Mr. Hammons's claims are barred by the Eleventh Amendment and the State's sovereign immunity. "[S]overeign immunity is akin to an affirmative defense, which the defendant bears the burden of demonstrating." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014). Not only have Defendants failed to meet their burden, but their sovereign immunity argument is foreclosed by *Lebron* itself.

**1.    The State of Maryland Has Stripped UMMS of Sovereign Immunity**

In arguing that UMMS is entitled to sovereign immunity, Defendants, once more, fail to address *Lebron*, which explained that Amtrak was part of the government, but was *not* entitled to sovereign immunity.  In *Lebron*, the Court considered the effect of a statute providing that Amtrak "will not be an agency or establishment of the United States."  *Lebron*, 513 U.S. at 391. The Court explained that the legislature, by enacting such a disavowal of a corporation's governmental status, can deprive the corporation "of all those inherent powers and immunities of Government agencies that it is within the power of [the legislature] to eliminate"—and, further, that such a disavowal is "assuredly dispositive" of those matters.  *Id.* at 392.  But the legislature cannot disavow the corporation's "status as a [g]overnment entity for purposes of determining the constitutional rights of citizens affected by its actions."  *Id.*  As a result, even though the Court held that Amtrak was part of the government for purposes of the First Amendment, it also explained there can be "no doubt . . . that the statutory disavowal of Amtrak's agency status deprives [it] of sovereign immunity from suit."  *Id.*

19

Here, the State of Maryland has issued precisely such a statutory disavowal: The State proclaimed that UMMS "shall not be a State agency, political subdivision, public body, public corporation, or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities." Compl. ¶¶ 64, 72; Md. Code Educ. § 13-303(a)(2). Because this disavowal is "assuredly dispositive of [UMMS]'s status as a Government entity for purposes of matters that are within [Maryland]'s control," there can be "no doubt" that UMMS does not enjoy the Eleventh Amendment immunity of the State. *Lebron*, 513 U.S. at 392; *cf. MedSense, LLC v. Univ. Sys. of Md.*, 420 F. Supp. 3d 382, 391 (D. Md. 2019) (finding that—unlike UMMS—the University System of Maryland and University of Maryland *do* enjoy sovereign immunity because the "Maryland legislature specifically defined [the University System of Maryland] as an 'instrumentality of the State,' governing 'constituent institutions' of higher education," and explicitly named the University of Maryland as such a "constituent institution") (cleaned up).

In *Napata*, the Maryland Court of Appeals performed a similar analysis regarding UMMS and the implications of Section 13-303(a)(2). It expressly found that UMMS was an "instrumentality of the state" for purposes of Maryland's Public Information Act. *Napata*, 417 Md. at 739-40. But it also found that Section 13-303(a)(2) stripped UMMS of certain state-instrumentality attributes (specifically, application of the Public Information Act), "because [Section 13-303(a)(2)] expressly exempts [UMMS] from laws affecting only public entities." *Id.* The Maryland legislature has the power to exempt UMMS from such state-law "matters that are within [Maryland]'s control," but Maryland has no similar power under *Lebron* to exempt UMMS from "the constitutional rights of citizens affected by its actions." 513 U.S. at 392.

20

SA28

2.    **UMMS Is Not an Arm of the State for Eleventh Amendment Purposes**

Even if the State of Maryland had not stripped UMMS of sovereign immunity with Section 13-303(a)(2), Defendants' argument that any state actor would necessarily enjoy sovereign immunity under the Eleventh Amendment, subject only limited exceptions (such as consent, or an *Ex Parte Young* suit for injunctive relief), MTD at 16, is profoundly incorrect. Rather, sovereign immunity attaches only "if, in the entity's operations, the state is the real party in interest, in the sense that the named party is the alter ego of the state." *Hutto*, 773 F.3d at 542 (cleaned up). This "differentiates arms or alter egos of the state from mere political subdivisions of the State such as counties or municipalities, which, though created by the state, operate independently and do not share the state's immunity." *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 250 (4th Cir. 2016) (cleaned up), *as amended* (July 8, 2016). "In analyzing whether entities . . . are arms of the State [for purposes of sovereign immunity], the most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." *Hutto*, 773 F.3d at 543 (cleaned up). "If . . . the State treasury will not be liable for a judgment, sovereign immunity applies only where the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Id.* (cleaned up).

Despite bearing the burden on this issue, Defendants do not so much as mention these criteria. And their own recitation of facts confirms that UMMS "must pay all obligations and judgments out of its own assets"—meaning that no judgment against UMMS would be paid by the State of Maryland. MTD at 5 (citing Md. Code Educ. § 13-310). Accordingly, by Defendants' own admission, the "most important consideration" in this analysis demonstrates

21

that UMMS is not an arm of the state for sovereign immunity purposes. *Hutto*, 773 F.3d at 543; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 49 (1994) ("[T]he state treasury factor is the most important factor to be considered," and is "generally accorded . . . dispositive weight."); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 667-68 (4th Cir. 2015) (finding that instrumentality lacked Eleventh Amendment sovereign immunity, despite state-appointed board, largely because of its "financial independence"). Thus, UMMS plainly cannot avail itself of the State's sovereign immunity here.

### 3.    UMMS Is a "Person" Under 42 U.S.C. § 1983

For the same reasons that Defendants are not protected by sovereign immunity, Defendants are also "persons" under 42 U.S.C. § 1983. The Supreme Court held in *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), that "a State is not a person within the meaning of § 1983." *Id.* at 64. But the Court expressly confined its decision "only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Id.* at 70. As a result, "[o]nce the Eleventh Amendment inquiry is complete, there is no need to consider 'personhood.'" *Harter v. Vernon*, 101 F.3d 334, 338 n.1 (4th Cir. 1996). "If an official or entity is not immune from suit under the Eleventh Amendment that official or entity *is* a 'person' subject to suit under § 1983." *Id.* (emphasis in original).

Here, UMMS is not protected by sovereign immunity both because Maryland has disavowed UMMS's status as state agency and because judgments against UMMS are not paid by the state treasury. Thus UMMS is a "person" subject to Section 1983.

## III.    MR. HAMMONS HAS ALLEGED A VIABLE ESTABLISHMENT CLAUSE CLAIM

The Complaint alleges egregious violations of the Establishment Clause. Defendants are state actors, who own and operate a hospital in accordance with religious principles. Compl.

22

¶¶ 9-13, 32, 34-40, 56-58.  They are applying religious beliefs against their patients, such as Mr. Hammons, to deny them medically necessary care.  Compl. ¶¶ 32, 56-58.  They are interpreting Catholic religious teachings to mandate which medical procedures accord with their religious faith—and which do not.  Compl. ¶¶ 56-58.  And they are proudly proclaiming the entanglement between church and state that this arrangement entails: The Hospital website advertises St. Joseph as both an "integral member of University of Maryland Medical System" and a "Catholic acute care hospital that observes the [Catholic Directives]."  Compl. ¶¶ 34-35.  The website then *links directly* to the Catholic Directives, which are developed and published by The U.S. Conference of Catholic Bishops, and which set out the various strictures to provide healthcare "animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church." Compl. ¶¶ 1, 28.

Defendants are "thus elbow-deep in the activities banned by the Establishment Clause." *Lund v. Rowan Cty.*, 863 F.3d 268, 281 (4th Cir. 2017) (en banc) (cleaned up).  If there were any remaining doubt, the Complaint sets out all the different ways in which Defendants are violating of Establishment Clause under Supreme Court precedent.  Compl. ¶ 66.[10]

*First*, Mr. Hammons has adequately alleged that Defendants impermissibly fused governmental and religious functions, and delegated government authority to a religious entity.

---

[10] In their motion to dismiss, Defendants only address the viability of Establishment Clause claims proceeding under the framework reflected in the *Lemon* test.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  Defendants have waived any argument to the other grounds for liability explicitly set out in the Complaint by neglecting to address them in their moving brief, and thus have necessarily failed to show that dismissal of those grounds is appropriate. *See Rose v. Harloe Mgmt. Corp.*, No. GLR-16-761, 2017 WL 193295, at *6 n.3 (D. Md. Jan. 17, 2017) ("In their Reply Brief, Defendants also argue that the Complaint does not state a claim for constructive fraud because it is based on Defendants' alleged promises of future action.  By failing to raise and argue this point in their initial Motion, Defendants waived it."); *see also Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 302 n.8 (4th Cir. 2004) (noting variety of Establishment Clause tests beyond *Lemon* test); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2080-81 (2019) (noting instances where *Lemon* test was not applied).  As to the theories that Defendants do address, their arguments are unavailing.

Delegation of "governmental power to religious institutions[] inescapably implicates the Establishment Clause." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123 (1982); *see also Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 710 (1994) (Blackmun, J., concurring) (noting disagreement about whether such violations proceed under *Lemon* test or independent framework). Defendants have committed themselves to providing healthcare that will "at all times be consistent with the teachings of the Roman Catholic Church," as reflected in the Catholic Directives. *Spacco v. Bridgewater Sch. Dep't*, 722 F. Supp. 834, 844-45 (D. Mass. 1989) (holding that town lease with similar provision violated Establishment Clause) (cleaned up). And their adherence to the Catholic Directives "inevitably requires the intimate involvement of members of that faith, and the leaders of that faith, in discerning the applicable standard." *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1343-44 (4th Cir. 1995) (finding that law defining Kosher foods by "Orthodox rules" violated Establishment Clause); *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 429 (2d Cir. 2002) (same). Further, in *Larkin*, the Supreme Court found an Establishment Clause violation where Massachusetts enabled a church to "veto" liquor licenses. 459 U.S. at 127-28. Here, Defendants have effectively granted a healthcare veto to the Catholic Church, since Defendants will forbid treatments banned by or deemed inconsistent with the Catholic Directives.

*Second*, Plaintiffs have adequately alleged that Defendants have violated "[t]he clearest command of the Establishment Clause," by failing to maintain "governmental neutrality." *Larson v. Valente*, 456 U.S. 228, 244, 246 (1982). This "fundamental principle," *Wynne v. Town of Great Falls*, 376 F.3d 292, 299 (4th Cir. 2004), requires that "the government may not favor one religion over another, or religion over irreligion," *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 875 (2005). Here, Defendants impermissibly favored Catholicism over other faiths. As

alleged by Plaintiffs, Defendants have explicitly declared a government-run hospital to be a Catholic entity and have adopted Catholic doctrine to govern its operations. They routinely enforce that religious doctrine against their employees and patients, and, accordingly, refused Mr. Hammons's medical care because Catholic teachings prohibit it. Thus, UMMS has not treated Catholicism "simply as one of many [religions] eligible for equal treatment under a general law"; it has provided a special status for a Catholic hospital without any "assurance that the next similarly situated group seeking a [hospital] of its own will receive one." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist.*, 512 U.S. at 703. "The anomalously case-specific nature of [UMMS]'s exercise of state authority in creating this [hospital] for a religious community leaves the [c]ourt without any direct way to review such state action for the purpose of safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion." *Id.*

*Third*, by mandating adherence to Catholic teachings, Defendants are coercing doctors and patients to support religious practices. "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Even "subtle coercive pressure" and "indirect coercion" may be unconstitutional. *Id.* at 592; *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Here, Defendants have mandated that doctors adhere to Catholic teachings, and barred patients—such as Mr. Hammons—from receiving medically necessary care that is deemed to conflict with Catholic teachings. As a result, Defendants have unconstitutionally coerced participation in Catholic practice of medicine.

*Finally*, Defendants are violating the Establishment Clause under the *Lemon* test from *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). Under the *Lemon* test, government action

25

violates the Establishment Clause unless it complies with three separate commands: "First, [it] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, [it] must not foster an excessive government entanglement with religion." *Id.* (quoting *Walz v. Tax Commission*, 397 U.S. 664, 674 (1970)) (cleaned up). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Buxton v. Kurtinitis*, 862 F.3d 423, 432 (4th Cir. 2017). Defendants' actions fail all of them.

The well-pled allegations in the Complaint show that Defendants acted "with the ostensible and predominant purpose of advancing religion." *McCreary Cty*, 545 U.S. at 860. Defendants adopted the Catholic Directives at St. Joseph in an effort to fulfill the Catholic Church's wishes when purchasing the Hospital from the Church, and canceled Mr. Hammons's surgery because of their adherence to these Catholic views. Defendants argue that such practices served the secular purpose of enabling the Hospital to stay in operation. But, as the allegations of the Complaint establish, Defendants have sought to keep the Hospital not simply as a functioning healthcare facility, but as a religious institution. *See* Compl. ¶¶ 1, 34.

The well-pled allegations also show that the "primary effect" of Defendants' adherence to the Catholic Directives is literally to "advance[]" Catholicism's teachings in the practice of medicine. *Wood v. Arnold*, 915 F.3d 308, 316 (4th Cir. 2019) (quoting *Moss*, 683 F.3d at 608). Defendants themselves, as state actors, instituted a policy of following religious dictates in the provision of healthcare at a state facility—and canceled Mr. Hammons's medically necessary surgery based on those religious beliefs. *See Lund*, 863 F.3d at 278-83 (holding that "lawmaker-led prayer" in county meetings raised particular Establishment Clause concerns because "the prayer-giver was the state itself," and that "promot[ion] of Christianity" as the "preferred system

of belief" violated the Establishment Clause (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 581 (2014)) (cleaned up)). In addition, the Hospital's adherence to the Catholic Directives "clearly identif[ies] the government with a particular faith." *Id.* at 280. The Hospital proudly advertises its devotion on its website, which promotes St. Joseph as both an "integral member of University of Maryland Medical System" and a "Catholic acute care hospital that observes the Ethical and Religious Directives for Catholic Health Care Services," while linking directly to the Catholic Directives. Compl. ¶¶ 1, 28, 34-35. Thus "a reasonable, informed observer would understand that 'the practice under review in fact conveys a message of endorsement' . . . of a religion." *Wood*, 915 F.3d at 316 (quoting *Mellen v. Bunting*, 327 F.3d 355, 374 (4th Cir. 2003)). While Defendants argue that any procedure banned at St. Joseph may be obtained at another UMMS facility, this does not detract from their explicit embrace of Catholicism at St. Joseph. Nor does it account for harm that their adherence to religious teachings causes to patients, such as Mr. Hammons, who must confront discrimination at St. Joseph when they are barred from receiving medically necessary care based on Defendants' religious ideals.

For the final prong of the *Lemon* test, the well-pled allegations of the Complaint show that Defendants' actions "created an excessive entanglement between government and religion." *Id.* at 318 (cleaned up). Defendants are government actors, who are "defining" the available care at a state facility "by a religious test," *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist.*, 512 U.S. at 702—specifically, "the moral tradition of the Church," Compl. ¶ 28. Because of state actors' continued involvement with the enforcement of Catholic religious practices at the Hospital, this case involves precisely "[t]he kind of excessive entanglement of government and religion precluded by *Lemon*[, which] is characterized by 'comprehensive, discriminating, and continuing state surveillance' of religious exercise" or "pervasive monitoring or other maintenance by

public authorities" of religious practices. *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 273 (4th Cir. 2005) (quoting *Lemon*, 403 U.S. at 619; citing *Mueller v. Allen*, 463 U.S. 388, 403 (1983)) (cleaned up).

Defendants contend that the Catholic belief structure of the Hospital amounts to a mere "interaction" with a religious organization, MTD at 18, but such a characterization grossly understates the ongoing and pervasive effect of the Catholic Directives on the administration of care at the Hospital. Defendants continuously mandate adherence to those religious teachings, and prohibit patients such as Mr. Hammons from receiving medically necessary care at the Hospital as a result. "Ordinary human experience and a long line of cases teach that few entanglements could be more offensive to the spirit of the Constitution." *Larkin*, 459 U.S. at 127.

In addition, Defendants' reliance on *Bradfield v. Roberts*, 175 U.S. 291 (1899), and *Smith v. Jefferson Cty. Bd. of Sch. Commissioners*, 788 F.3d 580 (6th Cir. 2015), is entirely misplaced. Both cases concerned agreements between government and private religiously affiliated organizations—not government actors *themselves* promoting religious adherence. *Bradfield*, 175 U.S. at 297 (agreement with religiously-affiliated hospital for funding); *Smith*, 788 F.3d at 593 (contract between school board and religious school for alternative education). This distinction is critical. *See Lund*, 863 F.3d at 278-81, 286 (holding that "lawmaker-led prayer" in county meetings raised particular Establishment Clause concerns because "the prayer-giver was the state itself," and "serious harms arise when the power and prestige of government is placed behind a particular religious belief" (cleaned up)). Further, in both *Bradfield* and *Smith*, the courts took pains to emphasize the secular nature of the religiously-affiliated institutions' operations. *Smith*, 788 F.3d at 594 (alternative education program at issue was "consistently run in a secular

manner"); *Bradfield*, 175 U.S. at 298-99 ("[T]here is nothing sectarian in the corporation";

"[t]here is no allegation that its hospital work is confined to members of that church or that in its

management the hospital has been conducted so as to violate its [secular] charter in the smallest

degree."). Here, by contrast, Defendants proudly operate the Hospital under the edicts of

Catholic teachings, and refuse to provide care on overtly religious grounds.

For all these reasons, Mr. Hammons has stated a valid claim under the Establishment

Clause for which relief can be granted.

## IV. DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES THE EQUAL PROTECTION CLAUSE

### A. The Hospital Singles Out Transgender Patients' Surgeries to Treat Gender Dysphoria for Different and Unequal Treatment

As alleged in the Complaint, St. Joseph canceled Mr. Hammons's necessary surgery

based on a facially discriminatory policy against providing medically necessary surgery for

gender dysphoria. The Complaint specifically alleges that the Hospital "did not cancel Mr.

Hammons's surgery based on a generally applicable policy of not performing hysterectomies."

Compl. ¶¶ 75, 90. The Hospital provides hysterectomies when they are medically necessary to

treat other conditions, but refuses to provide those same hysterectomies when they are medically

necessary to treat gender dysphoria. *See* Compl. ¶¶ 57-58.

Ignoring these factual allegations, Defendants falsely assert that Mr. Hammons "does not

allege that St. Joseph interpreted, intended to apply, or applied the [Catholic Directives'] gender-

neutral guidance against sterilization procedures and those impacting the integrity of the human

body in any discriminatory way." MTD at 20. But such discrimination is *exactly* what Mr.

Hammons alleges. The Complaint alleges that the Hospital routinely performs hysterectomies

and other surgeries resulting in sterilization or loss of "functional integrity" if those surgeries are

medically necessary to treat conditions other than gender dysphoria. Compl. ¶¶ 57-58. The

29

Complaint also alleges that the Hospital routinely performs surgeries that remove healthy tissue even when the surgery is purely cosmetic. Compl. ¶ 58. And the Complaint alleges that "Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria." Compl. ¶¶ 75, 90. There is nothing "conclusory" about those allegations, MTD at 21, and, for purposes of Defendants' motion to dismiss, they must be accepted as true.[11]

### B.     St. Joseph's Policy Against Providing Medically Necessary Surgery for Transgender Patients with Gender Dysphoria Facially Discriminates Based on Sex and Transgender Status

Under Fourth Circuit precedent, discrimination based on sex and transgender status is presumptively unconstitutional and subject to heightened scrutiny under the Equal Protection Clause. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020). Applying heightened scrutiny, Defendants bear the burden of proof to demonstrate that their discrimination serves an important governmental interest and "that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). "The burden of justification is demanding and it rests entirely on the State." *United States v. Va.*, 518 U.S. 515, 533 (1996).

Defendants do not assert that discriminating against people who are transgender is

---

[11] These allegations of disparate treatment distinguish this case from *Weinreb v. Xerox Business Services, LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 521 (S.D.N.Y. 2018), *adhered to on denial of reconsideration sub nom.*, *Weinreb v. Xerox Business Services*, No. 16-cv-6823, 2020 WL 4288376 (S.D.N.Y. July 27, 2020). *See* MTD at 21-22. The plaintiff in *Weinreb* alleged that an insurance policy discriminated on the basis of sex by denying coverage for the off-label use of fentanyl to treat Global Diffuse Adenomyosis, a disease that affects only women. The insurance policy denied coverage for *all* off-label use of fentanyl, including for diseases affecting only men and diseases affecting only women. *Weinreb*, 323 F. Supp. 3d at 517. By contrast, Mr. Hammons's Complaint alleges that St. Joseph does not have a generally applicable policy against providing surgery that results in sterilization or removes healthy tissue. St. Joseph provides such surgeries when they are medically necessary for other medical conditions, but singles out medically necessary surgery for transgender patients to treat gender dysphoria for different treatment.

substantially related to an important governmental interest.  Instead, Defendants assert that they cannot be held liable under the Equal Protection Clause unless they acted with discriminatory intent or animus.  MTD at 20.  But allegations of discriminatory motive are not necessary when a policy is discriminatory on its face.  "Although facially neutral statutes which have a discriminatory impact do not violate the Equal Protection Clause unless discriminatory intent can be demonstrated, discriminatory intent need not be established independently when the classification is explicit, as in this case."  *Faulkner v. Jones*, 51 F.3d 440, 444 (4th Cir. 1995) (cleaned up).

The Hospital's policy against providing transgender patients medically necessary care for gender dysphoria is discriminatory on its face for at least three reasons.  *First*, the policy discriminates based on sex: discriminating between transgender patients who require hysterectomies for gender dysphoria and patients who require hysterectomies for other medical conditions inherently rests on a sex classification because "the diagnosis at issue—gender dysphoria—only results from a discrepancy between assigned *sex* and *gender* identity."  *Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020).  Had Mr. Hammons' been designated at birth as "a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery."  *Toomey v. Arizona*, No. CV-19-00035-TUC-RM, 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019).  "[S]uch a policy cannot be stated without referencing sex," and "[o]n that ground alone, heightened scrutiny should apply."  *Grimm*, 972 F.3d at 608.

*Second*, the Hospital's policy discriminates against transgender patients: discrimination based on gender "transition clearly discriminates on the basis of transgender identity."  *Stone v. Trump*, 356 F. Supp. 3d 505, 513 (D. Md. 2018).  By providing medically necessary

31

hysterectomies for other medical conditions but excluding medically necessary hysterectomies

for gender dysphoria, Defendants' policy "creates a different rule governing the medical

treatment of transgender people." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 950

(W.D. Wis. 2018). Indeed, an exclusion of health care for gender dysphoria "is directly

connected to the incongruence between Plaintiff's natal sex and his gender identity," which is the

defining hallmark of being transgender. *Toomey*, 2019 WL 7172144, at *6; *cf. Christian Legal

Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689

(2010) (declining to distinguish between discrimination based on status of being gay and

discrimination based on conduct of having relationships with a same-sex partner); *Lawrence v.

Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in judgment) ("While it is true that

the law applies only to conduct, the conduct targeted by this law is conduct that is closely

correlated with being homosexual. Under such circumstances, [the] law is targeted at more than

conduct. It is instead directed toward gay persons as a class."); *Pac. Shores Properties, LLC v.

City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (explaining the when a

"defendant discriminates against individuals on the basis of criteria that are almost exclusively

indicators of membership in the disfavored group," the discrimination is treated as a facial

classification).[12]

---

[12] In a decision that conflicts with the great weight of authority, a district court in the Middle District of Georgia reluctantly reasoned that a health insurance plan excluding coverage for "sex change surgery" did not facially discriminate based on sex. *See Lange v. Houston Cty.*, No. 5:19-cv-392, 2020 WL 6372702, at *10-11 (M.D. Ga. Oct. 30, 2020). The *Lange* court believed at that this result was dictated by *Geduldig v. Aiello*, 417 U.S. 484 (1974), which held that the exclusion of pregnancy-related disabilities from a disability insurance program did not facially discriminate based on sex.

That was error. *Geduldig* predates the Supreme Court's modern equal protection jurisprudence and has not been cited by a majority opinion in an equal protection case since the mid-70s. *See generally* Reva B. Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 108 Georgetown L.J. 167, 208 n.229 (2020). Instead, the Supreme Court's modern cases have recognized that the differential treatment of pregnancy in insurance and employee-leave policies similar to the one at issue in *Geduldig* rests "on the pervasive sex-role    *(note continues on next page)*

*Third*, discriminating against care for gender dysphoria also facially discriminates based on sex stereotyping and gender nonconformity. "[D]iscrimination against transgender people constitute[s] sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608. In the context of healthcare, discrimination against transgender patients through the denial of transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex," *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018), and "tethers [transgender patients] to sex stereotypes which, as a matter of medical necessity, they seek to reject," *Kadel*, 446 F. Supp. 3d at 14. Defendants are willing to provide hysterectomies when they are medically necessary for other conditions, but Defendants refuse to provide those same hysterectomies when they are prescribed to transgender patients for the gender nonconforming purpose of treating gender dysphoria.

Because the Hospital's policy facially discriminates based on sex and transgender status, no additional allegations of discriminatory intent are necessary to state an equal protection claim. But even if it were necessary to also allege discriminatory intent, the Complaint has plausibly

---

stereotype that caring for family members is women's work," *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 731 (2003), and the Court has made plain that "'[i]nherent differences'' related to the capacity to become pregnant may no longer be cause "for denigration" or "artificial constraints on an individual's opportunity," *United States v. Va.*, 518 U.S. 515, 533-34 (1996).

But even if *Geduldig* were still controlling in the context of pregnancy, its reasoning cannot be extended to this case. The Supreme Court has not distinguished between sex discrimination and discrimination based on transgender status. To the contrary, the Supreme Court has explicitly recognized that "transgender status [is] inextricably bound up with sex." *Bostock*, 140 S. Ct. at 1742. In addition, the *Lange* court also restricted its analysis to whether the "sex change surgery" exclusion discriminated based on sex. But in the Fourth Circuit, discrimination based on transgender status is independently subject to heightened scrutiny. *See Grimm*, 972 F.3d at 611. As discussed above, denying medically necessary hysterectomies for transgender people with gender dysphoria, while providing those same hysterectomies for non-transgender people with other medical conditions, facially discriminates based on *both* sex and transgender status, and is subject to heightened scrutiny under *Grimm*.

alleged that too. As alleged in the Complaint, Defendants' disparate treatment of transgender people seeking medically necessary hysterectomies for gender dysphoria fails even rational basis review because it "was grounded in sex stereotypes, discomfort with gender nonconformity and gender transition, and moral disapproval of people who are transgender." Compl. ¶ 83; *see Toomey*, 2019 WL 7172144, at *9 (holding that exclusion of medically necessary surgery for gender dysphoria raised plausible inference of animus for purposes of motion to dismiss).

## V.    DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES SECTION 1557 OF THE AFFORDABLE CARE ACT

For all the same reasons that Defendants' denial of medically necessary care for transgender people violated the Equal Protection Clause, Defendants also violated Section 1557 of the Affordable Care Act. *See Kadel*, 446 F. Supp. 3d at 14; *Tovar v. Essentia Health,* 342 F. Supp. 3d 947, 952 (D. Minn. 2018); *Boyden*, 341 F. Supp. 3d at 997. Section 1557 provides that "an individual shall not, on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). The Supreme Court held in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1742 (2020), that discrimination based on transgender status is discrimination based on "sex" for purposes of Title VII. *Bostock*'s reasoning applies to Title IX, *see Grimm*, 972 F.3d at 616, and by extension to Section 1557.[13]

Defendants do not dispute that they receive federal financial assistance, but they once

---

[13] Because the plain text of Section 1557 prohibits discrimination against transgender patients—including discrimination with respect to care for gender dysphoria—the lawfulness of such discrimination does not depend on the implementing regulations for Section 1557. *See Tovar v. Essentia Health,* 342 F. Supp. 3d 947, 957 (D. Minn. 2018); *Prescott v. Rady Children's Hosp. San Diego*, 265 F. Supp. 3d 1090, 1105 (S.D. Cal. 2017).

again assert that they cannot be held liable unless they acted with discriminatory intent.  MTD at

21.  As the Supreme Court explained in *Bostock*, however, when someone discriminates based

on transgender status that person "inescapably *intends* to rely on sex in its decisionmaking."

*Bostock*, 140 S. Ct. at 1742.  "[N]othing in Title VII turns on the employer's labels or any further

intentions (or motivations) for its conduct beyond sex discrimination."  *Id.* at 1745-46.  "Whether

an employment practice involves disparate treatment through explicit facial discrimination does

not depend on why the employer discriminates but rather on the explicit terms of the

discrimination."  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*

*v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

Because the Supreme Court's decision in *Bostock* applies with full force to Title IX, *see*

*Grimm*, 972 F.3d at 616, no further allegations of motive are necessary to establish that

Defendant's facially discriminatory policy violates Section 1557.

## CONCLUSION

For these reasons, the Motion should be denied.

Date: November 23, 2020

Respectfully submitted,

/s/Louis J. Ebert
Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG,
LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice*)
Jonah M. Knobler (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
Abigail E. Marion (*pro hac vice*)
Emily H. Harris (*pro hac vice*)

35

SA43

Jonathan S. Z. Hermann (*pro hac vice*)
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
jknobler@pbwt.com
acohen@pbwt.com
amarion@pbwt.com
eharris@pbwt.com
jhermann@pbwt.com

Joshua A. Block (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

*Counsel for Plaintiff Jesse Hammons*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JESSE HAMMONS,                                    )
                                                  )
        Plaintiff,                         )
                                                  )
    v.                                          )     Case No. 20-cv-2088-DKC
                                                  )
UNIVERSITY OF MARYLAND MEDICAL SYSTEM             )
    CORPORATION, et al.,                        )
                                                  )
        Defendants.                        )
_____   )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

APPENDIX OF EXHIBITS .............................................................. viii

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF UNDISPUTED FACTS .............................................3

I.      Gender Dysphoria and Its Treatment. ...................................3

II.     UMMS Controls the Hospital Through Two Wholly Owned Subsidiaries. .......................5

III.    St. Joseph's Catholic Identity. ............................................7

        A.      St. Joseph Prohibits Transition-Related Care. .....................9

        B.      St. Joseph Regularly Performs Hysterectomies for Any Medical Reason—Except to Treat Gender Dysphoria. ..................11

IV.     St. Joseph Canceled Mr. Hammons's Hysterectomy Because He Is Transgender. ...........14

LEGAL STANDARD ......................................................................17

ARGUMENT ...............................................................................17

I.      DEFENDANTS' DENIAL OF CARE TO MR. HAMMONS VIOLATED THE ACA. .........................17

        A.      DEFENDANTS DENIED MEDICAL CARE TO MR. HAMMONS ON THE BASIS OF SEX. .............17

        B.      MR. HAMMONS SUFFERED HARM. ...............................22

        C.      DEFENDANTS RECEIVE FEDERAL FUNDS. ......................23

II.     UMMS IS LIABLE FOR THE VIOLATION OF MR. HAMMONS'S RIGHTS. ..........24

        A.      UMMS Is Subject to Section 1557 In All Its Operations. ............24

        B.      UMMS Is Directly Liable for Its Own Conduct. ....................26

        C.      UMMS Is Indirectly Liable for St. Joseph's Actions. ..............28

III.    THE NORTH DAKOTA INJUNCTION DOES NOT INSULATE ST. JOSEPH FROM LIABILITY. .........31

i

CONCLUSION................................................................................................................35

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................17

*Balogh v. Lombardi*,
    816 F.3d 536 (8th Cir. 2016) ..........................................................................33

*Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*,
    210 F.3d 18 (1st Cir. 2000)..............................................................................29

*Billard v. Charlotte Catholic High Sch.*,
    No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021), *appeal filed*
    No. 22-1440 (4th Cir. Apr. 25, 2022) ..............................................................35

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020).........................................................................18, 21, 22

*Bouchat v. Balt. Ravens Football Club, Inc.*,
    346 F.3d 514 (4th Cir. 2003) ..........................................................................17

*Boyden v. Conlin*,
    341 F. Supp. 3d 979 (W.D. Wis. 2018) ....................................................21, 22

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
    80 F. Supp. 2d 729 (W.D. Mich. 2000) ..........................................................26

*Cole v. Fam. Dollar Stores of Md., Inc.*,
    No. CV PX-17-0393, 2018 WL 3818811 (D. Md. Aug. 10, 2018), *aff'd*, 811
    F. App'x 168 (4th Cir. 2020) ..........................................................................19

*Conley v. Nw. Fla. State Coll.*,
    145 F. Supp. 3d 1073 (N.D. Fla. 2015)...........................................................20

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    142 S. Ct. 1562 (2022)....................................................................................23

*Daniel v. Paul*,
    395 U.S. 298 (1969)........................................................................................23

*Drewitt v. Pratt*,
    999 F.2d 774 (4th Cir. 1993) ..........................................................................17

*Dulaney v. Packaging Corp. of Am.*,
    673 F.3d 323 (4th Cir. 2012) ..........................................................................17

### TABLE OF AUTHORITIES
#### (continued)

**Page(s)**

*Equal Rights Ctr. v. Equity Residential*,
   No. CCB-06-1060, 2016 WL 1258418 (D. Md. Mar. 31, 2016) ......................................26, 29

*Fain v. Crouch*,
   545 F. Supp. 3d 338 (S.D. W. Va. 2021) ...............................................................................23

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983)......................................................................................19, 31, 33

*Geduldig v. Aiello*,
   417 U.S. 484 (1974)...........................................................................................................19

*Gen. Elec. Co. v. Gilbert*,
   429 U.S. 125 (1976)....................................................................................................19, 20

*Goddard v. Apogee Retail LLC*,
   No. 19-3269, 2021 WL 2589727 (D. Md. June 24, 2021)....................................................35

*Good v. Am. Water Works Co., Inc.*,
   No. CV 2:14-01374, 2016 WL 5402230 (S.D. W. Va. Sept. 26, 2016) ................................26

*Goya Foods, Inc v. Wallack Mgmt. Co.*,
   290 F.3d 63 (1st Cir. 2002).................................................................................................32

*Grimm v. Gloucester Cty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021).............................. *passim*

*Grove City College v. Bell*,
   465 U.S. 555 (1984).................................................................................................24, 25, 26

*Gunter v. Long Island Power Auth./Keyspan*,
   No. 08-cv-498 (RRM) (LB), 2011 WL 1225791 (E.D.N.Y. Feb. 15, 2011).........................35

*Heckler v. Mathews*,
   465 U.S. 728 (1984)...........................................................................................................23

*In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*,
   958 F. Supp. 1045 (D. Md. 1997).......................................................................................26

*Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*,
   No. CIV.A. ELH-12-572, 2013 WL 1010357 (D. Md. Mar. 13, 2013) ................................25

*Kadel v. Folwell*,
   446 F. Supp. 3d 1 (M.D.N.C. 2020), *aff'd*, 12 F.4th 422 (4th Cir. 2021), *as amended* (Dec. 2, 2021), *cert. denied*, 142 S. Ct. 861, 211 L. Ed. 2d 568 (2022)...........................................................................................................18, 21, 22

iv

## TABLE OF AUTHORITIES

### (continued)

Page(s)

*Kadel v. Folwell*,
    No. 1:19CV272, 2022 WL 2106270 (M.D.N.C. June 10, 2022) ............................ 21

*Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*,
    12 F.4th 422 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022) ....................... 30

*Keffer v. H.K. Porter Co.*,
    872 F.2d 60 (4th Cir. 1989) ................................................................... 29

*Lebron v. Natl R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ......................................................................... 31, 35

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (4th Cir. 2013) ................................................................ 17

*Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
    No. CV 19-10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019) ........................ 20

*NCAA v. Smith*,
    525 U.S. 459 (1999) ........................................................................... 33

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
    462 U.S. 669 (1983) ........................................................................... 20

*Next Investments, LLC v. Bank of China*,
    12 F. 4th 119 (2d Cir. 2021) ................................................................. 32

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ........................................................................... 30

*Paulone v. City of Frederick*,
    No. CV ELH-09-2007, 2012 WL 13184457 (D. Md. May 1, 2012) ................... 25

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001) ............................................................... 27, 28

*Religious Sisters of Mercy v. Azar*,
    513 F. Supp. 3d 1113 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr.
    21, 2021) ................................................................................ *passim*

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ........................................................................... 23

*Rumble v. Fairview Health Servs.*,
    No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) .......... 24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Scott v. Harris*,
    550 U.S. 372 (2007)..................................................................17, 19

*Shimkus v. Gersten Cos.*,
    816 F. 2d 1318 (9th Cir. 1987) ................................................33

*Stanford v. Fox Coll.*,
    No. 18 C 3703, 2020 WL 814865 (N.D. Ill. Feb. 19, 2020)..................20

*T.S. by & through T.M.S. v. Heart of CarDon, LLC*,
    No. 1:20-CV-01699-TWP-MG, 2021 WL 2946447 (S.D. Ind. July 14, 2021).......25

*Taylor v. Fluor Corp.*,
    No. CV 6:17-1875-BHH, 2019 WL 4727464 (D.S.C. Sept. 27, 2019).............28

*Thaxton v. Vaughan*,
    321 F.3d 474 (4th Cir. 1963) ..................................................32

*Tolan v. Cotton*,
    572 U.S. 650 (2014) (per curiam) ............................................17

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014)....................................................28

*United States v. Bestfoods*,
    524 U.S. 51 (1998)..............................................................26

*United States v. Sec'y Fla. Agency for Health Care Admin.*,
    21 F. 4th 730 (11th Cir. 2021) ................................................33

*Whole Woman's Health v. Jackson*,
    142 S. Ct. 522 (2021)..........................................................32

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
    477 F.3d 1282 (11th Cir. 2007) ................................................26

*Workman v. Univ. of Akron*,
    No. 5:16-CV-156, 2017 WL 6326898 (N.D. Ohio Dec. 11, 2017) ...............20

**Statutes**

42 U.S.C. § 18116.................................................................23, 24

42 U.S.C. § 2000e(k) .............................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 § 2, 102 Stat. 28
(1988) ...................................................................................................................2

Md. Code Educ. § 13-301 ...........................................................................................5

Md. Code Educ. § 13-302 ...........................................................................................5

Md. Code Educ. § 13-303 ...........................................................................................5

**Other Authorities**

34 C.F.R. § 106.40(b) ...............................................................................................20

45 C.F.R. § 92.3(b) ...................................................................................................25

Fed. R. Civ. P. 56 ......................................................................................................17

Fed. R. Civ. P. 65 ......................................................................................................32

*Nondiscrimination in Health and Health Education Programs or Activities,
Delegation of Authority*, 85 Fed. Reg. 37160-01 (June 19, 2020)....................21, 25

*Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31375-01
(May 18, 2016)...............................................................................................21, 25

APPENDIX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Declaration of Jesse R. Hammons. |
| 2 | Dr. Kate Thomas Letter to Dr. Steven Adashek. Bates No. HUM_0000050-51. |
| 3 | Expert Witness Report and Declaration of Loren S. Schechter, M.D. |
| 4 | Dr. Gail Cunningham Rule 30(b)(6) and Personal Capacity Deposition Transcript. |
| 5 | UMSJ Health System, LLC Articles of Organization. Bates No. HUM_0001100-03. |
| 6 | Northeastern Maryland Regional Health System, LLC Articles of Organization. Bates No. HUM_0000513-15. |
| 7 | Northeastern Maryland Regional Health System, LLC Articles of Amendment. Bates No. HUM_0000516-17. |
| 8 | William C. Greskovich Rule 30(b)(6) Deposition Transcript. |
| 9 | Everest Scott Conover Deposition Transcript. |
| 10 | UMSJ Health System, LLC 2017 Form 990. Bates No. HUM_0000518-619. |
| 11 | Keith Riddle Deposition Transcript. |
| 12 | Fr. Louis Asobi Deposition Transcript. |
| 13 | National Catholic Bioethics Center Policy Document. Bates No. UMMS000000004-05. |
| 14 | Catholic Identity and Ethics Review. Bates No. UMMS000000768. |
| 15 | Dr. Michael J. Marion Deposition Transcript. |
| 16 | Dr. Gail Cunningham Email Exchange. Bates No. UMMS000000107-10. |
| 17 | Dr. Monica Buescher Email to Dr. Steven Adashek et al. |
| 18 | Dr. Monica Buescher Deposition Transcript. |
| 19 | Dr. Steven Adashek Deposition Transcript. |
| 20 | Jesse R. Hammons Deposition Transcript. |
| 21 | Dr. Steven Adashek Handwritten Notes from January 30, 2020 Meeting. |

| 22 | Dr. Gail Cunningham Email to Dr. Michael J. Marion et al. Bates No. UMMS000000715-16. |

Plaintiff Jesse Hammons ("Plaintiff" or "Mr. Hammons") respectfully submits this memorandum of law in support of his motion for summary judgment and in opposition to the motion for summary judgment, ECF No. 98, filed by Defendants University of Maryland Medical System Corporation ("UMMS"), UMSJ Health System, LLC ("UMSJ LLC"), and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC") (all three collectively, "Defendants"; UMSJ LLC and St. Joseph LLC collectively, "St. Joseph").

## PRELIMINARY STATEMENT

Mr. Hammons is a man who is transgender and who has also been diagnosed with gender dysphoria. As part of his medically necessary care, Mr. Hammons's surgeon scheduled a hysterectomy to take place at the University of Maryland St. Joseph Medical Center, a wholly owned subsidiary of UMMS. But before Mr. Hammons's surgery could take place, St. Joseph ordered Mr. Hammons's surgeon to cancel the procedure because St. Joseph refuses to provide any gender-affirming care for transgender individuals.

As Defendants have now admitted in discovery, Defendants have a facially discriminatory policy against providing gender-affirming care of any kind to transgender patients at St. Joseph. That is because, despite being a government hospital system, UMMS requires St. Joseph to adhere to the Ethical & Religious Directives of the United States Conference of Catholic Bishops ("ERDs"), which St. Joseph interprets to ban all gender-affirming care, including gender-affirming hormone therapy and all gender-affirming surgery. Pursuant to that policy, Defendants "denied [Mr. Hammons] the benefits of [their] services because he has gender dysphoria, a condition inextricably linked to being transgender." ECF No. 52 (decision on motion to dismiss) at 46.

Defendants have asserted that St. Joseph has a facially neutral policy of not performing hysterectomies because of a generally applicable prohibition on sterilization procedures, but the undisputed evidence shows that this assertion has no basis in fact. Discovery revealed that St.

1

Joseph does not regard hysterectomies as "sterilization procedures" and routinely performs hysterectomies for any medically indicated reason *except* to treat gender dysphoria. Discovery also revealed that St. Joseph refuses to provide any gender-affirming care regardless of whether the surgery impacts fertility at all. Defendants thus "regarded [Mr. Hammons's] medical need [for a hysterectomy] differently because he is transgender" and "discriminated against him on the basis of sex by treating him worse than others who are similarly situated.'" ECF No. 52 at 47 (cleaned up). By denying Mr. Hammons's surgery on that basis, Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking," and thus "denied him the benefits of [their] services on the basis of sex, in violation of § 1557." *Id.*

UMMS and both of its defendant subsidiaries are jointly liable for violating Mr. Hammons's rights under Section 1557 of the Affordable Care Act ("ACA"). UMMS is directly liable for signing and enforcing an agreement with the Archdiocese of Baltimore in which UMMS promised to maintain St. Joseph's Catholic heritage and require St. Joseph to adhere to the ERDs. And UMSJ LLC and St. Joseph LLC are liable because they implemented the discriminatory policy and applied it against Mr. Hammons.

Defendants' attempts to evade accountability are meritless. UMMS argues that it cannot be held liable under Section 1557 because it did not receive the specific federal funds that were used in the program that discriminated against Mr. Hammons. But federal law explicitly requires an entity receiving federal financial assistance to comply with antidiscrimination requirements in all its operations. *See* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 § 2, 102 Stat. 28, 28 (1988) (codified at 29 U.S.C. § 794(b)) ("CRRA"). The flow of specific federal funds is irrelevant.

Defendants also erroneously contend that Mr. Hammons's claims against UMSJ LLC and

St. Joseph LLC are barred by an injunction in *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1153-54 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr. 21, 2021), which prohibits the federal government from enforcing Section 1557 against members of the Catholic Benefits Association.  Defendants assert that because UMSJ LLC and St. Joseph LLC ostensibly joined the Catholic Benefits Association a few days before filing their motion for summary judgment, the injunction in *Religious Sisters of Mercy* prevents Mr. Hammons from bringing claims against them in private litigation.  To the contrary, Mr. Hammons was not a party in the *Religious Sisters of Mercy* case and is not in privity with the federal government for purposes of the North Dakota injunction.  Indeed, the injunction in *Religious Sisters of Mercy* was based on the Religious Freedom Restoration Act ("RFRA"), which does not even apply to litigation between private parties.  And, as governmental entities, UMSJ LLC and St. Joseph LLC cannot claim protection under RFRA in any event.

Because the undisputed facts establish that Defendants denied Mr. Hammons care pursuant to a discriminatory policy, and because all Defendants are liable for that discrimination, Mr. Hammons's motion for summary judgment should be granted, and Defendants' motion denied.

## STATEMENT OF UNDISPUTED FACTS

### I.    Gender Dysphoria and Its Treatment.

Plaintiff Jesse Hammons is a man who is transgender, which means that he has a male gender identity but the sex assigned to him at birth was female.  Ex. 1 ("Hammons Decl.") ¶ 3.  Mr. Hammons has been diagnosed by his medical providers with gender dysphoria, a diagnostic term for clinically significant distress experienced by some transgender people based on the incongruence between their gender identity and the sex assigned to them at birth.  *Id.* at ¶ 4; Ex. 2 (Letter, Kate Thomas, PhD to Dr. Steven J. Adashek (Dec. 27, 2019)); Ex. 3 (Expert Witness Report and Declaration of Loren S. Schechter, M.D. (Dec. 14, 2021)) ¶ 20.  Gender dysphoria is a

serious medical condition recognized by the Diagnostic and Statistical Manual of Mental Disorders and by the International Classification of Diseases published by the World Health Organization. Ex. 3 ¶ 21. Transgender individuals diagnosed with gender dysphoria can experience intense discomfort with the primary and/or secondary sex characteristics of the sex they were assigned at birth, and those who do not receive necessary treatment can suffer severe and debilitating harms such as depression, anxiety, self-harm and suicidal ideation or attempts. *Id.* at ¶¶ 22-23.

The World Professional Association for Transgender Health ("WPATH") publishes Standards of Care for treating gender dysphoria. *Id.* at ¶ 24. Under the WPATH Standards, which are widely recognized guidelines on how to effectively treat transgender individuals with gender dysphoria,[1] medically necessary treatment for gender dysphoria may require medical treatment to affirm one's gender identity and transition from living as one gender to another. *Id.* at ¶¶ 27-30. This treatment, commonly referred to as gender-affirming or gender-confirming care, may include hormone therapy and surgery. *Id.* Gender-affirming care is recognized by medical and mental health professionals as medically necessary for treating people with gender dysphoria. *Id.*

According to the WPATH Standards of Care, some transgender individuals may require surgery to alleviate their gender dysphoria. *Id.* In these instances, surgical treatment is medically necessary because the treatments are clinically indicated to treat an underlying medical condition, gender dysphoria. *Id.* For transgender men, surgical treatment options may include chest reconstruction or breast removal, genital reconstruction, or removal of internal sex organs, including a hysterectomy. *Id.* at ¶ 29.

---

[1] The Fourth Circuit has noted that the WPATH Standards of Care "represent the consensus approach of the medical and mental health community [for treating gender dysphoria] and have been recognized by various courts, including this one, as the authoritative standards of care." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

## II.    UMMS Controls the Hospital Through Two Wholly Owned Subsidiaries.

UMMS was created by Maryland statute in 1984, to provide "comprehensive health care" to the state and region.  Md. Code Educ. § 13-301, *et seq.*; *id.* at § 13-302(1), (3).  The statute authorizes UMMS to establish "nonprofit or for-profit subsidiaries" subject to approval by the University of Maryland.  *Id.* at § 13-303(k)(2).  In 2012, UMMS purchased St. Joseph Medical Center, a Catholic hospital (the "Hospital").  Defs.' Ex. 2 (Asset Purchase Agreement); Ex. 4 ("Cunningham Tr.") 34:12-14.[2]  UMMS is the sole owner of the Hospital.  Cunningham Tr. 36:5-18.

UMMS controls the Hospital through two wholly-owned subsidiaries, UMSJ LLC and St. Joseph LLC.  Ex. 5 (Articles of Organization of UMSJ LLC); Ex. 6 (Articles of Organization of St. Joseph LLC, under prior name, Northeastern Maryland Regional Health System, LLC); Ex. 7 (changing name); Ex. 8 ("Greskovich Tr.") 80:6-13.[3]  The two subsidiaries are indistinguishable in practice.  Indeed, Defendants themselves refer to the two entities collectively as St. Joseph and

---

[2] Dr. Gail Cunningham, St. Joseph's Chief Medical Officer, was designated to testify as St. Joseph's 30(b)(6) witness on, among other things, St. Joseph's acquisition by UMMS; any commitments to continue to operate St. Joseph as a Catholic hospital that abides by the ERDs; St. Joseph's adherence to the ERDs; all review processes in place to determine whether a procedure is consistent with the ERDs; St. Joseph's definition of a "life-threatening condition"; all policies and processes for treating transgender patients with gender dysphoria; all policies and processes relating to gender-affirming surgery and related treatments; all policies and processes relating to hysterectomies; and all procedures that have not been permitted to take place at St. Joseph because of the ERDs.

[3] William Greskovich, Vice President for Operations for UMMS, was designated to testify as the UMMS 30(b)(6) witness on UMMS's acquisition of St. Joseph, UMMS's relationship with UMSJ LLC and St. Joseph LLC, UMMS's involvement in or approval of the operation of St. Joseph LLC in a manner consistent with Catholic values and principles, and UMMS's awareness of or participation in a Catholic Identity and Ethics Review.

5

explicitly state that they will "not further distinguish between th[em]."  Defs.' Mem. at 4.  Mr. Hammons here likewise refers to both entities jointly as "St. Joseph."[4]

UMMS retains controlling authority over St. Joseph's management and operations. UMMS has the power to appoint and remove St. Joseph's CEO and President.  Cunningham Tr. 54:7-10; Ex. 9 ("Conover Tr.") 44:2-10; Defs.' Ex. 13 (St. Joseph Operating Agreement) at 1217, 1232.  UMMS directly appoints two board members for St. Joseph; delegates to the Archdiocese of Baltimore the power to appoint one board member; selects St. Joseph's CEO, who holds an *ex officio* board seat; and selects all remaining board members through a nomination process.  Defs.' Ex. 2 at 915 (setting out nomination process); Cunningham Tr. 49:19-50:19 (confirming nomination process).  The UMMS CEO also sits on the joint board as an *ex officio* director and has the right to serve on every committee of the board.  Defs.' Ex. 13 at 1219; Cunningham Tr. 45:3-10.  UMMS must also approve all decisions of St. Joseph's board.  Ex. 10 (UMSJ LLC Form 990 (2017)) at 596; *see also* Cunningham Tr. 40:14-41:7; 50:20-51:6.  In addition, UMMS must approve St. Joseph's strategic plans; St. Joseph's annual budget, which includes the salaries and

---

[4] Formally, UMMS exercises control over UMSJ LLC's board pursuant to an Asset Purchase Agreement; UMSJ LLC in turn exercises control over St. Joseph LLC's board pursuant to a Second Amended and Restated Operating Agreement.  Defs.' Ex. 2 at 915; Defs.' Ex. 13 at 1219-20; Conover Tr. 34:10-12; Cunningham Tr. 35:6-36:18.  But UMMS's control over UMSJ LLC gives it direct control over St. Joseph LLC.  When it purchased the hospital, UMMS agreed that the boards of St. Joseph LLC and UMSJ LLC must consist of the same members.  Defs.' Ex. 2 at 916 ¶ 12.16(c); *see also* Cunningham Tr. 49:1-4 (testifying that Asset Purchase Agreement provides that boards must be the same); Conover Tr. 34:19-35:12 (testifying that boards are the same).  Dr. Thomas Smyth is the Chief Executive Officer and President for both UMSJ LLC and St. Joseph LLC.  *See* Conover Tr. 44:2-5.  And UMMS's corporate representative testified that there is no intermediary between the leadership teams of UMMS and the Hospital, and that they interface directly.  Greskovich Tr. 76:16-77:1.  Moreover, UMMS's express and reserved powers over UMSJ LLC are identical to UMSJ LLC's express and reserved powers over St. Joseph LLC, and thus any action subject to approval by UMSJ LLC is also subject to approval by UMMS.  *Compare* Defs.' Ex. 2 at 963-65, *with* Defs.' Ex. 13 at 1215-17 (enumerating actions requiring approval by UMSJ LLC "followed by the approval of UMMS").

compensation for all employees of the hospital; any of St. Joseph's real estate transactions; any material additions, expansions, revisions or deletions of a health care service at St. Joseph; and an array of St. Joseph's other business and financial matters. Cunningham Tr. 51:16-55:10; Conover Tr. 44:6-10; Defs.' Ex. 13 at 1215-16. UMMS also may require St. Joseph to make financial contributions to UMMS's general expenses. Defs.' Ex. 13 at 1217.

Defendants cite the testimony of UMMS's 30(b)(6) witness to argue that, notwithstanding the contractual powers vested in UMMS over St. Joseph, UMMS does not exercise those powers in practice. Defs.' Mem. at 14. The witness supplied no such testimony. To the contrary, he admitted that he had no knowledge of the topic, and that he did not prepare to testify about UMMS's control of and supervisory authority over St. Joseph, or about other topics for which he was designated to testify. *See, e.g.*, Greskovich Tr. 41:16-43:16, 47:14-48:14, 51:5-53:12, 63:6-64:9, 70:3-72:15. For example, the witness did not, as Defendants assert, testify that UMMS does not approve St. Joseph's strategic plans, as it is contractually required to do. Defs.' Ex. 2 at 963. Instead, the witness testified only that he had no knowledge of whether UMMS approves such strategic plans, Greskovich Tr. 57:18-20, and further that he could not speak to any specific strategic plans adopted by St. Joseph or approved by UMMS, *id.* 58:3-7; *but see id.* 81:9-13 ("Under oath I can't factually give you an example of when I've seen [UMMS] exercise [its reserved powers over St. Joseph]. My understanding of these agreements are they're there for a reason, and so I would assume that that happens."). The 30(b)(6) witness's absence of knowledge and preparation is insufficient to create a disputed question of fact.

## III.    St. Joseph's Catholic Identity.

Before it was purchased by UMMS, the Hospital was owned by Catholic Health Initiatives and operated as a Catholic facility. *See* Defs.' Ex. 2 at 838; Defs.' Ex. 7 (Catholic Identity

Agreement). As a Catholic facility, the Hospital adhered to the ERDs. The ERDs are guidelines published by the United States Conference of Catholic Bishops that dictate what a Catholic hospital can and cannot do. Ex. 11 ("Riddle Tr.") 32:22-33:6; Ex. 12 ("Asobi Tr.") 32:10-16. For example, the ERDs explicitly bar certain procedures, such as abortion. Defs.' Ex. 17 (ERDs) at 156 ¶ 45; Riddle Tr. 46:5-8. The ERDs also prohibit "sterilization" procedures unless the procedure is done to treat a "present and serious pathology and a simpler treatment is not available." Defs.' Ex. 17 at 157 ¶ 53. The ERDs do not mention hysterectomies, nor do they explicitly address gender dysphoria or gender-affirming care. Riddle Tr. 55:12-57:1, 103:14-16. Nonetheless, the National Catholic Bioethics Center interprets the ERDs to prohibit all gender-affirming care, including gender-affirming hormone therapy and all gender-affirming surgery, regardless of whether the surgery impacts fertility. *See* Ex. 13 (National Catholic Bioethics Center, *Transgender Issues in Catholic Health Care* (Feb. 2017)).

When UMMS acquired the Hospital, UMMS promised as a condition of the sale that it would maintain the Hospital's Catholic identity and require St. Joseph to continue to adhere to the ERDs. Defs.' Ex. 2 at 916-17; Defs.' Ex. 7. Specifically, in the Asset Purchase Agreement, UMMS agreed that "UMMS . . . shall continue to operate" the Hospital "in a manner consistent with Catholic values and principles." Defs.' Ex. 2 at 916.[5] UMMS further agreed that "UMMS . . . shall ensure" that the Hospital will be held "accountable for [its] Catholic identity"; and that "[f]rom and after the Closing, UMMS and [UMSJ LLC] shall continue to ensure that the [Hospital] compl[ies] with the . . . '*Elements and Accountability for Catholic Identity*,'" a framework for

---

[5] The document specifically refers to the "Health System Businesses," a term which is defined to include the hospital run by St. Joseph. Defs.' Ex. 2 at 845 (defining Health System Businesses to include "the Hospital"), *id.* at 838 (defining the "Hospital" as "St. Joseph Medical Center, a general acute care hospital located at 7601 Osler Drive, Towson, Maryland").

maintaining Catholic ideals.  *Id*. at 917.  UMMS also specifically promised that St. Joseph "will be operated in accordance with the [ERDs]."  Defs.' Ex 7 at 1036; *see also* Defs.' Ex. 2 at 916.

In addition, UMMS agreed in the Asset Purchase Agreement to establish formal corporate governance measures to maintain St. Joseph's Catholic identity.  UMMS agreed that St. Joseph's "executive team will include a Vice President, Mission Integration, who will have a direct reporting relationship to the [St. Joseph] board," and who would make regular reports to the board and the Archdiocese on such compliance.  Defs.' Ex. 2 at 916; Riddle Tr. 24:2-9, 28:1-15.  UMMS also agreed that at least one seat on St. Joseph's board would be a representative of the Archdiocese of Baltimore.  Defs.' Ex. 2 at 915; Defs.' Ex. 7 at 1038; Defs.' Ex. 13 at 1220.

UMMS also signed a separate Catholic Identity Agreement with the Archdiocese, in which UMMS agreed, *inter alia*, that St. Joseph would undergo an audit every two years by the National Catholic Bioethics Center to assess its adherence to the ERDs.  Defs.' Ex 7, at 1041; Cunningham Tr. 60:5-64:8.  Pursuant to that agreement, if that audit finds "any areas in which [St. Joseph's] activities are inconsistent with its Catholic identity," the Archbishop must be consulted on a corrective action plan, and a follow up audit must be performed within six months.  Defs.' Ex 7, at 1041.

The Asset Purchase Agreement and the Catholic Identity Agreement were both signed by Robert A. Chrencik, UMMS's then-President and CEO, who also signed on behalf of St. Joseph. Defs.' Ex. 2 938; Defs.' Ex 7. at 1048.  Pursuant to these contracts, St. Joseph lacks the power to decide that it will no longer follow or operationalize the ERDs.  Cunningham Tr. 66:17-67:4.

### A.  St. Joseph Prohibits Transition-Related Care.

Because the National Catholic Bioethics Center regularly audits St. Joseph, as discussed above, St. Joseph closely follows its interpretation and policy guidance on the ERDs.  Riddle Tr.

9

79:5-14.  Thus, when it comes to gender-affirming care, St. Joseph also follows the National Catholic Bioethics Center's guidance, and refuses to provide any treatment for gender dysphoria. Asobi Tr. 88:16-21, 90:20-91:4, 92:3-94:12;  Riddle Tr. 100:23-103:6, 104:1-6, 106:9-18.   In particular, St. Joseph follows and implements a National Catholic Bioethics Center guidance document that states, "Gender transitioning of any kind is intrinsically disordered because it cannot conform to the true good of the human person, who is a body-soul union unalterably created male or female. Gender transitioning should never be performed, encouraged, or positively affirmed as a good in Catholic health care.  This includes surgeries, the administration of cross-sex hormones or pubertal blockers, and social or behavioral modifications."  Ex. 13 at 004.

In a section titled "Cooperation With Evil," the National Catholic Bioethics Center also dictates that, should a transgender patient come into a Catholic hospital for "unrelated reasons," hospitals must not provide them with the hormones they are already taking because it "amounts to formal cooperation with gender transitioning and is immoral."  *Id.*  And when the National Catholic Bioethics Center audited St. Joseph, it requested data on every single encounter with a patient for the purpose of treating a gender dysphoria diagnosis.  Ex. 14 (Catholic Identity and Ethics Review); Riddle Tr. 134:7-17.

St. Joseph's medical staff implements the National Catholic Bioethics Center guidance as Hospital policy.  Cunningham Tr. 198:16-20.  Dr. Gail Cunningham, the Hospital's Chief Medical Officer, and Dr. Michael Marion, the Hospital's Chief of Surgery, testified that St. Joseph prohibits medical personnel from participating in any gender affirming treatments for transgender patients. *Id*. at 229:13-19; Ex. 15 ("Marion Tr.") 51:5-52:13.  This prohibition is enforced irrespective of whether the treatment results in sterilization or involves the removal of a healthy organ. Cunningham Tr. 199:1-202:8, 209:8-210:9.  For example, St. Joseph will permit a cisgender man

to undergo a phalloplasty if his penis was injured or if born with a "micropenis," but will not permit the same surgery as part of a transgender man's gender affirming care. Cunningham Tr. 213:16-214:10; Ex. 16 (Email, Dr. Rachel Bluebond-Langer to Dr. Gail Cunningham (Nov. 13, 2014)) at 109. Similarly, St. Joseph will permit a cisgender woman to undergo breast-reconstruction surgery following a mastectomy, but will not permit the same for a transgender woman "for the purpose of transgender reaffirming." Cunningham Tr. 202:16-203:5. Even after this litigation was filed, the chair of the OB-GYN department, Dr. Monica Buescher, wrote to her physicians to remind them, "[i]n no uncertain terms" that "gender affirmation/hormonal therapy . . . are disallowed. Period." Ex. 17 (Email, Dr. Monica Buescher to Dr. Steven Adashek, *et al.* (Nov. 15, 2021)) at 300-02.

### B. St. Joseph Regularly Performs Hysterectomies for Any Medical Reason—Except to Treat Gender Dysphoria.

Defendants have asserted in this litigation that, "[i]n accordance with the ERDs, hysterectomies . . . are generally not performed at St. Joseph," and are "generally disallowed" at the Hospital. ECF No. 39-1 (Defs.' Mot. to Dismiss) at 7; Defs.' Ex. 18 (Defs.' Resp. & Suppl. Resps. to Interrogatory No. 5) at 10. Defendants have further claimed that hysterectomies are "sterilization procedures" barred by the ERDs, which may be performed only "where the procedure is necessary to treat a life-threatening condition"; and that "[i]n deciding whether a procedure can be performed at St. Joseph, personnel engage in a patient- and procedure-specific review for each individual case." Defs.' Ex. 18 at 8; Defs.' Mem. at 6.

But discovery has conclusively shown these assertions to be false. To start, the evidence shows that St. Joseph does not actually regard hysterectomies as sterilization procedures. While a hysterectomy results in a person's inability to become pregnant, the procedure is not performed for the primary purpose of sterilization because simpler and less invasive sterilization procedures

11

are available, such as tubal ligations.  Ex. 18 ("Buescher Tr.") 27:18-28:21; Cunningham Tr. 85:4-86:8; Ex. 19 ("Adashek Tr.") 123:6-17.  In other words, sterilization is not a medically indicated reason to perform a hysterectomy.  *Id.*  Consistent with this medical understanding, the National Catholic Bioethics Center does not request information regarding hysterectomies when auditing whether St. Joseph complies with the ERDs' prohibition on performing sterilization procedures.  Ex. 14; Buescher Tr. 115:6-116:16.

More fundamentally, the evidence shows that hysterectomies are generally allowed at St. Joseph, not "disallowed."  St. Joseph regularly and frequently performs hysterectomies, for any medically indicated reason, except to treat gender dysphoria.  Cunningham Tr. 229:6-11 ("Q. And so, putting aside gender dysphoria, isn't it true that so long as the hysterectomy is consistent with the standard of care for a given diagnosis, the hysterectomy may be performed here? A. Yes."), 289:6-15 (testifying "[t]hat's false" in response to whether it is true that "[h]ysterectomies are generally disallowed and cannot proceed at [St. Joseph]"); Buescher Tr. 54:10-55:6 ("Q. So as long as there is a medically diagnosed condition being treated, hysterectomies are allowed at [St. Joseph]? A. Yes. I would say yes. In general, that's correct."), 84:21-85:2 ("Q. Now, to your understanding, do the ERDs prohibit hysterectomies? A. No. They don't prohibit hysterectomies."); Marion Tr. 65:1-14 (testifying that hysterectomies are "one of the more common procedures that GYNs do in the hospital").  Medically indicated reasons for performing a hysterectomy include pelvic pain, abnormal uterine bleeding, and fibroids.  Buescher Tr. 35:9-40:19; Adashek Tr. 106:16-107:5.  In fact, multiple hysterectomies are performed weekly at St. Joseph.  Buescher Tr. 53:20-54:6; Marion Tr. 31:15-16.  Over approximately the last five years, 634 hysterectomies were performed at St. Joseph.  Cunningham Tr. 87:16-92:19.

Because hysterectomies are performed for any medically indicated reason except gender

dysphoria, it is also not true that the procedure is only performed when "necessary" to treat a "life-threatening" condition, under any medical understanding of that term. Buescher Tr. 87:11-13 ("I personally have never used the term life-threatening" when assessing the need for a hysterectomy); *id.* 89:7–11 (physicians "aren't required to certify or verify that a patient suffers from a life-threatening condition before scheduling a hysterectomy"). The evidence unequivocally establishes that St. Joseph allows surgeons to perform hysterectomies for a host of medical reasons that it does not generally consider to be life-threatening in a medical sense, including fibroids, *see* Buescher Tr. 40:17-19; Marion Tr. 34:12-22, abnormal menstruation, *see* Buescher Tr. 32:14-33:5, and pelvic pain, *see* Buescher Tr. 36:21-37:9.

Defendants state that the term "life-threatening" is not a "a medical diagnosis" but rather a term of art for assessing whether a procedure is consistent with the ERDs. Defs.' Ex. 18 at 10. They assert that "[i]n deciding whether a procedure can be performed at St. Joseph, personnel engage in a patient- and procedure-specific review for each individual case." Defs.' Ex. 18 at 8. These assertions are also untrue. The evidence shows that there is no approval process at St. Joseph for surgeons before scheduling or performing hysterectomies at all. Cunningham Tr. 185:7-19, 290:16-291:8; Marion Tr. 46:1-47:14; Buescher Tr. 66:6-67:4, 67:19-69:16. Indeed, St. Joseph has never invoked the ERDs to cancel or block a hysterectomy from taking place, except for Mr. Hammons's.[6] Marion Tr. 46:1-8. Thus, there is no support in the record for the assertion that hysterectomies may only be performed when necessary to treat a life-threatening condition, under any definition of the term "life-threatening."

---

[6] Dr. Marion testified about a transgender patient who received a hysterectomy at the hospital in 2018. According to Dr. Marion, there was discussion about whether the hysterectomy would violate the ERDs, but the surgeon confirmed that its medical indication was for excessive uterine bleeding, not gender dysphoria. Marion Tr. 39:1-11, 53:4-64:3.

13

**IV.    St. Joseph Canceled Mr. Hammons's Hysterectomy Because He Is Transgender.**

Mr. Hammons began receiving gender-affirming testosterone therapy for gender dysphoria in 2008.  Hammons Decl. ¶ 4.  Over the course of his treatment for gender dysphoria, medical professionals told Mr. Hammons that it would eventually be medically necessary for him to get a hysterectomy, both to treat his gender dysphoria and because undergoing hormone replacement therapy without the benefit of a hysterectomy could increase the risk of cancer.  *Id.* ¶ 5.

Mr. Hammons met with Dr. Steven Adashek on September 4, 2019, for a consultation regarding a hysterectomy.  Adashek Tr. 33:9-34:4; Hammons Decl. ¶ 7.  Dr. Adashek confirmed that a hysterectomy was medically necessary.  Adashek Tr. 35:3-21, 106:7-19.  Dr. Adashek's office worked with Mr. Hammons to find a date and time for the procedure, based on Mr. Hammons's schedule and on Dr. Adashek's availability to perform the procedure at one of the hospitals where he has admitting privileges.   Adashek Tr. 37:5-22, 40:1-17.   Because Mr. Hammons worked for the Community College of Baltimore County, he asked for the surgery to be scheduled during the school's winter break so he would not have to take additional time off from work for surgery and recovery.  Hammons Decl. ¶ 11.  Dr. Adashek's office scheduled Mr. Hammons's procedure to take place at St. Joseph on January 6, 2020.  Adashek Tr. 38:6-14; Hammons Decl. ¶ 8.  Mr. Hammons prepared for the surgery, both mentally and by going through pre-operative blood tests, an echocardiogram, and other health screenings with Dr. Adashek and his other medical providers.  Hammons Decl. ¶¶ 9-10.

In late December 2019, Dr. Cunningham told Dr. Adashek by telephone that Mr. Hammons's hysterectomy could not take place at St. Joseph because it was being done to treat gender dysphoria.  Cunningham Tr. 237:4-241:21, 256:2-14 (Q. "It was just the fact that it was a gender transition treatment that was enough to deny it; right?" A. "Yes."); Adashek Tr. 43:12-18 ("My understanding was that they, the diagnosis code, gender identity disorder, was not one that

they would allow a hysterectomy for at St. Joe's.").[7]   Dr. Cunningham did not consider whether Mr. Hammons's gender dysphoria was life-threatening, nor was there any ethics consultation or input from the Vice President for Mission Integration.  Cunningham Tr. 239:13-241:21.[8]

Due to an oversight, Dr. Adashek did not inform Mr. Hammons that the surgery had been cancelled until January 5, the night before the surgery had been scheduled to occur.  Dr. Adashek called Mr. Hammons that night and informed him that St. Joseph would not allow the hysterectomy to take place because the purpose was to treat gender dysphoria.  Adashek Tr. 51:1-6; Ex. 20 ("Hammons Tr.") 44:16-22, 48:9-21. When he received the call, Mr. Hammons "felt shocked, angry, afraid, and devastated."  Hammons Decl. ¶ 13.  Mr. Hammons "felt like [he] was being told that [his] health and well-being were not worthy of being protected, and [he] felt angry that St. Joseph was using other people's religious beliefs to deny [him] the medical treatment [he] needed." *Id.*

Subsequently, on January 30, 2020, Dr. Adashek was called to a meeting with Dr. Cunningham, Dr. Smyth, Dr. Buescher, and Keith Riddle, St. Joseph's Vice President for Mission Integration, to discuss Mr. Hammons's procedure.  Adashek Tr. 55:7-14; Cunningham Tr. 269:12-270:3.  Mr. Riddle reiterated that, pursuant to the ERDs, the hospital would not provide transition-related care.  Adashek Tr. 58:15-60:15; Buescher Tr. 127:15-128:1; Cunningham Tr. 273:2-13.

---

[7] Dr. Adashek used the term "gender identity disorder," which is the term used in earlier editions of the Diagnostic and Statistical Manual of Mental Disorders.  *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (noting that "gender identity disorder" was the diagnosis listed in the DSM "until the DSM-5 was published in 2013").

[8] Defendants erroneously contend that Dr. Adashek knew the procedure could not be performed at St. Joseph, and then called Dr. Cunningham to ask whether the procedure could go forward despite the ERDs.  In fact, Dr. Adashek testified that he was unaware that St. Joseph's refused to treat gender dysphoria until the hospital reached out and informed him that Mr. Hammons's procedure could not go forward.  Adashek Tr. 42:2-45:15, 77:18-78:6.  In any event, this dispute is immaterial to Mr. Hammons's legal claims.

Specifically, Mr. Riddle stated that ERD paragraph 53 prohibited the removal of a normal organ, and paragraph 29 prohibited mutilating the body in any way. Ex. 21 (Notes of Dr. Adashek) at 295; Adashek Tr. 59:3-5. In response, Dr. Buescher stated at the meeting that she thought the Hospital was pointing to those portions of the ERDs because it did not want to "get into the miasma" of explaining "[t]hat we believe you should stay the way you were born no matter what. We don't believe in gender reassignment." Ex. 21 at 297; Adashek Tr. 71:4-73:19. Dr. Buescher said the Hospital was using the ERD's prohibitions on removing healthy organs as "a smoke screen" to avoid giving that explanation. Ex. 21 at 297; Adashek Tr. 71:4-73:19.

Following the cancellation of Mr. Hammons's surgery, St. Joseph has further entrenched its policy of prohibiting all treatment for gender dysphoria. Now, if a pre-operative diagnosis contains the word "gender," the Hospital's electronic records system sends an alert to the scheduling department to ensure that no procedures are scheduled or performed for the purpose of treating gender dysphoria. Marion Tr. 46:16-47:9, 86:2-18, 92:3-94:19, Ex. 22 (Email, Dr. Gail Cunningham to Dr. Michael Marion, et al. (Jan. 15, 2020)) at 1-2. St. Joseph has no other alerts for any other pre-operative diagnosis. Marion Tr. 96:1-9; Cunningham Tr. 231:20-235:12. The chair of the OB-GYN department, Dr. Monica Buescher, also recently wrote to her physicians to remind them, "[i]n no uncertain terms" that "gender affirmation/hormonal therapy . . . are disallowed. Period." Ex. 17.

Mr. Hammons eventually underwent a hysterectomy at Greater Baltimore Medical Center on June 24, 2020. Hammons Decl. ¶ 14. Mr. Hammons's procedure was delayed because of the COVID-19 pandemic and because he needed to schedule time to take off of work for his recovery. Adashek Tr. 108:10-109:5; Hammons Decl. ¶ 14. As a result, Mr. Hammons had to spend another six months experiencing gender dysphoria and dealing with the stress and anxiety of having to

mentally prepare for a major surgery again. *Id.* ¶ 15. Mr. Hammons also lost $748.46 in wages as a result of having to take the additional time off work for the surgery. *Id.* ¶ 16

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (*quoting Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## ARGUMENT

## I.    DEFENDANTS' DENIAL OF CARE TO MR. HAMMONS VIOLATED THE ACA.

Mr. Hammons readily satisfies the elements of his ACA claim: (i) "discrimination on the basis of sex and the denial of benefits on the basis of sex in any health program or activity"; (ii) that the health program or activity was receiving federal financial assistance; and (iii) "harm[] by a defendant's improper conduct." ECF No. 52 at 42 (citing *Grimm*, 972 F.3d at 616).

### A.    DEFENDANTS DENIED MEDICAL CARE TO MR. HAMMONS ON THE BASIS OF SEX.

The undisputed evidence shows that Defendants cancelled Mr. Hammons's hysterectomy because the surgery was meant to treat his gender dysphoria. Cunningham Tr. 239:13-241:21,

256:2-14; Adashek Tr. 43:12-18. Indeed, Defendants admitted as much. *See* Cunningham Tr. 256:2-14 (Q. "It was just the fact that it was a gender transition treatment that was enough to deny it; right?" A. "Yes."). As the Court previously recognized, by "den[ying] Plaintiff the benefits of its services because he has gender dysphoria, a condition inextricably linked to being transgender," Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking," and thus "denied him the benefits of [their] services on the basis of sex, in violation of § 1557." ECF No. 52 at 46-47 (quoting *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1742 (2020)); *accord Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020), *aff'd*, 12 F.4th 422 (4th Cir. 2021), *as amended* (Dec. 2, 2021), *cert. denied*, 142 S. Ct. 861, 211 L. Ed. 2d 568 (2022) ("The characteristics of sex and gender are directly implicated; it is impossible to refer to the Exclusion without referring to them.").

The undisputed evidence also shows that cancelling Mr. Hammons's surgery subjected him to discrimination by "treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (cleaned up). St. Joseph routinely performs hysterectomies for any medically indicated reason, *except* to treat gender dysphoria. Cunningham Tr. 229:6-11 ("Q. And so, putting aside gender dysphoria, isn't it true that so long as the hysterectomy is consistent with the standard of care for a given diagnosis, the hysterectomy may be performed here? A. Yes."), 289:6-19; Buescher Tr. 54:10-55:6, 84:21-85:2; Marion Tr. 65:1-14. This differential treatment is underscored by the fact that Defendants do not review whether hysterectomies generally comply with the ERDs, but they have created a special alert for the word "gender" so that they may track and cancel any procedure related to gender dysphoria. Marion Tr. 46:16-47:9, 86:2-18, 92:3-96:9; Cunningham Tr. 185:7-17, 231:20-235:12; Buescher Tr. 66:6-14, 67:19-69:16; Ex. 22 at 1-2.

While Defendants assert that hysterectomies are generally disallowed unless necessary to

treat a life-threatening condition, this assertion is "blatantly contradicted by the record, so that no reasonable jury could believe it."  *Scott*, 550 U.S. at 380; *see also Cole v. Fam. Dollar Stores of Md., Inc.*, No. CV PX-17-0393, 2018 WL 3818811, at *1 n.1 (D. Md. Aug. 10, 2018), *aff'd*, 811 F. App'x 168 (4th Cir. 2020) (disregarding assertions contradicted by documentary record).  In reality, Defendants will perform a hysterectomy to treat any medical condition other than gender dysphoria; again, Defendants admitted as much.  *See* Cunningham Tr. 229:6-11.  As the Court has explained, Defendants "regarded [Mr. Hammons's] medical need differently because he is transgender" and thus "discriminated against him on the basis of sex by treating him worse than others who are similarly situated."  ECF No. 52 at 47 (cleaned up).

Defendants now argue that the Court's prior legal reasoning is "too facile."  Defs.' Mem. at 24.  Drawing a strained analogy to Supreme Court cases holding that policies discriminating based on pregnancy do not facially discriminate based on sex, Defendants contend that their policy of refusing to provide gender-affirming care is not facially discriminatory either.  *See Geduldig v. Aiello*, 417 U.S. 484 (1974) (interpreting Equal Protection Clause); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) (interpreting Title VII).  Defendants contend that under the reasoning of *Geduldig* and *Gilbert*, "it may well be true that gender-transition surgeries are 'confined' to transgender persons, but these procedures are also unique (medically, ethically, etc.) such that treating them differently cannot be conflated with intentional discrimination against those with a transgender identity."  Defs.' Mem. at 24-25.

Defendants' new argument is wrong for at least three reasons.  ***First***, despite Defendants' assumption to the contrary, *Gilbert* does not apply to Title IX or Section 1557.  As Defendants acknowledge (Defs.' Mem. at 25 n.8), Congress overruled *Gilbert* by passing the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), which amended the definition of "sex" in Title VII to

include "pregnancy."  In doing so, Congress "unambiguously expressed its disapproval of both the holding *and the reasoning* of the Court in the Gilbert decision."  *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79 (1983) (emphasis added).  "The House Report stated, 'It is the Committee's view that the dissenting Justices correctly interpreted the Act.'  Similarly, the Senate Report quoted passages from the two dissenting opinions, stating that they 'correctly express both the principle and the meaning of [T]itle VII.'"  *Id.* at 679 (cleaned up).  "Thus, the Pregnancy Discrimination Act merely 'clarified' what Congress had intended all along, *i.e.,* that Title VII's sex-discrimination prohibition includes pregnancy discrimination."  *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1084 (N.D. Fla. 2015).

Instead of applying *Gilbert*, "[c]ourts have held that discrimination on the basis of pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title IX."  *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 19-10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019); *accord Stanford v. Fox Coll.*, No. 18 C 3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19, 2020) ("Discrimination 'on the basis of sex' [under Title IX] includes pregnancy discrimination."); *Workman v. Univ. of Akron*, No. 5:16-CV-156, 2017 WL 6326898, at *3 (N.D. Ohio Dec. 11, 2017) ("The discrimination prohibited by Title IX includes discrimination related to pregnancy.").  "Although it is true that Congress has never amended Title IX's definition of sex to explicitly include pregnancy," that is simply a reflection of the fact that "[i]n the case of Title IX there has been no faulty precedent to overturn."  *Conley*, 145 F. Supp. 3d at 1084-85.  Indeed, Title IX's regulations have long prohibited discrimination based on pregnancy as part of discrimination based on sex.  *See* 34 C.F.R. § 106.40(b).[9]

---

[9] Both past and current versions of the Section 1557 regulations provide that discrimination based on pregnancy also violates Section 1557.  The 2016 implementing regulations for Section 1557

**Second**, even if *Gilbert*'s holding with respect to pregnancy did apply to Title IX and Section 1557, Defendants' policy of refusing to provide any form of gender-affirming treatment would still facially discriminate on the basis of sex. By definition, excluding coverage for medically necessary treatment because the surgery is performed for the purposes of gender-affirming care "unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock*, 140 S. Ct. at 1746. "[T]he diagnosis at issue—gender dysphoria—only results from a discrepancy between assigned sex and gender identity." *Kadel*, 446 F. Supp. 3d at 18. "The characteristics of sex and gender are directly implicated; it is impossible to refer to" Defendants' policy "without referring to them." *Id.*

For these reasons, court have repeatedly rejected attempts to draw an analogy between pregnancy and gender dysphoria. *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 2106270, at *21 (M.D.N.C. June 10, 2022) ("Pregnancy can be explained without reference to sex, gender, or transgender status. The same cannot be said of the exclusion at issue here.") (footnote omitted); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999–1000 (W.D. Wis. 2018) ("Defendants' reliance on *Gedulig* . . . rests on a finding that the Exclusion does not treat individuals differently based on sex. For the reasons explained above, the court has rejected this argument.").

**Third**, even if Defendants' policy were regarded as facially neutral, the undisputed

---

explicitly stated that "[o]n the basis of sex includes, but is not limited to, discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31375-01, at 31467 (May 18, 2016). The 2020 regulations declined to define "on the basis of sex" but reaffirmed that the term included pregnancy. "Many comments on the 2019 NPRM assume that Section 1557's protection against discrimination 'on the basis of sex' covers women's health issues including pregnancy, uterine cancer, and prenatal and postpartum services. That assumption is correct: These issues are protected under Section 1557 because of the ordinary and biological meaning of 'sex.'" *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160-01, at 37179-80 (June 19, 2020).

evidence establishes that the policy is based on the discriminatory purpose of enforcing gender conformity. *See Bostock*, 140 S. Ct. at 1742-43 (explaining that adverse employment action based on "fail[ure] to fulfill traditional sex stereotypes" is discrimination because of sex); *id.* at 1749 (same). Defendants cancelled Mr. Hammons's surgery pursuant to the National Catholic Bioethics Center's instructions that transgender people and gender transition are "intrinsically disordered because [they] cannot conform to the true good of the human person." Ex. 13 at 004. The policy is based on a religious belief that "a body-soul union [is] unalterably created male or female," *id.*, and that people "should stay the way you were born no matter what," Ex. 21 at 297; Adashek Tr. 71:13-17. Instead of relying on sex-neutral motivations, Defendants' policy is thus explicitly based on disapproval of the fact that gender-affirming surgery fails to conform to a person's sex assigned at birth. *See Boyden*, 341 F. Supp. 3d at 997 (explaining that excluding transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex"); *Kadel*, 446 F. Supp. 3d at 14 ("By denying coverage for gender-confirming treatment, the Exclusion tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject.").

For all these reasons, the Court should adhere to its previous conclusion that by "den[ying] Plaintiff the benefits of its services because he has gender dysphoria, a condition inextricably linked to being transgender," Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking," and thus "denied him the benefits of [their] services on the basis of sex, in violation of § 1557." ECF No. 52 at 46-47 (citation omitted).

**B.    MR. HAMMONS SUFFERED HARM.**

Mr. Hammons was "harm[ed] by a defendant's improper conduct." ECF No. 52 at 42 (citing *Grimm*, 972 F.3d at 616). Mr. Hammons suffered $748.46 in lost wages as a result of having to take the additional time off work for the surgery. Hammons Decl. ¶ 16. Mr. Hammons

also suffered emotional harm from experiencing another six months experiencing gender dysphoria and dealing with the stress and anxiety of having to mentally prepare for a major surgery again. *Id.* at ¶ 15.[10] And Mr. Hammons also suffered the dignitary and stigmatic harm that is inevitably inflicted on individuals "who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984). Hammons "felt like [he] was being told that [his] health and well-being were not worthy of being protected, and [he] felt angry that St. Joseph was using other people's religious beliefs to deny [him] the medical treatment [he] needed." Hammons Decl. ¶ 13. Our nation's civil rights laws have thus recognized the "daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (quoting H.R. Rep. No. 914, 88th Cong., 1st Sess., 18); *cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). Accordingly, this element of Mr. Hammons's claim is satisfied.

## C.    DEFENDANTS RECEIVE FEDERAL FUNDS.

Defendants admit that they each receive federal financial assistance in the form of Medicare and Medicaid payments. ECF No. 83 at 9 ¶ 14. By accepting Medicare and Medicaid funding, an entity is covered under Section 1557. 42 U.S.C § 18116(a); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1569 (2022); *Fain v. Crouch*, 545 F. Supp. 3d 338, 343 (S.D. W. Va. 2021). Thus, this final element of Mr. Hammons's claim is also satisfied.

---

[10] Mr. Hammons does not seek to recover monetary damages for that emotional distress in this litigation. His emotional harm is nevertheless relevant to the elements of his claim.

## II.    UMMS IS LIABLE FOR THE VIOLATION OF MR. HAMMONS'S RIGHTS.

Defendants do not dispute that St. Joseph[11] may be held directly liable in this action.  Nor could they, given that St. Joseph implemented the discriminatory policy, and applied it against Mr. Hammons.  Instead, Defendants claim that UMMS, as the corporate parent, cannot be held liable because (a) its federal funding is not traceable to St. Joseph, (b) it lacks sufficient involvement in the discrimination to be held directly liable, and (c) it may not be otherwise held indirectly liable by piercing the corporate veil.  Defendants are wrong on all counts.

### A.    UMMS Is Subject to Section 1557 In All Its Operations.

Defendants argue that UMMS is not subject to Section 1557 with respect to the operations at St. Joseph because St. Joseph receives its "own federal funding" and "the alleged discrimination did not occur in any 'health program or activity' . . .  for which *UMMS* received federal funding." Defs.' Mem. at 12.  This argument misconceives the scope of Section 1557, which does not restrict coverage to the particular parts of an entity receiving federal funding.  Rather, Section 1557 explicitly applies to "any health program or activity, *any part of which* is receiving Federal financial assistance."  See 42 U.S.C. § 18116(a) (emphasis added).  Thus, Section 1557 plaintiffs "need not seek medical care specifically from the part of the organization that receives federal funding" to be protected by the statute.  *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *12 (D. Minn. Mar. 16, 2015).

By extending coverage to an entire health program or activity if "any part of" it received federal funding, Section 1557 applies the same coverage standards set forth for Title IX claims in the CRRA.  In *Grove City College v. Bell*, 465 U.S. 555 (1984), the Supreme Court held that

---

[11] As noted *supra* at pages 5-6, Plaintiff uses "St. Joseph" here to refer to both UMSJ LLC and St. Joseph LLC.

receipt of federal funds "does not trigger institution-wide coverage under Title IX," *id.* at 573; instead, only the "aided program or activity"—that is, only the specific program that received federal funds—was required to operate "in accordance with Title IX and the applicable regulations," *id.* 575. "But in 1988, Congress—over President Ronald Reagan's veto—passed the [CRRA] to vindicate the scope of protection." *T.S. by & through T.M.S. v. Heart of CarDon, LLC*, No. 1:20-CV-01699-TWP-MG, 2021 WL 2946447, at *5 (S.D. Ind. July 14, 2021); *accord Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. CIV.A. ELH-12-572, 2013 WL 1010357, at *4 n.9 (D. Md. Mar. 13, 2013) (explaining that the CRRA overruled *Grove City*). Under the CRRA, "[i]f 'any part' of 'a department, agency, . . . or other instrumentality of a State' receives federal financial assistance, the entire agency is subject to" the antidiscrimination requirements of Title VI, Title IX, and the Rehabilitation Act. *Paulone v. City of Frederick*, No. CV ELH-09-2007, 2012 WL 13184457, at *2 (D. Md. May 1, 2012) (quoting 29 U.S.C. § 794(b)); *see also Heart of CarDon*, 2021 WL 2946447, at *2 & n.1, *7 (applying CRRA to Section 1557). Thus, the CRRA makes clear that Section 1557 covers all of UMMS's operations, including its operations with respect to St. Joseph.[12]

Defendants' argument that "only the funding recipient for the allegedly discriminatory health program is exposed to private damages liability" under Section 1557, Defs.' Mem. at 15, if

---

[12] Past and present versions of Section 1557's implementing regulations have also recognized that the statute covers "all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance." 45 C.F.R. § 92.3(b); *see also* 85 Fed. Reg. at 37171 (2020 rule explaining that this definition "align[s] . . . with the standard articulated in the CRRA"); 81 Fed. Reg. at 31386 (2016 rule: "[T]he term 'health program or activity' must be interpreted in a manner that uniformly covers all of the operations of any entity that receives Federal financial assistance and that is principally engaged in health services . . . even if only part of the health program or activity receives such assistance. . . . This approach is consistent with the approach Congress adopted in the CRRA.").

accepted, would effectively reimpose the narrow definition of "program or activity" that the Supreme Court articulated in *Grove City*, and that Congress specifically overturned. To the contrary, under the plain text of Section 1557 and the CRRA, UMMS is subject to Section 1557 regardless of whether UMMS received federal funding for St. Joseph or for a different part of its operations.[13]

### B.    UMMS Is Directly Liable for Its Own Conduct.

UMMS is directly liable for the violation of Mr. Hammons's rights under Section 1557. A "parent's involvement in activities related to the subsidiary may give rise to direct liability" when "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of." *Equal Rights Ctr. v. Equity Residential*, No. CCB-06-1060, 2016 WL 1258418, at *4 (D. Md. Mar. 31, 2016) (cleaned up). In particular, "by 'forcing' a subsidiary to take a particular action . . . a parent company is liable in the same way as any tortfeasor who causes harm by acting in concert with others." *Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5402230, at *9 (S.D. W. Va. Sept. 26, 2016)). "In such instances, the parent is directly liable for its own actions." *United States v. Bestfoods*, 524 U.S. 51, 65 (1998); *see In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*, 958 F. Supp. 1045, 1051 (D. Md. 1997) (parent company liable "as a principal" where it "expressly authorized and directed the subsidiary's wrongful acts").

Under the undisputed facts of this case, UMMS is directly liable for its own actions in

---

[13] Even if UMMS did not independently receive federal funding, UMMS would still have to comply with Section 1557 with respect to St. Joseph because "any entity which has controlling authority over a 'program or activity receiving Federal financial assistance' is subject to Title IX's anti-discrimination rule." *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733 (W.D. Mich. 2000); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007) (adopting same test). For the same reasons discussed in Section II.B and C, *infra*, UMMS holds controlling authority over St. Joseph's Catholic identity and its mandate to adhere to the ERDs.

mandating that St. Joseph adhere to the Catholic religious directives.  When it purchased St. Joseph, UMMS signed multiple agreements with the Archdiocese of Baltimore in which UMMS promised to maintain St. Joseph's Catholic heritage.  Defs.' Ex. 2 at 916-17; Defs.' Ex. 7.  UMMS also specifically promised that St. Joseph "will be operated in accordance with the [ERDs]."  Defs.' Ex 7, at 1036; *see also* Defs.' Ex. 2 at 916.  UMMS further agreed that St. Joseph would undergo an audit every two years, performed by the National Catholic Bioethics Center to assess adherence to the ERDs.  Defs.' Ex 7, at 1041.[14]

Further, UMMS is plainly the "final decisionmaker for the challenged practice."  *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001).  The UMMS President and CEO signed the relevant agreements regarding Catholic practices at the Hospital on behalf of UMMS and St. Joseph alike.  Defs.' Ex. 2 at 938; Defs.' Ex 7, at 1048.  And, as Defendants acknowledge, pursuant to these contracts, St. Joseph lacks the power to decide that it will no longer adhere to and operationalize the ERDs.  Cunningham Tr. 66:17-67:4.  UMMS also retains an active part in maintaining St. Joseph's Catholic identity.  UMMS promised to undertake a continuing obligation to "ensure" that St. Joseph would adhere to Catholic teachings in their operations.  Defs.' Ex. 2 at 916-17.  And UMMS must approve all decisions of the St. Joseph board, as well as strategic plans, and any material additions, expansions, revisions or deletions of a health care service—meaning that any efforts to change the Hospital's adherence to the ERDs or policies regarding the provision of health care would require UMMS's approval.  Cunningham Tr. 40:14-

---

[14] In addition, UMMS agreed to establish formal corporate governance positions to further the St. Joseph's Catholic identity.  UMMS agreed that St. Joseph's "executive team will include a Vice President, Mission Integration," who would make regular reports to the board and the Archdiocese on St. Joseph's compliance with its Catholic mandate.  Defs.' Ex. 2 at 916; Riddle Tr. 24:2-9, 28:1-15.  UMMS also agreed that at least one seat on St. Joseph's board would be a representative of the Archdiocese of Baltimore.  Defs.' Ex. 2 at 915; Defs.' Ex 7 at 1038; Defs.' Ex. 13 at 1220.

41:7, 50:20-51:6, 51:16-55:10; Conover Tr. 44:6-10; Defs.' Ex. 13 at 1215-16; Ex. 10 at 596.

Thus, through its own actions and conduct, UMMS is directly responsible for St. Joseph's facially discriminatory policy of refusing to provide any form of gender-affirming care. By virtue of the agreements entered into by UMMS, St. Joseph is contractually bound to follow the ERDs, and must undergo audits performed by the National Catholic Bioethics Center to ensure their compliance with the ERDs. Defs.' Ex. 2 at 916-17; Defs.' Ex 7, at 1036, 41; Cunningham Tr. 60:5-64:8. Pursuant to these obligations, St. Joseph is required to follow the National Catholic Bioethics Center's instruction that the ERDs prohibit all gender-affirming care. Asobi Tr. 88:16-21, 90:20-91:4, 92:3-94:12; Riddle Tr. 100:23-103, 104:1-6, 106:9-18. St. Joseph then applied that policy to Mr. Hammons, in violation of Section 1557. The discriminatory policy of refusing to provide transition-related care is thus rooted in UMMS's actions and contractual obligations. *See Pearson*, 247 F.3d at 487 (explaining that direct parent liability attaches if parent "has forced the subsidiary to take the complained-of action" or is "specifically responsible for the . . . practice at issue in the litigation"); *cf. Taylor v. Fluor Corp.*, No. CV 6:17-1875-BHH, 2019 WL 4727464, at *4 (D.S.C. Sept. 27, 2019) (denying parent entity's motion for summary judgment where "the policies at issue are [the parent]'s corporate policies"); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (jury question found on parent liability as employer where parent "negotiated and entered into the collective bargaining agreement with the union, and it was this agreement that governed the plant's response to [the plaintiff]'s complaints" regarding discrimination).

## C.    UMMS Is Indirectly Liable for St. Joseph's Actions.

In addition to being directly liable, UMMS is also indirectly liable under Section 1557 for discrimination at its wholly owned subsidiary. "[I]n the federal cases a corporate entity may be disregarded in the interests of public convenience, fairness and equity." *Equal Rights Ctr.*, 2016

WL 1258418, at *3 (cleaned up).  This inquiry "usually gives less respect to the corporate form than does the strict common law alter ego doctrine." *Id.* (quoting *Thomas v. Peacock*, 39 F.3d 493, 503-04 (4th Cir. 1994)).  "Under this approach, the court considers 'the specific legislative policies at issue and whether piercing the corporate veil is necessary to further those policies.'" *Id.* (quoting *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 27 (1st Cir. 2000)).

The Fourth Circuit also instructs courts to consider "traditional" veil-piercing factors, such as: (1) "that it would be 'fundamentally unfair' to allow [a parent] to escape liability by hiding behind [a subsidiary's] corporate existence"—a factor which receives particular emphasis; (2) that the parent exercised "excessive control" over the subsidiary's "operations, by requiring . . . approval of all proposals, and its purse strings"; (3) that the subsidiary was grossly undercapitalized; (4) that the parent "usurped the functions ordinarily served by the junior corporation's officers and directors"; (5) that the parent pays medical coverage and life insurance benefits of retirees; and (6) common officers and directors between the parent and subsidiary. *Keffer v. H.K. Porter Co*., 872 F.2d 60, 65 (4th Cir. 1989).  However, "not all of these factors need be present for the court to pierce the corporate veil, and considering the emphasis federal common law places on the legislative policies behind federal statutes, the interests of 'public convenience, fairness, and equity,' likely will require fewer of these traditional factors when those policies are affected by respect for the corporate form." *Equal Rights Ctr.*, 2016 WL 1258418, at *4 (quoting *Thomas*, 39 F.3d at 503-04).

Here, if UMMS were not directly liable, veil piercing would be necessary to prevent UMMS from frustrating Section 1557's antidiscrimination mandate.  The primary purposes of the ACA are "to increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012).  Of the many barriers to health care

that the ACA addresses, chief among them is the "shameful history of invidious discrimination and the stark disparities in outcomes in our health care system." *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 436 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022) (quoting Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1821, 1842 (daily ed. Mar. 23, 2010) (statement of Sen. Patrick Leahy)). The ACA's prohibition of discrimination is therefore central to its design. *Id.* at 435–36.

By agreeing that St. Joseph would continue to operate "in a manner consistent with Catholic values and principles," Defs.' Ex. 2 at 916, and "in accordance with the [ERDs]," Defs.' Ex 7 at 1036, UMMS ensured that St. Joseph maintained a policy that flouted the antidiscrimination principles of the ACA. All the while, UMMS continues to exercise the power of the purse over St. Joseph by approving its annual budget and by retaining the authority to require St. Joseph to make financial contributions to UMMS's general expenses. Defs.' Ex. 13 at 1217. It also must approve all decisions of the board, as well as an array of St. Joseph's business and financial matters, such as its strategic plans, real estate transactions, and any material alterations of health care services. Cunningham Tr. 40:14-41:7, 50:20-51:6, 51:16-55:10; Conover Tr. 44:6-10; Defs.' Ex. 13 at 1216; Ex. 10 at 596. And UMMS generally controls St. Joseph's board, appoints St. Joseph's CEO, and reserves a board seat for the UMMS CEO, who may sit on all St. Joseph committees. Cunningham Tr. 45:3-10, 49:19-50:19, 54:7-10; Conover Tr. 44:2-10; Defs.' Ex. 13 at 1217, 1219, 1232; Defs.' Ex. 2 at 915.

Despite its domination over St. Joseph and its agreement to operationalize the ERDs at St. Joseph, UMMS now seeks to hide behind the corporate form by arguing that St. Joseph adheres to the ERDs "independently" of UMMS. Courts have "consistently refused to give effect to the corporate form where," as here, "it is interposed to defeat legislative policies." *First Nat'l City*

*Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 630 (1983); *cf. Lebron v. Natl R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."). Allowing UMMS to first pledge enforcement of a discriminatory policy, then disclaim any liability as a parent entity, would be "fundamentally unfair" and at odds with Section 1557's prohibition of discrimination.

## III.    THE NORTH DAKOTA INJUNCTION DOES NOT INSULATE ST. JOSEPH FROM LIABILITY.

As a final matter, the Court should reject St. Joseph's last-minute attempt to avoid accountability by joining the Catholic Benefits Association. *See* Defs.' Mem. at 15-21. In *Religious Sisters of Mercy*, the Catholic Benefits Association and other non-governmental Catholic entities preemptively challenged the Department of Health and Human Services' ("HHS") interpretation and implementation of Section 1557 based on RFRA. *See* 513 F. Supp. 3d at 1153. The court granted summary judgment on the RFRA claim and permanently enjoined "HHS, Secretary Azar, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them," from, *inter alia*, interpreting or enforcing Section 1557 in such a way as to require the non-governmental Catholic entities to perform gender-transition procedures. *Id*.

Three days before filing its summary judgment motion, St. Joseph became a member of the Catholic Benefits Association. *See* Defs.' Ex. 22. Based on St. Joseph's new membership status, Defendants argue that the injunction in *Religious Sisters of Mercy* immunizes St. Joseph, not only from future enforcement action by the government, but also from private lawsuits under Section 1557. *See, e.g.*, Defs.' Mem. at 21. Defendants' arguments are creative, but wrong.

To start, the *Religious Sisters of Mercy* injunction, by its own terms, applies only to the

31

federal government. *See* 513 F. Supp. 3d at 1153-54. Moreover, under Federal Rule of Civil Procedure 65, an injunction "binds only" "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with" them. Fed. R. Civ. P. 65(d)(2).

Mr. Hammons does not fit within any of the above categories. Mr. Hammons was not a party to the North Dakota litigation and has no affiliation to any party to that litigation. Nor is Mr. Hammons—a private citizen with no connection to HHS or to any of the circumstances in *Religious Sisters of Mercy*—"in active concert or participation" with any of the parties to that litigation. *See Thaxton v. Vaughan*, 321 F.3d 474, 478 (4th Cir. 1963) ("Action as an alter ego, or in collusion, is required to find concert or participation under rule 65(d)."); *see also Next Investments, LLC v. Bank of China*, 12 F. 4th 119, 134 (2d Cir. 2021) ("The relevant inquiry under Rule 65(d) is whether the nonparty Banks aided or abetted the Defendant[].");  *Goya Foods, Inc v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002) (explaining that "active concert or participation" requires that "the nonparty must be legally identified with" the party enjoined, "or, at least, deemed to have aided and abetted that defendant in the enjoined conduct"). As a result, under the plain terms of Rule 65, the North Dakota injunction does not apply to Mr. Hammons.

Indeed, it is black-letter law that injunctions against the government—or settlements with the government—do not bar separate lawsuits by private parties not before the court. "Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may lawfully enjoin the world at large or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (cleaned up). Similarly, "[w]hen the government brings a discrimination action against a party resulting in a consent order, private

parties, not in privity with the order, are not bound by its terms and may bring their own suit against the defendant." *Shimkus v. Gersten Cos.*, 816 F. 2d 1318, 1320 (9th Cir. 1987); *see also Balogh v. Lombardi*, 816 F.3d 536, 544 (8th Cir. 2016) (holding that lawsuit against government could not redress injuries from the threat of private lawsuits).

Defendants' authority does not say otherwise. **First,** Defendants rely on a footnote, in *NCAA v. Smith*, 525 U.S. 459, 467 n.5 (1999), which observes that a private citizen cannot use Title IX to challenge conduct that the federal government itself cannot challenge under that statute. *See* Defs.' Mem. at 18. But the Court's footnote in *Smith* concerns the scope of Title IX's private right of action, not whether a private citizen is barred from pursuing a lawsuit due to an injunction against the federal government. *See United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F. 4th 730, 746 (11th Cir. 2021) ("*Smith* teaches that when Congress creates an implied private right of action to sue for civil rights violations, the private right of action and the federal government's enforcement authority are coextensive."). *Religious Sisters of Mercy* did not alter the scope of the federal government's statutory authority under Section 1557. It merely held, due to the countervailing force of RFRA, that the federal government is prohibited from enforcing Section 1557 in a particular manner against the particular plaintiffs in that case. *See Religious Sisters of Mercy*, 513 F. Supp. 3d at 1149 (holding that, "*[a]s applied*, the challenged interpretations of Section 1557 and Title VII violate the RFRA" and granting summary judgment accordingly) (emphasis added). Because *Religious Sisters of Mercy* did not alter the federal government's statutory enforcement authority, the decision did not affect the scope of the private right of action either.

**Second**, Defendants urge the Court to restrict Mr. Hammons's ability to seek relief based on the theory that *Religious Sisters of Mercy* has partly abrogated the "contract" between St. Joseph

and the federal government, and therefore Plaintiff—as a "third-party beneficiary" of that contract—cannot bring suit. *See* Defs.' Mem. at 19. Defendants cite no authority for the proposition that as-applied injunctions against particular government enforcement actions somehow partially void the "contract" created by Spending Clause legislation. In any event, Defendants' spurious theory fails on its own terms because, as discussed, the District of North Dakota's injunction has not altered the statutory scope of Section 1557. The "contract" between the federal government and the plaintiffs in *Religious Sisters of Mercy* still requires the latter to comply with Section 1557's prohibition on sex discrimination. All that the injunction has done is prevented *the government* from enforcing that contract in a particular way due to that court's application of RFRA.

*Third*, Defendants claim that Mr. Hammons is bound by the injunction because he is somehow in privity with HHS. *See* Defs.' Mem. at 19-20. But Defendants' case says the opposite. Defendants cite *National Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. National Spiritual Assembly of Baha'is of U.S., Inc.*, which explained that "when it comes to injunctions, the concept of nonparty privity has at least two subcategories[:] . . . an injunction will bind nonparty successors in interest to an enjoined party[, and] a nonparty may be bound by an injunction if the nonparty is otherwise 'legally identified' with the enjoined party." 628 F.3d 837, 849 (7th Cir. 2010). Mr. Hammons does not fit either category. *See id*. at 853 ("'Legal identity' usually means successors and assigns, but it can include a limited class of other nonparties as well—*provided* the evidence establishes a very close identity of interest and such significant control over the organization *and* the underlying litigation that it is fair to say that the nonparty had his day in court when the injunction was issued.").

Even if Defendants could somehow overcome all these obstacles, their attempt to rely upon

the *Religious Sisters of Mercy* would face the problem that RFRA simply does not apply to this case.   As this Court has already recognized, RFRA does not apply to litigation between private parties.  *See* ECF No. 81 at 5; *Goddard v. Apogee Retail LLC*, No. 19-3269, 2021 WL 2589727, at *8 (D. Md. June 24, 2021) ("[RFRA] places restrictions on the government, not private parties.") (Chasanow, D.J.); *Billard v. Charlotte Catholic High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *15-17 (W.D.N.C. Sept. 3, 2021), *appeal filed* No. 22-1440 (4th Cir. Apr. 25, 2022) (holding that RFRA does not apply to private parties and noting that three circuits and "district courts have almost universally agreed that RFRA does not apply to suits between private parties").   Mr. Hammons is not the government; his private lawsuit cannot be barred by RFRA.

Moreover, this Court has already held that Defendants are state entities and, therefore, may not invoke a RFRA defense.  *See* ECF No. 81 at 6.  UMMS is a governmental entity under *Lebron*, and, as the wholly-owned subsidiaries of a state entity, there is little doubt that UMSJ LLC and St. Joseph LLC are, as the Court has already held, state entities too.  *See Gunter v. Long Island Power Auth./Keyspan*, No. 08-cv-498 (RRM) (LB), 2011 WL 1225791, at *7-8 (E.D.N.Y. Feb. 15, 2011) (holding that a wholly-owned subsidiary of a state-owned utility company was a state actor, and citing *Lebron*).  Defendants have failed to present any argument or evidence to the contrary.  Defs.' Mem. at 20.  RFRA is therefore irrelevant to Mr. Hammons's claims.  *See* ECF No. 81 at 6 ("The Medical System concedes that it cannot assert" RFRA "because of its status as a governmental entity.").

## CONCLUSION

For these reasons, Mr. Hammons respectfully requests that the Court grant his motion for summary judgment and deny Defendants' motion for summary judgment.


Dated: July 25, 2022

Respectfully submitted,

*/s/ Louis J. Ebert*
Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
Abigail E. Marion (*pro hac vice*)
Jonathan S. Z. Hermann (*pro hac vice*)
Edward J. Delman (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
acohen@pbwt.com
amarion@pbwt.com
jhermann@pbwt.com
edelman@pbwt.com

Joshua A. Block (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

36

*Counsel for Plaintiff Jesse Hammons*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JESSE HAMMONS,                                  )
                                                )
       Plaintiff,                          )
                                                )
    v.                                        )        Case No. 20-cv-2088-DKC
                                                )
UNIVERSITY OF MARYLAND MEDICAL SYSTEM           )
      CORPORATION, et al.,                   )
                                                )
      Defendants.                            )
_____ )

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S
## CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................II

APPENDIX OF EXHIBITS ...............................................................................VIII

PRELIMINARY STATEMENT ............................................................................1

I.    DEFENDANTS DISCRIMINATED AGAINST MR. HAMMONS ON THE
      BASIS OF SEX, IN VIOLATION OF SECTION 1557. ...................................2

      A.    Defendants Cancelled Mr. Hammons's Surgery Pursuant to Their Policy
            Against Providing Gender-Affirming Care. ............................................2

      B.    Defendants' Blanket Refusal to Provide Gender-Affirming Care Is
            Discrimination on the Basis of Sex...........................................................4

II.   UMMS CANNOT ESCAPE LIABILITY. ........................................................8

      A.    UMMS's Operations Include Its Actions Regarding Its Subsidiaries. ....8

      B.    UMMS Is Directly Liable. ......................................................................10

      C.    UMMS Is Indirectly Liable......................................................................13

III.  THE ST. JOSEPH SUBSIDIARIES CANNOT ESCAPE LIABILITY. ..........15

      A.    RFRA Does Not Apply to This Case........................................................15

      B.    Defendants' Injunction-Based Defense Fails...........................................19

IV.   THERE ARE NO DISPUTED QUESTIONS OF FACT FOR TRIAL. ...........20

CONCLUSION....................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Governing Comm. for Tax Deferred Annuity and Deferred Compen. Plans v. Norris*,
    463 U.S. 1073 (1983) ................................................................................4

*Atherton v. FDIC*,
    519 U.S. 213 (1997) ................................................................................14

*Billard v. Charlotte Cath. High Sch.*,
    No. 3:17-CV-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ...........16, 17, 18

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020) ..........................................................................4, 8

*Boyden v. Conlin*,
    341 F. Supp. 3d 979 (W.D. Wis. 2018) ..................................................6

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ................................................................................18

*Conley v. Nw. Fla. State Coll.*,
    145 F. Supp. 3d 1073 (N.D. Fla. 2015) .................................................5

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    142 S. Ct. 1562 (2022) ......................................................................11, 14

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013) ...............................................................15

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ........................................................................ *passim*

*Dixon Lumber Co., Inc. v. Austinville Limestone Co., Inc.*,
    256 F. Supp. 3d 658 (W.D. Va. 2017) .................................................15

*Doe v. Cath. Relief Servs.*,
    No. CV CCB-20-1815, 2022 WL 3083439 (D. Md. Aug. 3, 2022) ........16

*Dole v. Shenandoah Baptist Church*,
    899 F.2d 1389 (4th Cir. 1990) .............................................................18

*Duckett v. Fuller*,
    819 F.3d 740 (4th Cir. 2016) ...............................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*EEOC v. Cath. Univ.*,
    83 F.3d 455 (D.C. Cir. 1996) ................................................................17

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018) ..............................................................18

*Equal Rts. Ctr. v. Equity Residential*,
    No. CCB-06-1060, 2016 WL 1258418 (D. Md. Mar. 31, 2016) ......................13, 14

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938) .........................................................................14

*Fain v. Crouch*,
    No. CV 3:20-0740, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022) ...................6

*FDIC v. Cashion*,
    720 F.3d 169 (4th Cir. 2013) ................................................................2

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009) .......................................................................12

*Geduldig v. Aiello*,
    417 U.S. 484 (1974) ......................................................................5, 6

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
    617 F.3d 402 (6th Cir. 2010) ..........................................................16, 17

*Gen. Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976) ......................................................................5, 6

*Goddard v. Apogee Retail LLC*,
    No. CV DKC 19-3269, 2021 WL 2589727 (D. Md. June 24, 2021)
    (Chasanow, J.), *appeal dismissed*, No. 21-1814, 2021 WL 6689512 (4th Cir.
    Nov. 2, 2021) ..............................................................................16

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
    218 F.3d 337 (4th Cir. 2000) ..............................................................16

*Good v. Am. Water Works Co., Inc.*,
    No. CV 2:14-01374, 2016 WL 5402230 (S.D.W. Va. Sept. 26, 2016) ................11

*Gunter v. Long Island Power Auth./Keyspan*,
    No. 08 CV 498 (RRM) (LB), 2011 WL 1225791 (E.D.N.Y. Feb. 15, 2011) ..........16

*Hankins v. Lyght*,
    441 F.3d 96 (2d Cir. 2006) ........................................................16, 17, 18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hildreth v. Tidewater Equip. Co.*,
    378 Md. 724 (2003) ................................................................14

*Jennings v. Univ. of N.C. at Chapel Hill*,
    240 F. Supp. 2d 492 (M.D.N.C. 2002) ......................................11

*Kadel v. Folwell*,
    446 F. Supp. 3d 1 (M.D.N.C. 2020) ......................................6, 7

*Kadel v. Folwell*,
    No. 1:19CV272, 2022 WL 3226731 (M.D.N.C. Aug. 10, 2022) ............6

*Keffer v. H.K. Porter Co.*,
    872 F.2d 60 (4th Cir. 1989) ..............................................13, 15

*Kinman v. Omaha Pub. Sch. Dist.*,
    171 F.3d 607 (8th Cir. 1999) ..............................................11

*Lange v. Houston Cty.*,
    No. 5:19-CV-392, 2022 WL 1812306 (M.D. Ga. June 2, 2022) ............4

*Lipsett v. Univ. of P.R.*,
    864 F.2d 881 (1st Cir. 1988) ..............................................11

*Listeki v. Off. Comm. of Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ..............................................16, 17

*Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*,
    142 S. Ct. 1968 (2022) ....................................................6, 7, 12

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ....................................................8

*Mathis v. Christian Heating & Air Conditioning, Inc.*,
    158 F. Supp. 3d 317 (E.D. Pa. 2016) ......................................17

*Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
    No. CV 19- 10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019) ............5

*NCAA v. Smith*,
    525 U.S. 459 (1999) ......................................................20

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001) ..............................................10

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rayburn v. Seventh–Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) ............................................................18

*Religious Sisters of Mercy v. Azar*,
   513 F. Supp. 3d 1113 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr.
   21, 2021) ....................................................................................19

*Rweyemamu v. Cote*,
   520 F.3d 198 (2d Cir. 2008)...............................................................16

*Silva v. Baptist Health S. Fla., Inc.*,
   856 F.3d 824 (11th Cir. 2017) ..............................................................9

*Smith v. Metro. Sch. Dist. Perry Twp.*,
   128 F.3d 1014 (7th Cir. 1997) ............................................................11

*Sossamon v. Texas*,
   563 U.S. 277 (2011)......................................................................1, 11

*Stanford v. Fox Coll.*,
   No. 18 C3703, 2020 WL 814865 (N.D. Ill. Feb. 19, 2020)......................5

*Starbuck v. Williamsburg James City Cty. Sch. Bd.*,
   28 F.4th 529 (4th Cir. 2022) ...............................................................13

*Sutton v. Providence St. Joseph Med. Ctr.*,
   192 F.3d 826 (9th Cir. 1999) ..............................................................17

*T. S. by & through T.M.S. v. Heart of CarDon, LLC*,
   No. 120CV01699, 2021 WL 981337 (S.D. Ind. Mar. 16, 2021), *aff'd*, 43 F.4th
   737 (7th Cir. Aug. 5, 2022)...................................................................9

*Taylor v. Sturgell*,
   553 U.S. 880 (2008).........................................................................20

*Texas v. Dep't of Lab.*,
   929 F.3d 205 (5th Cir. 2019) ..............................................................19

*Thomas v. Peacock*,
   39 F.3d 493 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349 (1996)............14

*Tomei v. Parkwest Med. Ctr.*,
   No. 319CV00041, 2022 WL 703656 (E.D. Tenn. Mar. 8, 2022) ...............9

*United States v. Bestfoods*,
   524 U.S. 51 (1998)..........................................................................11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Untracht v. Fikri,*
454 F. Supp. 2d 289 (W.D. Pa. 2006).................................................................16

*In re Young,*
82 F.3d 1407 (8th Cir. 1996), *cert. granted, judgment vacated,* 521 U.S. 1114
(1997)...................................................................................................................17

**Statutes**

42 U.S.C. § 2000bb-1....................................................................................17, 18

42 U.S.C. § 2000bb-3.............................................................................................18

Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-
274 § 7, 114 Stat. 803 (2000)..............................................................................18

**Other Authorities**

34 C.F.R. § 106.31..................................................................................................10

34 C.F.R. § 106.40....................................................................................................5

45 C.F.R. § 92.3........................................................................................................8

## APPENDIX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | Keith Riddle Deposition Transcript. |
| 2 | Dr. Michael J. Marion Deposition Transcript. |
| 3 | Email from Keith Riddle to Jennifer Manlapaz and attachments, UMMS000000002-017. |
| 4 | Dr. Gail Cunningham Rule 30(b)(6) and Personal Capacity Deposition Transcript. |

Plaintiff Jesse Hammons ("Plaintiff" or "Mr. Hammons") respectfully submits this memorandum of law in further support of his motion for summary judgment, ECF No. 105, against Defendants University of Maryland Medical System Corporation ("UMMS"), UMSJ Health System, LLC ("UMSJ LLC"), and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC") (all three collectively, "Defendants"; UMSJ LLC and St. Joseph LLC collectively, "St. Joseph" or "the St. Joseph subsidiaries").

## PRELIMINARY STATEMENT

Mr. Hammons explained in his motion that Defendants have a facially discriminatory policy against providing gender-affirming care of any kind at the St. Joseph hospital, that Defendants cancelled Mr. Hammons's surgery pursuant to this policy, and that all Defendants are liable for that discrimination under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. In response, Defendants do not raise a genuine dispute of material fact: their references either are beside the point, or in fact support Plaintiff's position. The undisputed record is overwhelming clear, and Defendants' own admissions demonstrate their discriminatory policy.

Mr. Hammons also explained why all Defendants are liable under Section 1557. For their part, Defendants do not dispute that UMMS would be liable under principles that apply to typical statutory violations, but argue that those general rules should not apply to Section 1557 because it was passed under the Spending Clause. Although the Supreme Court has analogized Spending Clause legislation to contract law for purposes of determining available remedies, Defendants have no authority indicating that their various twists on the contract analogy have been accepted by a single court in the context of Spending Clause legislation. To the contrary, the Supreme Court has "been clear 'not to imply… that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.'" *Sossamon v. Texas*, 563 U.S. 277, 290 (2011) (quoting *Barnes v. Gorman*, 536 U.S. 181, 189, n.2 (2002)) (cleaned up).

1

Defendants also continue to insist that St. Joseph cannot be liable because a North Dakota court found that RFRA barred the federal government from enforcing Section 1557 to require certain parties to provide particular health insurance coverage. But RFRA does not apply to government entities such as St. Joseph, or against a private plaintiff like Mr. Hammons. And Mr. Hammons is not bound by litigation to which he was not a party.

Because Defendants fail to raise a genuine dispute of material fact, there are no questions of fact to be tried in this case. All that remains is for the Court to apply legal principles to the undisputed record. Accordingly, summary judgment in favor of Mr. Hammons is warranted.

## I. DEFENDANTS DISCRIMINATED AGAINST MR. HAMMONS ON THE BASIS OF SEX, IN VIOLATION OF SECTION 1557.

### A. Defendants Cancelled Mr. Hammons's Surgery Pursuant to Their Policy Against Providing Gender-Affirming Care.

Mr. Hammons set out undisputed evidence that Defendants have a blanket ban on providing gender-affirming care, and that it was this policy—and not any other post-hoc rationalization—that St. Joseph applied in refusing Mr. Hammons's hysterectomy. *See* ECF No. 105 ("Mot.") at 9-17. In response, Defendants assert that these facts are actually "disputed," and that they have a facially neutral policy against performing hysterectomies except to treat "life-threatening condition[s]" or "when an organ has a physical defect," in accordance with the Ethical & Religious Directives of the United States Conference of Catholic Bishops ("ERDs") prohibiting "direct sterilization" and interference with functional, healthy organs. *See* ECF No. 111 ("Resp.") at 24-25. But Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts." *FDIC v. Cashion*, 720 F.3d 169, 180-81 (4th Cir. 2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). They "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* The dispositive facts in this case are not subject to any genuine dispute, and Defendants' stubborn

refusal to acknowledge undisputed facts does not create a genuine question for trial.

Defendants have failed to come forward with admissible evidence of any kind to support their assertions and defeat summary judgment. Defendants cite only to deposition testimony from Mr. Riddle for the proposition that St. Joseph will perform a hysterectomy to treat life-threatening excessive bleeding. But Mr. Riddle did not testify that the *only* permissible reason for a hysterectomy is to treat a life-threatening condition. In fact, he was unable to recall the existence of any such policy. *See* Ex. 1, Riddle Tr. at 71:18-24 ("Q: Did you ever hear of any hysterectomies not being permitted except to treat a life-threatening condition? A: I don't recall."). And testimony from Defendants' other witnesses confirms that no such policy existed. *See, e.g.*, ECF No. 105-20, Buescher Tr. 87:7-13 (unaware of any such policy); Ex. 2, Marion Tr. 33:4-36:19 (same); *see also* Mot. at 11-12, 18 (collecting evidence that St. Joseph routinely performs hysterectomies for any medically indicated reason, except to treat gender dysphoria).

Defendants also assert that St. Joseph will not perform hysterectomies or vasectomies for the purpose of sterilization, and that St. Joseph will not perform a hysterectomy for a woman with "no diagnosis" who says "she just doesn't want to have periods anymore and it's a way of preventing her from having children." Resp. at 25. But those hypotheticals are not *medically indicated reasons* for performing hysterectomies at St. Joseph or anywhere else. *See* ECF No. 105-20, Buescher Tr. 27:18-28:21; ECF No. 105-6, Cunningham Tr. 85:4-86:8; ECF No. 105-21, Adashek Tr. 123:6-17. By contrast, gender dysphoria *is* a medically indicated reason for performing hysterectomies. Mot. at 4, 14.

It is no defense for Defendants to say they will perform hysterectomies for transgender patients to treat *other* medical conditions besides gender dysphoria. *See* Resp. at 25-26. As this Court has already recognized, Defendants discriminated on the basis of transgender status because "gender dysphoria [is] a condition inextricably linked to being transgender," and Defendants

3

cancelled Mr. Hammons's surgery "specifically *because* it was linked to this condition." ECF No. 52 at 47. The facially discriminatory policy remains illegal even if Defendants do not discriminate against transgender patients with respect to *other* medical treatments. *See Lange v. Houston Cty.*, No. 5:19-CV-392, 2022 WL 1812306, at *14 (M.D. Ga. June 2, 2022) (rejecting argument that an employer "can lawfully refuse to pay benefits because of transgender status for some conditions as long as it pays benefits to transgender[] [people] for other services."); *cf. Ariz. Governing Comm. for Tax Deferred Annuity and Deferred Compen. Plans v. Norris*, 463 U.S. 1073, 1081 n.10 (1983) ("An employer that offers one fringe benefit on a discriminatory basis cannot escape liability because he also offers other benefits on a nondiscriminatory basis.").

Last, Defendants contend Mr. Hammons's allegations regarding their discriminatory intent cannot be resolved on summary judgment. Resp. at 27. But the relevant "intent" in this case is simply the "intent" to use a facially discriminatory policy. Sex discrimination occurs whenever an employer "intentionally applies sex-based rules," and "nothing in Title VII"—or Section 1557— "turns on the employer's labels or any further intentions (or motivations) for its conduct." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1745 (2020). As this Court has explained, by excluding care for "gender dysphoria, a condition inextricably linked to being transgender," Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking." ECF No. 52 at 46-47.

### B. Defendants' Blanket Refusal to Provide Gender-Affirming Care Is Discrimination on the Basis of Sex.

In disputing whether the harm that Mr. Hammons suffered was inflicted "on the basis of sex," Defendants double down on their strained analogy to Supreme Court cases holding that policies discriminating based on pregnancy do not facially discriminate based on sex. *See* Resp. at 19 (citing *Geduldig v. Aiello*, 417 U.S. 484 (1974) (interpreting Equal Protection Clause); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) (interpreting Title VII)). Mr. Hammons has already

explained why that analogy is flawed for at least three reasons. *See* Mot. at 19-22.

**First,** neither *Geduldig* nor *Gilbert* applies to Section 1557. Defendants note that *Geduldig* is still good law for purposes of analyzing pregnancy discrimination under the Equal Protection Clause. Resp. at 20 (citing *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 228, 2245-46 (2022)). But, as Plaintiff explained, *Geduldig*'s reasoning does not apply to Title VII, Title IX, or Section 1557, and *Gilbert*'s attempt to extend *Geduldig* to Title VII was quickly overruled by Congress when it passed the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). Defendants do not cite any decision purporting to resurrect *Gilbert* and extend it to Title IX or other statutes prohibiting sex discrimination. To the contrary, courts have consistently held that that Title IX prohibits discrimination based on pregnancy. *See e.g.*, *Stanford v. Fox Coll.*, No. 18 C3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19, 2020); *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 19- 10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019); *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1083-84 (N.D. Fla. 2015).

Defendants now begrudgingly acknowledge that *Gilbert* and *Geduldig* do not apply to Title IX, and that Title IX prohibits discrimination based on pregnancy as a form of discrimination based on sex. Resp. at 20. Defendants attempt to minimize the significance of that concession by asserting that Title IX covers pregnancy solely by virtue of an implementing regulation. 34 C.F.R. § 106.40(b). But that distinction does not help Defendants because the implementing regulations for Section 1557—both past and present—also prohibit discrimination based on pregnancy. *See* Mot. at 20 n.9 (citing *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160-01, at 37179-80 (June 19, 2020) (agreeing that "Section 1557's protection against discrimination 'on the basis of sex' covers women's health issues including pregnancy, uterine cancer, and prenatal and postpartum services")).

Because Section 1557 prohibits discrimination based on pregnancy as a form of

5

discrimination based on sex, the entire premise of Defendants' analogy between pregnancy and gender-affirming care fails at the outset. If Defendants are correct that discrimination against gender-affirming care should be analyzed the same way as discrimination based on pregnancy, then discrimination against gender-affirming care—like discrimination based on pregnancy—must be recognized under Section 1557 as discrimination based on sex.

**Second**, even if *Geduldig* did apply to Section 1557, the refusal to provide any form of gender-affirming treatment would still facially discriminate on the basis of sex. Three courts (including two within this Circuit) have already rejected Defendants' analogy to *Geduldig* and explained that discrimination against gender-affirming care—unlike discrimination based on pregnancy—facially constitutes sex-based discrimination even under the Fourteenth Amendment. *Fain v. Crouch*, No. CV 3:20-0740, 2022 WL 3051015, at *8 (S.D.W. Va. Aug. 2, 2022); *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 3226731, at *21 (M.D.N.C. Aug. 10, 2022) (summary judgment decision); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020) (denying motion to dismiss); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999-1000 (W.D. Wis. 2018).

Pivoting away from *Gilbert*, Defendants also point to the recent Supreme Court decision in *Marietta Memorial Hospital Employee Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968 (2022), but that decision once again supports Mr. Hammons, not Defendants. The Court in *DaVita* held that an insurance plan limiting coverage for kidney dialysis did not violate a Medicare statute prohibiting primary insurers from "differentiat[ing] in the benefits it provides between individuals having end stage renal disease and other individuals covered." 142 S. Ct. at 1973. In ruling that the limitations on coverage for dialysis did not violate the Medicare statute, the Court rejected the dissent's argument "that singling out outpatient dialysis is simply a proxy for singling out individuals with end-stage renal disease because those individuals disproportionately receive outpatient dialysis." *Id.* at 1974 n.2. But it did so on the narrow grounds that the statute was

6

designed "simply [to] coordinate[] payments between group health plans and Medicare," and not to prevent discrimination against patients: "This statute is a coordination-of-benefits statute, not a traditional antidiscrimination statute." *Id.* at 1974 & n.2.

Here, Mr. Hammons does not rely on a "proxy" theory because discriminating against gender-affirming care *explicitly* discriminates based on sex. *See Kadel*, 446 F. Supp. 3d at 18 (explaining that when a policy discriminates against gender-affirming care, "[t]he characteristics of sex and gender are directly implicated; it is impossible to refer to the [policy] without referring to them"). But if "proxy" discrimination were relevant here, *DaVita* indicates that "a traditional antidiscrimination statute" such as Section 1557 would indeed prohibit exclusions of gender-affirming care that serve as a proxy for discrimination based on transgender status.

***Third***, even if Defendants' policy against providing gender-affirming care were regarded as facially neutral, the evidence unequivocally shows that it was adopted based on a religious belief that people should conform to their sex assigned at birth, and that failing to do so is "intrinsically disordered." Mot. at 9-11, 22 (collecting evidence). Defendants attempt to distract from this reality by misleadingly dismissing documents from the National Catholic Bioethics Center ("NCBC") as documents "from a third party," Resp. at 21, while ignoring the fact that St. Joseph must, pursuant to contracts signed by UMMS, adhere to the NCBC's interpretation of the ERDs, Mot. at 28 (collecting evidence). Indeed, Defendants specifically consulted the "intrinsically disordered" document when discussing whether surgery for gender dysphoria could be performed at St. Joseph. Ex. 3 (email from Riddle attaching NCBC guidance stating that "Gender Transitioning of any kind is intrinsically disordered"). Defendants also errantly discount testimony from Dr. Adashek, without acknowledging that Dr. Adashek was recounting Defendants' precise explanation to him for why Mr. Hammons's surgery was cancelled. ECF No. 105-23 at 297; ECF No. 105-21, Adashek Tr. 71:13-17; ECF No. 105-6, Cunningham Tr. 270:4-9.

Moreover, despite Defendants' assertions to the contrary, recognizing that Defendants' policy is discriminatory does not require the Court (or anyone else) to condemn people with sincere religious beliefs as being motivated by animus or hatred. *Contra* Resp. at 20-21. Indeed, the Supreme Court has made clear that an employer can violate Title VII by applying sex-based rules even when they do not perceive themselves to be motivated by animus or "a desire to discriminate." *Bostock*, 140 S. Ct. at 1745. Religious beliefs must be treated with respect, but it is nevertheless "[a] general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable [antidiscrimination] law." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018).

## II.    UMMS CANNOT ESCAPE LIABILITY.

Mr. Hammons explained why UMMS is directly liable for forcing St. Joseph to adhere to the ERDs, and indirectly liable for St. Joseph's actions through veil piercing. Mot. at 24-31. In response, Defendants assert that these settled principles of corporate liability do not apply to suits brought pursuant to Spending Clause legislation, because such suits are effectively suits in contract. As discussed below, Defendants provide no support for their assertions that these various extensions of the contract analogy should govern suits under Section 1557, or any other Spending Clause legislation. To the contrary, Defendants' various theories have largely been outright rejected by courts. Defendants' appeals to the contract analogy should be disregarded here.

### A.    UMMS's Operations Include Its Actions Regarding Its Subsidiaries.

As Plaintiff previously explained, because UMMS accepts federal funds, it is subject to Section 1557 in "all [its] operations," including its operations with respect to St. Joseph. 45 C.F.R. § 92.3(b), Mot. at 24-26. In response, Defendants argue that UMMS cannot be liable because St. Joseph cancelled the surgery, and Section 1557 "does not extend liability beyond [an] 'entity,' for

8

discrimination in *another company's* program." Resp. at 3. Defendants provide no support for this assertion—and the only courts to address such an argument have rejected it.

For example, in *Doe One v. CVS Pharmacy, Inc.*, the court held that Section 1557 liability "may sweep across corporate entity lines" because a parent entity's "operations" may include the operations of its subsidiaries. No. 18-CV-01031, 2022 WL 3139516, at *9 (N.D. Cal. Aug. 5, 2022). The court there reasoned that "Section 1557 was intended to reach broadly," and, that "[t]o ignore the overall interrelationship among the entities which … design and implement the allegedly discriminatory program[,] and permit the [defendant] interrelated entities to escape responsibility would exalt form over substance and impair the effectiveness of the anti-discrimination provision of the ACA." *Id.* at *9-10; *see also T. S. by & through T.M.S. v. Heart of CarDon, LLC*, No. 120CV01699, 2021 WL 981337, at *9 (S.D. Ind. Mar. 16, 2021), *aff'd*, 43 F.4th 737 (7th Cir. Aug. 5, 2022) (holding that employer and its group health plan—a separate legal entity—were subject to suit under Section 1557 for discriminatory provisions within the employer's health plan); *Tomei v. Parkwest Med. Ctr.*, No. 319CV00041, 2022 WL 703656, at *7 (E.D. Tenn. Mar. 8, 2022) (parent corporation liable under Section 1557 when a plaintiff suffered harm at a subsidiary health care facility); *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 842 (11th Cir. 2017) (similar, under Rehabilitation Act).

Defendants' assertions are also undermined by *Davis v. Monroe County Board of Education,* 526 U.S. 629 (1999), a case repeatedly and inexplicably invoked by Defendants in support of their arguments. In finding that schools could be held liable under Title IX for students' harassment of other students, the Court held that funding recipients could be liable for the actions of third parties, and specifically noted that Title IX regulations have long prohibited funding recipients from entering into contractual arrangements that would cause students to be subjected

to discrimination at the hands of a broad range of third parties. *See id.* at 643-44.[1] Thus, instead of supporting Defendants, *Davis* confirms that "operations" can extend to legally separate entities.

### B.    UMMS Is Directly Liable.

In his motion for summary judgment, Mr. Hammons discussed the extensive case law holding a parent corporation directly liable for causing or authorizing illegal conduct to occur at its subsidiaries. *See* Mot. at 26-28. Mr. Hammons also explained why UMMS is directly liable in this case: the undisputed record establishes that UMMS created the defendant entities UMSJ LLC and St. Joseph LLC, and, through a series of contracts, required those entities to adhere to both the ERDs and the audits of the NCBC, which regards transgender people as "intrinsically disordered" and prohibits treatment of gender dysphoria. *Id.* Thus, UMMS "forced the subsidiary to take the complained-of action," and is "specifically responsible for the … practice at issue in the litigation." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001).

In opposing summary judgment, Defendants do not dispute the well-established principles of liability recounted in Mr. Hammons's motion. Instead, Defendants assert that these principles do not apply to legislation passed pursuant to the Spending Clause because "this theory of direct participation does not apply *to breaches of contract*.'" Resp. at 4 (emphasis from Defendants). But Defendants are wrong to equate a lawsuit under Section 1557 to a literal action for breach of contract. To the contrary, the Supreme Court has emphatically stated that "our cases do not treat

---

[1] *See also* 34 C.F.R. § 106.31(b) (funding recipients may not "[a]id or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees"); 34 C.F.R. § 106.31(d) (when recipient requires students to participate in activities operated by third parties, recipient "(i) [s]hall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any applicant, student, or employee of such recipient which this part would prohibit such recipient from taking; and (ii) [s]hall not facilitate, require, permit, or consider such participation if such action occurs").

suits under Spending Clause legislation as literal 'suits in contract,' subjecting funding recipients to whatever 'governing rules' some general federal law of contracts would supply." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1573 (2022) (cleaned up); *accord Sossamon*, 563 U.S. at 290 (quoting *Barnes*, 536 U.S. at 189, n.2) ("We have been clear 'not to imply… that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.'") (cleaned up).

Far from rejecting theories of tort liability for Spending Clause statutes, the Supreme Court has specifically applied direct liability in the context of Spending Clause legislation in *Davis*. 526 U.S. at 644 (looking to Restatement (Second) of Torts when determining covered entity's liability for discrimination inflicted by nominal third parties and setting out deliberate indifference "as a theory of direct liability" under Title IX). *Davis* analyzed whether an entity (the school board) could be held directly liable based on the acts of third parties (students); it did not relate to a parent entity's liability based on actions taken by a subsidiary. In both contexts, however, "direct liability" is simply another means of saying that an entity will be liable "for its own actions" in perpetrating a wrong, notwithstanding the involvement of others. *United States v. Bestfoods*, 524 U.S. 51, 65 (1998) (analyzing parent-subsidiary context); *see also Davis*, 526 U.S. at 645-46 ("[T]he district was directly liable for its *own* failure to act.") (emphasis in original); *Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5402230, at *9 (S.D.W. Va. Sept. 26, 2016) ("[U]nder the 'direct' theory … a parent company is liable in the same way as any tortfeasor who causes harm by acting in concert with others.").[2]

---

[2] Defendants also point to cases holding that Title IX does not attach to individual school administrators, who did not receive federal funds. *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999); *Jennings v. Univ. of N.C. at Chapel Hill*, 240 F. Supp. 2d 492, 509 (M.D.N.C. 2002); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018-21 (7th Cir. 1997); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 901 (1st Cir. 1988). These cases do not discuss

In addition to their faulty legal arguments, Defendants also attempt to raise a factual dispute with respect to whether UMMS actually caused St. Joseph to adhere to its discriminatory policy, arguing that St. Joseph adhered to the ERDs prior to UMMS's acquisition of the hospital, and "St. Joseph's continued adherence to the ERDs therefore cannot be causally linked to UMMS or the acquisition documents." Resp. at 6-7, 22-23.[3] Here, Defendants make the critical error of attributing a legal identity to the hospital building, independent of the corporations that own and operate the facility. While the *hospital* known as St. Joseph adhered to the ERDs prior to UMMS's acquisition, the defendant entities—St. Joseph LLC and UMSJ LLC—were created by UMMS as part of its acquisition of the hospital.[4] Defendants are flatly incorrect in their assertion that the defendant entities already adhered to the ERDs prior to any interaction with UMMS: the defendant entities *did not exist* until UMMS created them.

Defendants do not dispute—nor could they—that UMMS holds the authority to prevent the St. Joseph subsidiaries and the hospital from changing course, and declining to adhere to the ERDs or submit to the regular audits by the NCBC. Rather, Defendants assert that UMMS has

---

directly liability principles, and UMMS, unlike the administrators, is a corporate entity that *does* receive federal funds, rendering these cases inapt. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX reaches institutions ... that receive federal funds ... but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."). Defendants also argue that "the only proper defendant in a breach of contract action is the contract's signatory." Resp. at 4-5. Even if this spurious theory were accepted, it would fail on its own terms. As discussed, UMMS itself receives federal funding. As a result, even under Defendants' view, UMMS would simply be another "signatory" to Section 1557. *Id.*

[3] Throughout the parties' briefing, both Defendants and Plaintiff have referred to the defendant entities UMSJ LLC and St. Joseph LLC collectively as "St. Joseph."

[4] *See* ECF No. 105-7 (creation document for UMSJ LLC); ECF No. 105-8 (same, St. Joseph LLC); *see also* Ex. 4, Cunningham Tr. at 38-39 (Megan Arthur, signatory on both creation documents, served as general counsel for UMMS); ECF No. 98-8 at 1035 (Catholic Identity Agreement, noting Defendants UMSJ LLC and St. Joseph LLC are "affiliate[s] of [UMMS]," and only "upon the closing date ... will become the owner[s] and operator[s]" of the hospital).

never had reason to exercise this authority, because there is no indication that the St. Joseph subsidiaries "ever sought to abandon [their] Catholic heritage, much less that UMMS stood in the way." Resp. at 7. Effectively, Defendants argue that, because the St. Joseph subsidiaries willingly discriminated, UMMS's authority is irrelevant. Defendants cite no support for this proposition, nor is it the law. *Cf. Davis*, 526 U.S. 629, 646-47 (school liable for discrimination in setting "under the school's disciplinary authority"); *Starbuck v. Williamsburg James City Cty. Sch. Bd.*, 28 F.4th 529, 535 (4th Cir. 2022) (under *Monell*, a school board's "final policymaking authority" over particular action creates municipal liability, regardless of whether the board "participate[d] in the initial constitutional violation perpetrated by subordinates").

### C.    UMMS Is Indirectly Liable.

UMMS is also indirectly liable. As explained, under the federal common law, the proper standard is whether a corporate entity may be "disregarded in the interests of public convenience, fairness and equity," after consideration of "the specific legislative policies at issue and whether piercing the corporate veil is necessary to further those policies." *Equal Rts. Ctr. v. Equity Residential*, No. CCB-06-1060, 2016 WL 1258418, at *3 (D. Md. Mar. 31, 2016) (cleaned up) (quoting *Thomas v. Peacock*, 39 F.3d 493, 503-04 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349 (1996), & *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 27 (1st Cir. 2000)). Courts must also consider, *inter alia*, whether it would be "'fundamentally unfair' to allow [a parent] to escape liability by hiding behind [a subsidiary's] corporate existence." *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 65 (4th Cir. 1989). Because UMMS is contractually obligated to enforce a discriminatory policy through the St. Joseph subsidiaries, it would be fundamentally unfair and subversive of Section 1557's nondiscrimination provision to allow UMMS to seek shelter behind the corporate form.

Defendants sidestep this test, arbitrarily asserting that Spending Clause legislation is not

susceptible to federal veil piercing because Spending Clause legislation grants particular deference to the corporate form. But, again, this view has no support in the law; Defendant cite only a literal breach of contract case. *Todd*, 2016 WL 727108; *contra Cummings*, 142 S. Ct. at 1573 ("[S]uits under Spending Clause legislation [are not] literal 'suits in contract.'").

Defendants also rely heavily on *Atherton v. FDIC*, 519 U.S. 213 (1997), observing that the circumstances justifying application of the federal common law are "few and restricted." *Id.* at 218. But the Supreme Court's holding in *Atherton*—which concerned the source of a defendant bank's substantive liability in the wake of the Court's reformation of federal common law in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), *see Atherton*, 519 U.S. at 218—is irrelevant to UMMS's indirect liability. Because the defendant-bank's standard of care had since developed under state law, and because that standard of care did not conflict with federal law, the Court found no reason to apply the federal common law. *Id.* at 225-26. In contrast, there is no question here that Defendants' liability arises under federal law. Consequently, the Court's only remaining task is to determine "*who* is liable for [the] breach[]" of federal law. *See Thomas*, 39 F.3d at 503 (piercing the corporate veil under the federal common law). In any event, even under Maryland law, veil piercing is appropriate as a matter of "paramount equity," as UMMS would otherwise be allowed to evade its legal obligations by enforcing a discriminatory policy while hiding behind the corporate form. *See, e.g.*, *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 739 (2003).

Defendants also assert that summary judgment cannot be granted because of alleged factual disputes over UMMS's level of control over the St. Joseph subsidiaries. Resp. at 23-24. They cherry-pick certain factors they claim point in their favor, "[b]ut not all … factors need be present … and [federal veil piercing] require[s] fewer of these traditional factors." *Equal Rts. Ctr.*, 2016 WL 1258418, at *4. Defendants also ignore the evidence establishing the myriad ways in which UMMS is vested by contract with controlling authority over St. Joseph, including, *inter alia*, the

14

power to control St. Joseph's budget. *See* Mot. at 6-7, 29-30; *see also Keffer*, 872 F.2d at 65 (veil piercing supported by a parent's power over subsidiary's "purse strings"). Neither UMMS's nor St. Joseph's 30(b)(6) witnesses had "any reason to believe that UMMS no longer holds" the control enumerated in its contracts. ECF No. 105-6, Cunningham Tr. at 55:8-10; ECF No. 105-10, Greskovich Tr. at 81:11-13 ("My understanding of these agreement are they're there for a reason, and so I would assume that that happens.").[5] Indeed, Defendants themselves, who have full knowledge of UMMS's relationship with the St. Joseph subsidiaries, have not come forward with any admissible evidence showing that UMMS does *not* exercise its authority. By "fail[ing] to provide evidence establishing that the factfinder could reasonably decide in [their] favor," Defendants have failed to establish a genuine dispute of material fact. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

## III.    THE ST. JOSEPH SUBSIDIARIES CANNOT ESCAPE LIABILITY.

### A.    RFRA Does Not Apply to This Case.

In a final effort to shield St. Joseph from liability, Defendants contend that Mr. Hammons—a private citizen—cannot win summary judgment against St. Joseph—a state entity—because the state actor is protected under RFRA. Defendants are wrong.

To begin, while Defendants concede that state actors cannot invoke RFRA as a defense, Defendants insist that "the claim that St. Joseph is a state actor is factually disputed," pointing to their discussion on UMMS's control over the St. Joseph subsidiaries. Resp. at 28 & n.6. But, as discussed, UMMS's contractual agreements provide an undisputed record of UMMS's control over both the St. Joseph subsidiaries generally, and the specific discriminatory policy at issue here.

---

[5] In any event, an admittedly unprepared 30(b)(6) witness cannot create a genuine issue of fact. *See* Mot. at 7. Defendants also complain that their 30(b)(6) witnesses were "non-lawyers," Resp. at 22 n.5, but "[a] Rule 30(b)(6) designee speaks for the corporation," *Dixon Lumber Co., Inc. v. Austinville Limestone Co., Inc.*, 256 F. Supp. 3d 658, 667 (W.D. Va. 2017).

Further, the state-actor inquiry is primarily a *legal* inquiry. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 344 n.7 (4th Cir. 2000) ("[T]he ultimate resolution of whether an actor was a state actor or functioning under color of law is a question of law for the court."). Defendants have failed to present any argument that this Court's prior holding is legally unsound.[6]

Regardless of St. Joseph's status as a state actor, Defendants' RFRA defense fails as a matter of law because RFRA cannot be invoked as a defense against private plaintiffs. The clear weight of Circuit authority has so held, as has this Court. *See Listeki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *Doe v. Cath. Relief Servs.*, No. CV CCB-20-1815, 2022 WL 3083439, at *6 (D. Md. Aug. 3, 2022); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-CV-00011, 2021 WL 4037431, at *15 (W.D.N.C. Sept. 3, 2021); *Goddard v. Apogee Retail LLC*, No. CV DKC 19-3269, 2021 WL 2589727, at *8 (D. Md. June 24, 2021) (Chasanow, J.), *appeal dismissed*, No. 21-1814, 2021 WL 6689512 (4th Cir. Nov. 2, 2021).

The only Court of Appeals decision to apply RFRA to a lawsuit between private parties is *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006), and the Second Circuit subsequently repudiated that decision in *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2, 203-04 (2d Cir. 2008) (stating, in light of the plain text of RFRA, "we do not understand how it can apply to a suit between private parties,

---

[6] Defendants attack Mr. Hammons's citation to *Gunter v. Long Island Power Authority/Keyspan*, No. 08 CV 498 (RRM) (LB), 2011 WL 1225791 (E.D.N.Y. Feb. 15, 2011) as inapt. *See* Resp. at 28-29. But contrary to Defendants' assertions, the *Gunter* court did not rely on any factors beyond the fact that the defendant was a "wholly owned subsidiary" of a state entity in holding that the defendant was likewise a state entity. *See* 2011 WL 1225791, at *7-8 (holding that, defendant "wholly owned subsidiary of the Authority," was "controlled by an agency of the state," and therefore was a state actor itself) (cleaned up). And Defendants' sole additional citation on this issue does not discuss a parent-subsidiary relationship. *Untracht v. Fikri*, 454 F. Supp. 2d 289, 319-20 (W.D. Pa. 2006).

16

SA115

regardless of whether the government is capable of enforcing the statute at issue"). Defendants

point to two additional circuit decisions, but neither discussed RFRA's application to private

parties. Moreover, the D.C. Circuit's decision in *EEOC v. Catholic University*, 83 F.3d 455, 468-

69 (D.C. Cir. 1996), was a case brought by the government as a co-plaintiff through the EEOC,

and *In re Young*, 82 F.3d 1407, 1416-17 (8th Cir. 1996), *cert. granted, judgment vacated*, 521 U.S.

1114 (1997), was a case brought by a court-appointed bankruptcy trustee, *see Hankins*, 441 F.3d

at 103 n.4 (2d Cir. 2006) (noting that a "bankruptcy trustee is arguably 'acting under color of law'

and therefore falls within the RFRA's definition of 'government'").[7] The fact of the matter is that

"[i]t has now been twenty-seven years" since RFRA's enactment, "and *Hankins*, a decision

questioned by district courts in the Second Circuit and the Second Circuit itself, still stands alone

as the only court holding RFRA applies to private parties." *Billard*, 2021 WL 4037431, at *22.

Facing insurmountable case law, Defendants twist the statute's text. Defendants point to

the statute's findings, but conveniently fail to observe that the operative text requires the

government to be a party. *See* 42 U.S.C. § 2000bb-1 (providing that the "*[g]overnment* shall not

substantially burden a person's exercises of religion" unless it "demonstrates" certain criteria, and

that "[a] person whose religious exercise has been burdened in violation of this section may assert

that violation as a claim or defense in a judicial proceeding … against the *government*") (emphasis

added). Defendants argue that because RFRA applies to "all federal law, and the implementation

---

[7] Contrary to Defendants' argument other Circuits have not accepted *Hankin*'s theory that RFRA
might apply in cases where the government could have been a party. *See* Resp. at 29. Of the
three cases Defendants cite here, two expressly disagree with *Hankins*'s reasoning. *See Listecki*,
780 F.3d at 737; *McGill*, 617 F.3d at 412. In the third, the Ninth Circuit implicitly rejected the
argument: the complained-of action was compelled and caused by the government, but the court
nonetheless held that RFRA would not attach where "Plaintiff did not bring this action against
the federal government [but instead] sued a private employer," with an insufficient relationship
to the government itself. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 837 (9th Cir.
1999). Other courts have rejected the argument outright. *See Billard*, 2021 WL 4037431, at *21;
*Mathis v. Christian Heating & Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 328 (E.D. Pa. 2016).

of that law," *id.* at § 2000bb-3(a), it is applicable whenever a federal law burdens religious exercise. But the more reasonable interpretation is that "RFRA practically acts as a modifier to every federal law, and the requirement that the government be a party simply acts as a condition that must be met in order to trigger RFRA's protections." *Billard*, 2021 WL 4037431, at *19.[8]

Defendants also argue that RFRA must apply to private plaintiffs because "[c]ourts routinely require private plaintiffs to satisfy heightened scrutiny when their claims trigger constitutional defenses akin to RFRA." *See* Resp. at 31. However, RFRA, unlike the First Amendment cases on which Defendants rely, is not a constitutional defense, and thus these cases "are irrelevant." *Billard*, 2021 WL 4037431, at *15.

For all these reasons, RFRA has no application to this case. But if RFRA did apply, Mr. Hammons's claims would survive RFRA scrutiny. In cases applying RFRA's "strict scrutiny" test, the Fourth Circuit has repeatedly held that laws prohibiting religious organizations from engaging in sex discrimination serve interests "of the highest order" and survive strict scrutiny. *See Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir. 1990); *Rayburn v. Seventh–Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985). The Sixth Circuit has also held (in a case where the government was a party) that prohibiting sex discrimination against transgender employees survives RFRA scrutiny. *See EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 593 (6th Cir. 2018) ("The undisputed record demonstrates that Stephens has been and would be

---

[8] Defendants argue that Section 2000bb-1(c) should be read as an abrogation of state sovereign immunity. This reading not only ignores the rest of the statute, *see Hankins*, 441 F.3d at 114-115 (Sotomayor, C.J., dissenting), but also overlooks the amendment history. Following *City of Boerne v. Flores*, 521 U.S. 507, 508-09 (1997)—which held that RFRA does not apply to state and local governments—Congress amended those portions of RFRA that applied to state and local law. *See* Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-274 § 7, 114 Stat. 803 (2000). Congress, however, did not amend any portion of Section 2000bb-1, demonstrating that section does not pertain to applying federal law to the states.

harmed by the Funeral Home's discriminatory practices in this case, and the [government] has a compelling interest in eradicating and remedying such discrimination."). If the Court revisits its earlier rulings and holds that RFRA does apply to this action, the Court should allow the parties to present further submissions on whether RFRA has been satisfied here.

### B. Defendants' Injunction-Based Defense Fails.

Despite the overwhelming authority demonstrating that RFRA cannot apply here, Defendants continue to insist that RFRA precludes St. Joseph's liability by virtue of the injunction in *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr. 21, 2021). But Mr. Hammons has no relation to any of the parties in that action, and thus cannot be bound by that litigation. *See Texas v. Dep't of Lab.*, 929 F.3d 205, 213 (5th Cir. 2019) (holding that injunction prohibiting the Department of Labor from enforcing new overtime rule did not apply to private parties and did not prevent them from attempting to enforce the rule through separate litigation). Moreover, the issues barring RFRA from applying here—RFRA's ineffectiveness to claims against a government entity, and in a suit brought by a private party— were not litigated in *Religious Sisters*, and thus were never decided by that court.

Defendants concede that "an injunction against the government does not preclude private litigation." Resp. at 14. Yet they contend (once again) that the Spending Clause upends this normal rule. Defendants assert that the North Dakota injunction applies to private parties because third party beneficiaries are "in privity" with contracting parties and that "if a contractual promise becomes unenforceable as to the promisee, it also cannot be enforced by a third party beneficiary." *Id.* at 15-16. As with all their other Spending Clause arguments, Defendants have no support that the Spending Clause has actually been interpreted in this manner, and, as explained, Spending Clause suits are not literal suits in contract.

Defendants also cite *NCAA v. Smith*, 525 U.S. 459, 467 n.5 (1999), and *Davis*, 526 U.S. at

19

641, for the proposition that the scope of a private party's right of action under Title IX is no broader than the government's own statutory enforcement authority. Resp. at 15. But those cases simply describe the scope of the statute itself; they do not somehow replace the traditional rules of privity and issue preclusion. Moreover, *Taylor v. Sturgell*, 553 U.S. 880, 892-895 (2008), squarely forecloses Defendants' attempt to invent new exceptions to the traditional rules of privity. There, the Supreme Court "provide[d] a comprehensive synthesis of the discrete exceptions that apply in limited circumstances to the fundamental…rule that a litigant is not bound by a judgment to which she was not a party," effectively ending the "privity" inquiry for these purposes. *Duckett v. Fuller*, 819 F.3d 740, 745 (4th Cir. 2016) (quoting *Taylor*, 553 U.S. at 898) (cleaned up).

## IV.    THERE ARE NO DISPUTED QUESTIONS OF FACT FOR TRIAL.

Finally, Defendants assert that even if their motion for summary judgment is denied, there are disputed facts preventing the Court form granting summary judgment to Mr. Hammons. Rep. at 22-32. As discussed above, none of these alleged factual disputes creates a genuine question for trial. *See, supra*, Section II.B at 12-13 (undisputed contractual agreements establish that UMMS directly caused the discrimination); Section II.C at 14-15 (undisputed contractual agreements establish UMMS's control over St. Joseph); Section I.A (undisputed record demonstrates that Mr. Hammons's procedure was cancelled based on facially discriminatory policy); Section III.A (RFRA does not apply as a matter of law).

## <u>CONCLUSION</u>

For these reasons, Mr. Hammons respectfully requests that the Court grant his motion for summary judgment and deny Defendants' motion for summary judgment.

Dated: September 6, 2022

Respectfully submitted,

20

*/s/ Louis J. Ebert*

Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
Abigail E. Marion (*pro hac vice*)
Jonathan S. Z. Hermann (*pro hac vice*)
Edward J. Delman (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
acohen@pbwt.com
amarion@pbwt.com
jhermann@pbwt.com
edelman@pbwt.com

Joshua A. Block (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

*Counsel for Plaintiff Jesse Hammons*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

JESSE HAMMONS,                                )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )    Case No. 20-cv-2088-DKC
                                             )
UNIVERSITY OF MARYLAND MEDICAL SYSTEM        )
CORPORATION, et al.,                         )
                                             )
            Defendants.                      )
                                             )
_____    )

### JOINT MOTION
### TO DEFER FILING OF MOTION REQUESTING ATTORNEY'S FEES

Pursuant to Federal Rule of Civil Procedure 54(d), Plaintiff Jesse Hammons and

Defendants University of Maryland Medical System Corporation, UMSJ Health System, LLC,

and University of Maryland St. Joseph Medical Center, LLC (collectively, "Defendants")

respectfully request an order deferring the filing of Plaintiff's motion requesting attorney's fees

pending resolution of any appeal from this Court's final judgment.  Specifically, the parties

request that the Court enter an order directing Plaintiff's motion requesting attorney's fees to be

filed within the later of 21 days after the expiration of the time allowed to file an appeal

following this Court's entry of judgment or the Fourth Circuit's issuance of its mandate in the

event either party appeals.  In support of this Joint Motion the parties state as follows:

1.      On March 13, 2023, this Court entered a final judgment, awarding Plaintiff

$874.63 in compensatory damages and interest.  ECF No. 133.  As the prevailing party, Plaintiff

may be allowed reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

1

2.      Under Federal Rule of Civil Procedure 54(d)(2), "[u]nless a statute or a court order provides otherwise," Plaintiff's petition for fees "must be filed no later than 14 days after the entry of judgment."  Local Rule 109(2)(a) requires a Plaintiff's motion requesting attorney's fees to be filed "within fourteen (14) days of the entry of judgment," unless "otherwise ordered by the Court."

3.      According to the notes regarding the 1993 amendments to Rule 54, the Advisory Committee suggested that "[i]f an appeal on the merits of the case is taken, the court may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice, directing under subdivision (d)(2)(B) a new period for filing after the appeal has been resolved." Fed. R. Civ. P. 54 advisory committee's note (1993 amendments).  The Advisory Committee also suggests that "if the claim for fees involves substantial issues or is likely to be affected by the appellate decision, the district court may prefer to defer consideration of the claim for fees until after the appeal is resolved."  Fed. R. Civ. P. 58 advisory committee's note (1993 amendments).

4.      In this case, the Parties agree that interests of judicial economy would be best served by deferring the filing of Plaintiff's motion requesting attorney's fees until after the resolution of any appeal to the Fourth Circuit.  Specifically, the parties request that the Court enter an order directing Plaintiff's motion requesting attorney's fees to be filed within 21 days of the expiration of time allowed for appeal of a final judgment, or within 21 days of the issuance of a mandate by the Court of Appeals, should either party appeal this Court's judgment.

Dated: March 14, 2023

/s/ Denise Giraudo
Denise Giraudo (Bar No. 29015)
Paul Werner (*pro hac vice*)
Danielle Vrabie (*pro hac vice*)
Imad Matini (*pro hac vice*)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20036
Tel: 202-747-1906
Fax: 202-747-3933
dgiraudo@sheppardmullin.com
pwerner@sheppardmullin.com
dvrabie@sheppardmullin.com
imatini@sheppardmullin.com

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Tel: 202-879-7658
Fax: 202-626-1700
yroth@jonesday.com

*Counsel for Defendants University of Maryland
Medical System Corporation, UMSJ Health
System, LLC, and University of Maryland St.
Joseph Medical Center, LLC*

Respectfully submitted,

/s/ Louis J. Ebert
Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
Abigail E. Marion (*pro hac vice*)
Jonathan S. Z. Hermann (*pro hac vice*)
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
acohen@pbwt.com
amarion@pbwt.com
jhermann@pbwt.com

Joshua A. Block (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

*Counsel for Plaintiff Jesse Hammons*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of March 2023, I filed the foregoing Joint Motion to Defer Filing of Bill of Costs and Petition for Fees with the Clerk of the Court using the CM/ECF system, which will automatically serve electronic copies upon all counsel of record.


*/s/ Louis J. Ebert*
Louis J. Ebert

SA124