**Nos. 23-1394, 23-1452**

---

# In the
# United States Court of Appeals
# for the Fourth Circuit

---

JESSE HAMMONS,

*Plaintiff-Appellant-Cross-Appellee,*

v.

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORP., ET AL.,

*Defendants-Appellees-Cross-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND, HON. DEBORAH K. CHASANOW
(NO. 20-CV-2088)

---

**COMBINED OPENING AND RESPONSE BRIEF OF
DEFENDANTS-APPELLEES-CROSS-APPELLANTS**

---

Yaakov M. Roth
  *Counsel of Record*
Brinton Lucas
Joshua S. Ha
Caleb P. Redmond
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
yroth@jonesday.com

*Counsel for Defendants-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>23-1394</u>          Caption: <u>Hammons v. University of Maryland Medical System Corp., et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>University of Maryland Medical System Corporation; UMSJ Health System, LLC;</u>
(name of party/amicus)

<u>and University of Maryland St. Joseph Medical Center, LLC,</u>

who is <u>Defendants-Appellees</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                      ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Defendant-Apellee University of Maryland Medical System Corporation is the parent of
      Defendant-Appellee UMSJ Health System, LLC, which is the only member of
      Defendant-Appellee University of Maryland St. Joseph Medical Center, LLC.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                          ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☑YES ☐NO
     If yes, identify entity and nature of interest:

     American International Group, Inc., may have a financial interest in the outcome of this litigation as insurer in policies held by the University of Maryland Medical System Corporation.

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:   Yaakov Roth                        Date:   January 22, 2025

Counsel for:   Defendants-Appellees

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1452        Caption: Hammons v. University of Maryland Medical System Corp., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

University of Maryland Medical System Corporation; UMSJ Health System, LLC;
(name of party/amicus)

and University of Maryland St. Joseph Medical Center, LLC,

who is  Defendants-Cross-Appellants , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Defendant-Apellee University of Maryland Medical System Corporation is the parent of Defendant-Appellee UMSJ Health System, LLC, which is the only member of Defendant-Appellee University of Maryland St. Joseph Medical Center, LLC.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☑YES ☐NO
   If yes, identify entity and nature of interest:

   American International Group, Inc., may have a financial interest in the outcome of this litigation as insurer in policies held by the University of Maryland Medical System Corporation.

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Yaakov Roth                    Date: January 22, 2025

Counsel for: Defendants-Cross-Appellants

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT............................................................. 4

ISSUES PRESENTED............................................................................ 4

STATEMENT OF THE CASE .................................................................. 5

    A.  St. Joseph serves the Maryland community for over 150 years as a Catholic institution................................................................. 5

    B.  UMMS acquires St. Joseph so that it may continue to serve the Maryland community..............................................................7

    C.  Hammons seeks a hysterectomy at St. Joseph for the purposes of gender transition ........................................................ 9

    D.  Hammons sues St. Joseph and UMMS.........................................10

SUMMARY OF ARGUMENT ..................................................................14

STANDARD OF REVIEW ......................................................................17

ARGUMENT ........................................................................................17

I.    THIS COURT SHOULD DISMISS THE APPEAL AS MOOT. ..............................17

II.   IN THE ALTERNATIVE, THIS COURT SHOULD AFFIRM THE DISMISSAL OF THE CONSTITUTIONAL CLAIMS. ..........................................................18

    A.  Defendants are not "persons" under § 1983 ..................................19

    B.  Defendants are protected by sovereign immunity from Hammons' constitutional claims ................................................. 28

III.  THE COURT SHOULD DISMISS THE SECTION 1557 CLAIMS. ........................41

    A.  Defendants have not engaged in sex discrimination. .................... 42

    B.  At a minimum, UMMS is not liable under Section 1557................ 43

CONCLUSION ................................................................................... 53

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Allen v. Cooper*,
  895 F.3d 337 (4th Cir. 2018) ................................................................. 32

*Am. Premier Underwriters, Inc. v. Nat'l Railroad Passenger Corp.*,
  709 F.3d 584 (6th Cir. 2013) ..........................................................*passim*

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997) .......................................................................... 26, 27

*Auer v. Robbins*,
  519 U.S. 452 (1997) ............................................................................ 39

*Bank of United States v. Planters' Bank of Georgia*,
  22 U.S. 904 (1824) .............................................................................. 34

*Baynard v. Malone*,
  268 F.3d 228 (4th Cir. 2001) ................................................................. 44

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ............................................................................ 36

*Brown v. Dep't of Pub. Safety & Corr. Servs.*,
  383 F. Supp. 3d 519 (D. Md. 2019) ........................................................ 27

*Cash v. Granville Cnty. Bd. of Educ.*,
  242 F.3d 219 (4th Cir. 2001) ................................................................. 39

*Comite de Apoyo a Los Trabajadores Agricolas v. U.S. Dep't of Labor*,
  995 F.2d 510 (4th Cir. 1993) ................................................................. 18

*Constantine v. Rectors & Visitors of George Mason Univ.*,
　411 F.3d 474 (4th Cir. 2005) ................................................................. 26

*Cummings v. Premier Rehab Keller, PLLC*,
　596 U.S. 212 (2022) .......................................................................... 43, 51

*Cureton v. NCAA*,
　198 F.3d 107 (3d Cir. 1999) ................................................................. 44

*Davis v. Monroe Cnty. Bd. of Educ.*,
　526 U.S. 629 (1999) .......................................................................*passim*

*Dep't of Transp. v. Ass'n of Am. R.R.*,
　575 U.S. 43 (2015) ........................................................................ 31, 36

*District of Columbia v. Heller*,
　554 U.S. 570 (2008) ............................................................................. 36

*Doe One v. CVS Pharmacy, Inc.*,
　2022 WL 3139516 (N.D. Cal. Aug. 5, 2022) .................................... 46, 52

*Eden, LLC v. Justice*,
　36 F.4th 166 (4th Cir. 2022) .................................................................. 17

*Fain v. Crouch*,
　618 F. Supp. 3d 313 (S.D.W. Va. 2022) ............................................ 12, 13

*FDIC v. Meyer*,
　510 U.S. 471 (1994) ........................................................................ 22, 23

*Fed. Maritime Comm'n v. S.C. State Ports Auth.*,
　535 U.S. 743 (2002) ............................................................................. 40

*Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico*,
　322 F.3d 56 (1st Cir. 2003) ................................................................... 37

*Gen. Elec. Co. v. Gilbert*,
　429 U.S. 125 (1976) ............................................................................. 42

*Grajales v. P.R. Ports Authority,*
    831 F.3d 11 (1st Cir. 2016) ........................................................................ 37

*Grove City College v. Bell,*
    465 U.S. 555 (1984) ................................................................................... 46

*Hafer v. Melo,*
    502 U.S. 21 (1991) ..................................................................................... 19

*Harter v. Vernon,*
    101 F.3d 334 (4th Cir. 1996) ........................................................ 24, 25, 26

*Hennessey v. Univ. of Kan. Hosp. Auth.,*
    53 F.4th 516 (10th Cir. 2022) ................................................................... 37

*Hixson v. Moran,*
    1 F.4th 297 (4th Cir. 2021) ....................................................................... 17

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ................................................................................... 18

*Howlett v. Rose,*
    496 U.S. 356 (1990) ............................................................................. 19, 27

*Kadel v. Folwell,*
    100 F.4th 122 (4th Cir. 2024) ............................................................. 13, 42

*Kadel v. Folwell,*
    620 F. Supp. 3d 339 (M.D.N.C. 2022) .................................. 12, 13, 16, 42

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ................................................................................... 19

*Kinman v. Omaha Pub. Sch. Dist.,*
    171 F.3d 607 (8th Cir. 1999) ..................................................................... 44

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.,*
    535 U.S. 613 (2002) ................................................................................... 20

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ..........................................................*passim*

*Lindke v. Freed*,
601 U.S. 187 (2024) .................................................. 20

*Martin v. Hunter's Lessee*,
14 U.S. 304 (1816) .................................................. 36

*Md. Stadium Auth. v. Ellerbe Becket Inc.*,
407 F.3d 255 (4th Cir. 2005) .................................... 39

*Owens v. Balt. Cty. State's Att'ys Off.*,
767 F.3d 379 (4th Cir. 2014) ..................................... 40

*P.R. Ports Auth. v. Fed. Maritime Comm'n*,
531 F.3d 868 (D.C. Cir. 2008) .................................... 40

*Parrett v. Se. Boll Weevil Eradication Found., Inc.*,
155 Fed. App'x 188 (6th Cir. 2005) ............................. 33

*Payne v. Taslimi*,
998 F.3d 648 (4th Cir. 2021) .................................... 25

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) ................................................ 28

*Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*,
926 F.3d 97 (4th Cir. 2019) ............................... 32, 35

*Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*,
822 F.2d 456 (4th Cir. 1987) ........................35, 38, 39, 40

*Ray v. Roane*,
948 F.3d 222 (4th Cir. 2020) .................................... 17

*Regents of Univ. of Cal. v. Doe*,
519 U.S. 425 (1997) .......................................... 37, 40, 52

*Short v. Hartman*,
  87 F.4th 593 (4th Cir. 2023)....................................................38

*Silva v. Baptist Health S. Fla., Inc.*,
  856 F.3d 824 (11th Cir. 2017)...........................................51, 52

*Small v. Chao*,
  398 F.3d 894 (7th Cir. 2005) ..............................................22

*Smith v. Metro. Sch. Dist. Perry Twp.*,
  128 F.3d 1014 (7th Cir. 1997)...............................................44

*Strawser v. Atkins*,
  290 F.3d 720 (4th Cir. 2002) ..............................................26

*T.S. v. Heart of CarDon, LLC*,
  43 F.4th 737 (7th Cir. 2022)..............................................50, 51

*Takle v. Univ. of Wis. Hosp. & Clinics Auth.*,
  402 F.3d 768 (7th Cir. 2005)................................................37

*Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*,
  31 F.4th 238 (4th Cir. 2022)................................................20

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance
  Agency*,
  804 F.3d 646 (4th Cir. 2015)............................................37, 40

*United States v. Bestfoods*,
  524 U.S. 51 (1998)..........................................................45, 49

*Va. Off. for Prot. & Advoc. v. Reinhard*,
  405 F.3d 185 (4th Cir. 2005)...............................................20

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ......................................................25, 26

*Wahi v. Charleston Area Med. Ctr., Inc.*,
  562 F.3d 599 (4th Cir. 2009)...............................................32

*Weller v. Dep't of Soc. Servs.*,
901 F.2d 387 (4th Cir. 1990) ................................................................. 39

*White Coat Waste Project v. Greater Richmond Transit Co.*,
35 F.4th 179 (4th Cir. 2022) ....................................21, 22, 36, 39

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ............................................... 20, 23, 24, 27

*Wood ex rel. United States v. Am. Inst. in Taiwan*,
286 F.3d 526 (D.C. Cir. 2002) .................................................. 33

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. amend. XIV.................................................................. 20

20 U.S.C. § 1681.......................................................................... 42

28 U.S.C. § 1291 .......................................................................... 4

28 U.S.C. § 1331 .......................................................................... 4

29 U.S.C. § 794 ...........................................................................51

42 U.S.C. § 1983..........................................................*passim*

42 U.S.C. § 2000b.........................................................................1

42 U.S.C. § 12182 ........................................................................51

42 U.S.C. § 18116 ...........................................................*passim*

Md. Code Educ. § 13-301........................................................21

Md. Cts. & Jud. Proc. Code. § 5-518 ................................. 33

Md. Educ. Code § 13-302 .........................................................7

Md. Educ. Code § 13-303 ..................................................... 11, 33

Md. State Gov't Code § 20-903 .............................................. 33

**OTHER AUTHORITIES**

Barbara Pash, BALT. SUN, *After 150 Years, Aim of St. Joseph Hospital in Towson Is Still Compassionate Care* (Nov. 19, 2014) ......................................................................................... 5

**INTRODUCTION**

Jesse Hammons brought this suit because the University of Maryland St. Joseph Medical Center (St. Joseph)—a Roman Catholic hospital since its 1864 founding—refused to perform a hysterectomy to effectuate Hammons' gender transition. While the opening brief buries the lede, *Hammons won*. The district court granted judgment against Defendants under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a). And Defendants, seeking to move on, paid that judgment in full. Hammons' legal team nevertheless appealed, and now asks this Court for an advisory opinion on whether Defendants' conduct *also* ran afoul of the Constitution. But there is no longer any real relief left for any court to award. This case is as moot as it gets. The Court should therefore dismiss the appeal (and Defendants' conditional cross-appeal) without reaching the merits.

If the Court does exercise jurisdiction, it should affirm the dismissal of the constitutional claims. Below, Hammons convinced the district court to designate Defendants as "part of the State of Maryland." JA65. That label not only provided the state action necessary to bring any constitutional claim, but also freed the court to hold that St. Joseph, as "a state actor," could not invoke the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*, as a defense to liability. JA1016.

1

But designating Defendants as state agencies came with consequences: If they are part of the State of Maryland, then, by definition, they are not "person[s]" subject to suit under 42 U.S.C. § 1983. For the same basic reason, they share Maryland's sovereign immunity, as the district court appreciated. Either way, the constitutional claims could not proceed.

On appeal, Hammons embraces the conclusion that Defendants "'are part of the government.'" Br. 2. Again, that is a necessary predicate for any constitutional claims: As private actors, Defendants would be released from constitutional constraints and, in St. Joseph's case, protected by RFRA. Instead, Hammons insists that Defendants are part of the State when it comes to facing the sword, but not when it comes to raising the shield. Under that have-it-both-ways theory, Defendants are "the government for purposes of individuals' constitutional rights," but mere private corporations when it comes to sharing "Maryland's sovereign immunity." Br. 4. That chameleon view of sovereignty may be a useful litigating position, but makes no sense as a matter of law. As the Sixth Circuit recognized in a similar case, government instrumentalities cannot be both sovereign and non-sovereign at the same time. Of course, entities may always *waive* their immunity, but the district court explained at length why there was no such waiver here, and Hammons all but abandons any challenge to that ruling.

If this Court exercises jurisdiction, it must also address Defendants' conditional cross-appeal of the judgment on the Section 1557 claim. And that judgment should be reversed. St. Joseph did not discriminate based on sex. As a Catholic hospital, St. Joseph will not perform procedures for purposes of sterilization or to remove healthy organs; that means it will not conduct a hysterectomy to effectuate a gender transition. But that policy applies to *all* patients, regardless of their sex or gender identity. The only "discrimination" is based on the patient's *diagnosis*—not the patient's *sex.* While Circuit precedent admittedly conflates the two, the Supreme Court is considering the issue and may disagree. In that event, reversal would be required.

At a minimum, the judgment against St. Joseph's ultimate owner, the University of Maryland Medical System Corporation (UMMS), should be reversed. Section 1557 is Spending Clause legislation that operates as a contract between the federal government and the recipient of federal funding, with the latter agreeing not to discriminate in any of its "health program[s]." Under that contract-like framework, *only the funding recipient* for the *allegedly discriminatory program* can be on the hook for a breach. Here, Hammons alleged discrimination only in a *St. Joseph* "health program," and only *St. Joseph* received federal funding for that program. All else aside, UMMS simply does not belong in this case.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331. JA21. This appeal is moot and should be dismissed along with Defendants' conditional cross-appeal. Docs. 6-1, 22, 33-1, 40; *infra* Part I. If this Court disagrees, however, it has jurisdiction over Defendants' conditional cross-appeal under 28 U.S.C. § 1291. JA1076.

## ISSUES PRESENTED

1.     Whether the appeal is moot given that Hammons has already received all requested compensatory and nominal damages.

2.     Whether the district court correctly dismissed the constitutional claims, because Hammons' position that Defendants are part of the State of Maryland means both (a) that Defendants are not "persons" under 42 U.S.C. § 1983, and (b) that Defendants are shielded by sovereign immunity.

3.     Whether the district court erred in holding that St. Joseph's policy of refusing to directly sterilize any patient or remove healthy organs was sex discrimination in violation of Section 1557 of the Affordable Care Act.

4.     Whether the district court erred in holding that UMMS could be held liable under Section 1557 when the only alleged discriminatory "health program" was St. Joseph's surgical department, for which only St. Joseph receives federal funding.

## STATEMENT OF THE CASE

### A.  St. Joseph serves the Maryland community for over 150 years as a Catholic institution.

St. Joseph is a Catholic acute care hospital that was founded in 1864, when a woman donated three row homes in Baltimore to the Sisters of St. Francis of Philadelphia.  JA26; *see also* Barbara Pash, BALT. SUN, *After 150 Years, Aim of St. Joseph Hospital in Towson Is Still Compassionate Care* (Nov. 19, 2014).  In 1964, it relocated to Towson, a community just north of Baltimore, where it remains to this day.

Throughout the hospital's history, one thing has remained constant: its Catholic identity.  St. Joseph began as a private Catholic hospital, "calls itself a Catholic hospital" today, and remains accredited as a Catholic hospital by the Catholic Health Association.  JA181, JA928.  The hospital continues to proclaim that it is "Roman Catholic in origin and philosophy, and has a strong and long-lasting tradition founded in the Catholic faith."  JA1250.

The Sisters of St. Francis "established the hospital in line with the Catholic teaching to provide care to all within the community," and St. Joseph has kept that promise.  JA182.  Each year, the hospital handles over 14,000 admissions, 22,000 emergency visits, and almost 90,000 outpatient visits.  JA204.  It also provides nearly $45 million in annual community benefits, including free primary care to low-income patients.  JA204.

5

As a Catholic hospital, St. Joseph follows the Ethical and Religious Directives (ERDs) for Catholic Healthcare Services. The ERDs serve "all Catholic hospitals in the United States" as "a document that will guide them in the practice of medicine." JA191. All medical personnel at St. Joseph agree to abide by them as a condition of admitting privileges. JA27, JA54. Some ERDs are general, such as the directive to respect and protect "[t]he inherent dignity of the human person." JA398. Others are more specific. As relevant here, the "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted," although "[p]rocedures that induce sterility are permitted" to treat some conditions. JA404. Similarly, to preserve its patients' "bodily and functional integrity," St. Joseph will not "remove healthy organs," although a patient's "functional integrity … may be sacrificed to maintain the health or life of the person when no other morally permissible means is available." JA399, JA956.

The ERDs apply to "[a]ll persons" receiving care at St. Joseph, regardless of sex or gender identity. JA398, JA404, JA439. For example, St. Joseph will not perform a hysterectomy on a woman who wishes to avoid pregnancy (or a vasectomy on a man who wishes to avoid fatherhood). JA374, JA439. The hospital would, however, perform a hysterectomy if the woman would otherwise "die from uterine bleeding." JA320, JA424.

St. Joseph applies the same framework to its transgender patients. In 2018, for example, the hospital performed a hysterectomy on a transgender patient to address "abnormal uterine bleeding" involving a "life-threatening condition" and "a damaged and improperly functioning uterus." JA457, JA320. If a patient wants a hysterectomy for purposes of a gender transition, however, St. Joseph will not provide it. JA247, JA376.

## B. UMMS acquires St. Joseph so that it may continue to serve the Maryland community.

From 1996 to 2012, Catholic Health Initiatives—a Catholic corporation that operates multiple hospitals across the nation—owned and operated St. Joseph. JA218. Toward the end of that time, however, St. Joseph faced dire financial straits threatening to close its doors. JA26. Under that pressure, Catholic Health Initiatives put St. Joseph up for sale in 2012. JA26.

UMMS stepped in. A nonprofit corporation offering comprehensive healthcare through an integrated network of hospitals and clinics, UMMS was created by the State of Maryland in 1984 "to provide medical care of the type unique to University medical facilities for the citizens of the State and region." Md. Educ. Code § 13-302; *see also* JA157. In keeping with that mission, UMMS sought to acquire St. Joseph and stave off its collapse, rather than see tens of thousands of patients in the Baltimore area lose access to local hospital care. *See* JA26, JA218.

7

Because St. Joseph was a Catholic hospital, however, its acquisition was contingent on approval from the Roman Catholic Church. JA222. As a condition of purchase, UMMS therefore agreed to allow St. Joseph to retain "the authority and responsibility for maintaining Catholic identity by assuring the operationalization of the [ERDs]." JA1161. The deal closed in late 2012, permitting St. Joseph to remain open and "promote the continued delivery of acute care and emergency services delivered to the Hospital's patients and individuals" in the surrounding region. JA1084.

Under the purchase agreement, UMMS and St. Joseph are distinct corporate entities, with different CEOs. JA295-296. Like other hospitals in the UMMS network, St. Joseph directly receives its own federal funding for its own health programs. JA158, JA204. St. Joseph does not need UMMS' approval for its "strategic plan[s]," JA271-272, and there is no "direct connection" between St. Joseph's medical executive committee and UMMS, JA317. UMMS thus "has nothing to do with the Catholic identity and ERDs" in place at St. Joseph. JA185. Indeed, UMMS itself operates a "Transgender Health Program ... dedicated to helping individuals explore medical treatment options regarding their gender identity." JA158. Put simply, the affiliation between UMMS and St. Joseph "is partnership in the practice of medicine, not in Catholic identity." JA185.

**C.   Hammons seeks a hysterectomy at St. Joseph for the purposes of gender transition.**

In 2019, Hammons, who identifies as a transgender man, "asked members of a trans support group if they could recommend a surgeon who would perform a hysterectomy" to treat gender dysphoria, JA459-460—*i.e.*, "clinically significant distress caused by a discrepancy between a person's gender identity and that person's primary and/or secondary sexual characteristics," JA468.   The group's recommendation was Dr. Steven Adashek, a physician with admitting privileges at St. Joseph.  JA460; *see also* JA54, JA980.   In September 2019, Hammons met Dr. Adashek, who scheduled the surgery at St. Joseph for January 6, 2020.  JA980.

On December 24, 2019, Dr. Adashek phoned Dr. Gail Cunningham, St. Joseph's chief medical officer, to request permission to perform the surgery. JA228.  The call was short; upon hearing that the hysterectomy was for a gender transition, Dr. Cunningham denied permission to proceed because the ERDs forbid removing healthy organs and direct sterilization procedures. JA228-239, JA562, JA956.  Indeed, the fact that Dr. Adashek had scheduled the surgery there at all surprised her since he had been admitted at St. Joseph for decades and "kn[ew]" that, per the ERDs, the Catholic hospital does not perform hysterectomies as part of a "gender transition."  JA246-247.

9

As an alternative, Dr. Cunningham suggested Dr. Adashek reschedule the surgery at the Greater Baltimore Medical Center (GBMC) a mile away, where he also had admitting privileges. JA234. Instead, Dr. Adashek waited nearly two weeks, until the night before the surgery was to occur, January 5, 2020, to inform his patient that it had been cancelled. JA460. After rescheduling the procedure, Hammons received a hysterectomy at GBMC on June 24, 2020. JA461.

### D. Hammons sues St. Joseph and UMMS.

**1.** The next month, Hammons sued the two entities that operate St. Joseph—the University of Maryland St. Joseph Medical Center, LLC, and UMSJ Health System, LLC (collectively, St. Joseph)—and their parent, UMMS, in federal district court. JA18-42. The complaint alleged that the cancellation of the hysterectomy had caused monetary loss due to the need to take off extra time from work for the rescheduled surgery. JA36. And it claimed that the cancellation had violated both the Constitution and federal statute. Counts I and II asserted that Defendants were "instrumentalities of the State of Maryland" that had contravened the Establishment Clause and Equal Protection Clause by cancelling the surgery. JA19; *see also* JA36-40. Count III asserted that the cancellation also amounted to discrimination on the basis of sex in violation of Section 1557. JA40-41.

**2.**      At the pleading stage, the court dismissed the two constitutional claims.  JA91.  The court first accepted Hammons' argument that, under *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), "UMMS is a governmental entity" and "an arm of Maryland," thereby making the Medical System—along with its subsidiary, St. Joseph—"a state actor."  JA61, JA72.  But, as the court went on to explain, this meant that Defendants are also "an arm of the State for purposes of sovereign immunity."  JA80.  The court observed that it could not identify "any decision[]" that determined that "a corporate defendant was part of state government" "under *Lebron*" and "then proceeded to analyze whether the defendant was entitled to state sovereign immunity" under another test.  JA76.  As the court concluded, that was because the *Lebron* inquiry "answers both questions."  JA76.

The district court then rejected Hammons' argument that Maryland had waived sovereign immunity in a statute providing that UMMS "shall not be a State agency, political subdivision, public body, public corporation, or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities."  Md. Educ. Code § 13-303(a)(2); JA82.  As the court explained, that law did not even mention "the term 'sovereign immunity'" or a "suit in federal court," let alone provide the "express and unequivocal" waiver necessary under Supreme Court precedent.  JA82-83.

Hammons sought reconsideration of the dismissal of the constitutional claims, but the district court stuck to its ruling. JA93. The court rejected the argument that "*dicta* in *Lebron*" shows that Maryland "deprived UMMS of sovereign immunity" by disavowing its governmental status in a state statute. JA96-97. And even if "superficial reliance on *dicta*" could support the theory that Maryland had waived UMMS' "sovereign immunity in *state* court," the relevant state statute still would not qualify as an "express[]" waiver sufficient to cover "*federal* court actions." JA97 (emphases added).

**3.**      After discovery, the district court granted summary judgment to Hammons on the Section 1557 claim. JA1028. Relying on *Fain v. Crouch*, 618 F. Supp. 3d 313 (S.D.W. Va. 2022), and *Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022), the court ruled that the cancellation of "Hammons' hysterectomy pursuant to policy that prohibits gender-affirming care" qualifies as sex-based "discrimination." JA997; *see also* JA991-997.

The district court also held that, even though St. Joseph's chief medical officer had cancelled the surgery, which was set to occur in St. Joseph's hospital, its corporate parent UMMS could be held "directly liable under Section 1557" simply "for owning and operating a hospital that adheres to discriminatory policies." JA1005. Indeed, the court thought UMMS was on the hook "for discrimination that occurs in any of its hospitals." JA1000.

12

The district court then rejected St. Joseph's reliance on RFRA as a defense to the Section 1557 claim. JA1014-1021. It agreed with Hammons that because "St. Joseph is a state actor, it simply may not assert this defense." JA1016; *see also* SA89, SA114-115.

**4.** The parties stipulated to $748.46 in damages from lost earnings and over $100 in prejudgment interest. JA1038. The district court entered a final judgment in Hammons' favor for the total agreed amount of $874.63. JA1071-1072. Defendants paid the judgment in full. Doc. 6-1 at 3.

Hammons nonetheless appealed, seeking review of the dismissal of the constitutional claims. JA1073. Defendants moved to dismiss the appeal as moot, but also filed a conditional cross-appeal to protect their rights. Docs. 6-1, 19. Hammons opposed dismissal by claiming an entitlement to receive separate nominal damages on the constitutional claims, so Defendants sent those nominal damages as well, and again moved to dismiss the appeal. Doc. 33-1. This Court deferred consideration of both motions to dismiss to the merits panel. Docs. 28, 46.

This Court held this case in abeyance pending its en banc review of the *Fain* and *Kadel* decisions relied on by the district court. Doc. 32. Following the decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), merits briefing in this case commenced. Doc. 57.

13

## SUMMARY OF ARGUMENT

**I.**     This Court should dismiss this appeal as moot. The district court granted final judgment against Defendants, who paid the stipulated damages and satisfied Hammons' demand for nominal damages as well. Hammons does not allege damages beyond those already paid, and does not seek any prospective relief. Because no federal court can provide any further remedy, there is no longer a live controversy under Article III.

**II.**    If this Court exercises jurisdiction, it should affirm the dismissal of the constitutional claims. Having convinced the district court that Defendants are part of the State of Maryland, Hammons must live with consequences—namely, the inability to press these claims under 42 U.S.C. § 1983. Not only are States (and their agencies) beyond the reach of § 1983 as a matter of statutory text, but they also inherently enjoy sovereign immunity as a matter of constitutional law.

**A.**    The analysis of the constitutional claims can begin and end with § 1983, which permits suits only against "persons," not States. If Defendants are deemed to be part of Maryland (as Hammons maintains), they cannot be "persons" under § 1983. While the district court bypassed this analysis to jump to sovereign immunity, Supreme Court precedent makes clear that the statutory inquiry can be undertaken first. And, here, it should be.

14

**B.**     Sovereign immunity leads to the same conclusion, for much the same reason.  If Defendants share in Maryland's constitutional *obligations* (as Hammons claims), they likewise share in its constitutional *privileges*. Hammons resists this by pointing to a statutory disavowal of UMMS' status as a state agency.  But the very Supreme Court decision Hammons invokes held that *legislative* labels do not control the federal *constitutional* analysis. Sure, sovereign immunity can be *waived*, but Hammons devotes only a single sentence to contesting the district court's lengthy explanation why there was no waiver here.  That is because the court below got this right: The statutory disclaimer does not even mention sovereign immunity, much less expressly waive it for lawsuits in federal court, as precedent requires.

Falling back, Hammons urges that an entity should simultaneously be treated as state actor for purposes of constitutional obligation but as a private party for purposes of sovereign immunity.  This Court should instead follow the Sixth Circuit in rejecting that effort to both have and eat this sovereign cake.  An entity cannot be public and private at the same time, and either option is fatal for the constitutional claims.  If Defendants are *not the State*, there is no state action necessary to maintain a constitutional claim.  And if they *are the State*, they enjoy its immunity from suit.  This Court should reject Hammons' novel invitation to inject discord into the law.

**III.**    If the Court exercises jurisdiction over the appeal, then it must also reach the cross-appeal—and, if so, should reverse the judgment on the statutory claim.  Defendants did not discriminate on the basis of sex, and in all events, UMMS is not a proper defendant under Section 1557.

**A.**    There was no sex discrimination.  St. Joseph will not conduct direct sterilization operations, including gender-transition surgery, but that policy does not turn on a patient's sex or gender identity. While this Court held in *Kadel* that such a policy is inherently discriminatory, that decision is the subject of pending petition before the Supreme Court, which is already grappling with the issue.  Defendants therefore respectfully preserve this argument for further review in the event that *Kadel* is no longer good law.

**B.**    At a minimum, UMMS was not a proper defendant in the first place.  Section 1557 functions like a contract—each entity that accepts federal funds promises not to engage in discrimination in its own "health program." Here, the alleged discrimination occurred entirely in *St. Joseph's* surgery department, for which only *St. Joseph* received federal funds.  The district court nonetheless ruled that UMMS could be on the hook for discrimination by its subsidiary.  That analysis contradicts background rules of corporate separateness, and conflicts with settled law about the limits of liability under Section 1557 and related Spending Clause statutes.

16

## STANDARD OF REVIEW

This Court reviews "a district court's grant of a motion to dismiss *de novo*." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).  It also reviews "a district court's grant of summary judgment de novo, drawing all reasonable factual inferences in favor of the nonmoving party."  *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (cleaned up).

## ARGUMENT

## I.    THIS COURT SHOULD DISMISS THE APPEAL AS MOOT.

This appeal is textbook moot, as Defendants have explained in motions currently pending before the Court and incorporated here by reference.  Docs. 6-1, 22, 33-1, 40.  This Court should therefore not reach the merits of this appeal (or conditional cross-appeal) at all, but instead dismiss both.

In a nutshell, the appeal is moot because Hammons "already received the 'precise relief'" requested.  *Eden, LLC v. Justice*, 36 F.4th 166, 170 (4th Cir. 2022).  The complaint sought declaratory relief, compensatory damages, nominal damages, costs, and attorneys' fees.  JA41.  Hammons secured full compensatory damages below; Defendants proffered the requested nominal damages; and Hammons is already entitled to recover attorney's fees and costs based on the victory below (though the parties agreed to defer those proceedings pending this appeal, *see* SA121-124).

17

That leaves the requested "declaratory judgment," but that relief "[b]y itself" "cannot be the redress" supporting an Article III controversy. *Comite de Apoyo a Los Trabajadores Agricolas v. U.S. Dep't of Labor*, 995 F.2d 510, 513 (4th Cir. 1993). Rather, "plaintiffs must identify some further concrete relief" the litigation could provide. *Id.* But there is no further retrospective relief to be secured here, and no prospective relief was sought—nor could it be, as Hammons had already received a hysterectomy elsewhere.

To be sure, Hammons and the ACLU may have ideological reasons to continue to press the constitutional claims. But Article III protects the Judiciary from being hijacked to serve "as a 'vehicle for the vindication of value interests.'" *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013).

## II. IN THE ALTERNATIVE, THIS COURT SHOULD AFFIRM THE DISMISSAL OF THE CONSTITUTIONAL CLAIMS.

Hammons asserts that St. Joseph's surgical decisions violated the First and Fourteenth Amendments. But those constitutional provisions bind only state actors, not private hospitals. To skirt that obvious problem, Hammons maintained that Defendants are part of "[t]he government" of Maryland itself—and prevailed on that point below. Br. 1. But this theory, adopted by the district court, only moves these constitutional claims from the frying pan into the fire. If Defendants are part of the State, as Hammons insists, then they are shielded from suit by both § 1983 and the Eleventh Amendment.

18

### A. Defendants are not "persons" under § 1983.

The threshold problem with the constitutional claims here is the lack of a viable cause of action against Defendants. Congress provided plaintiffs with a powerful weapon in § 1983 to vindicate their constitutional rights, but made clear that this sword was only to be pointed at "persons"—a term that excludes States and their agencies. So while designating Defendants as part of Maryland may have given Hammons the state action necessary to plead constitutional violations, it simultaneously eliminated the cause of action to pursue these claims against Defendants in federal court.

**1.** Section 1983 provides a cause of action against "[e]very *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State," deprives "any citizen of the United States or other person within the jurisdiction thereof" of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). Under this statute, a variety of state actors may qualify as "persons" amenable to suit, ranging from "municipal corporations," *Howlett v. Rose*, 496 U.S. 356, 376 (1990); to state officials "sued in their personal capacity" for money damages, *Hafer v. Melo*, 502 U.S. 21, 27 (1991); to state officials facing "official-capacity actions for prospective relief," *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).

On the other hand, "a State is not a 'person' within the meaning of § 1983," consistent with the presumption that the statutory "term 'person' does not include the sovereign." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). A "state agency," as part of "the sovereign" itself, is likewise "not a 'person' within the meaning of the statute." *Va. Off. for Prot. & Advoc. v. Reinhard*, 405 F.3d 185, 189 (4th Cir. 2005). Indeed, the defendant in *Will* was the Michigan *Department of State Police*, which the Court still described as "a State" for purposes of § 1983. 491 U.S. at 60; *see also, e.g.*, *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002) (state university); *Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 258-59 (4th Cir. 2022) (four state agencies).

This fundamental rule disposes of Hammons' appeal. In seeking to hold Defendants liable for alleged violations of the Fourteenth Amendment, Hammons faced a problem. *See* JA36 (First Amendment, incorporated via Fourteenth Amendment); JA38 (Fourteenth Amendment's Equal Protection Clause). The Fourteenth Amendment restricts only "States"—it does nothing to limit how a private hospital dispenses medical care. U.S. Const. amend. XIV. By the same token, because Section 1983 applies only to actions taken "under color of" law, it does not enable suits targeting "[p]rivate action." *Lindke v. Freed*, 601 U.S. 187, 198 (2024).

To overcome both hurdles, Hammons invoked the "*Lebron* test," which directs that a "government-created and -controlled corporation is part of the government itself." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 191 n.4 (4th Cir. 2022). By deeming a corporation to be "the Government itself," *Lebron* frees courts from having to cross the "difficult terrain" of determining when the "actions of private entities can ... be regarded as governmental action." 513 U.S. at 378. Under *Lebron*, a government-created corporation counts as "part of the government" if three conditions are satisfied: "(1) creation of the corporation occurred by 'special law'; (2) creation was 'for the furtherance of governmental objectives'; and (3) retention by the government of 'permanent authority to appoint a majority of the directors of that corporation.'" *White Coat*, 35 F.4th at 191.

Relying on this framework, Hammons convinced the district court to hold that UMMS is "by its very nature, what the Constitution regards as the Government." SA25 (quoting *Lebron*, 513 U.S. at 392). The court concluded that (1) "UMMS was created 'by special law'" (namely, Md. Code Educ. §§ 13-301 to 13-313); (2) "'for the furtherance of governmental objectives'" (namely, providing medical care "'for the citizens of the State'"); and (3) subject to "governmental control" (namely, all of UMMS' "directors are appointed by the Governor of Maryland"). JA70-72.

21

The result of this strategy was that Defendants were bound by the Fourteenth Amendment—but also that Defendants themselves could not be sued for violating it. A corporation that satisfies the *Lebron* test "is part of the government itself and is a state actor *for all purposes*, just like any other government entity." *White Coat*, 35 F.4th at 191 n.4 (emphasis added); *see also Lebron*, 513 U.S. at 398 (describing Amtrak as "no different" from "the Federal Communications Commission"). As Hammons puts it, "UMMS belongs to 'a special class of corporate entities' that 'are part of the government'" itself. Br. 2. But if UMMS is "part of the State of [Maryland], it is not a 'person' within the meaning of § 1983." *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005); *see supra* at 20.

The Sixth Circuit's decision in *American Premier Underwriters, Inc. v. National Railroad Passenger Corp.*, 709 F.3d 584 (6th Cir. 2013) (*APU*), proves the point. In rejecting APU's constitutional claims seeking damages against Amtrak, the court explained that because "Amtrak is a federal agency for the purpose of seeking redress of constitutional violations" under *Lebron*, it is also protected by the rule that "a federal agency cannot be sued under an implied cause of action for monetary damages that stem from the agency's constitutional violations." *Id.* at 587-88 (citing *FDIC v. Meyer*, 510 U.S. 471, 486 (1994)).

22

In reaching this conclusion, the Sixth Circuit rejected an "improbable interpretation of *Lebron* that would saddle Amtrak with all the obligations of a federal agency without any of the concomitant advantages." *Id.* at 588. "If Amtrak is merely a private corporation carrying out a federal mandate, it cannot be sued for damages for constitutional violations." *Id.* at 590. But if it "is a federal agency for the purpose of individual rights guaranteed against the government by the Constitution, then it must be treated like a federal agency in suits for the violation of individual constitutional rights." *Id.* As the Sixth Circuit aptly summarized: "APU cannot have it both ways." *Id.*

The same goes for Hammons. Swap the rule of *Meyer* for the closely analogous rule of *Will* and this is the same case. Hammons obviously could not pursue constitutional claims against the Maryland Department of Health under § 1983, as that entity would not qualify as a "person" subject to suit thereunder. But under the district court's application of *Lebron*, UMMS is in the same boat as any typical Maryland agency. In the words of the complaint, Defendants are "part of" Hammons' "own State government." JA36. That means they are bound by the Fourteenth Amendment, but also that they cannot be sued under § 1983. "It is not for this Court to declare a new third category of [state]-private-agency corporations" uniquely amenable to constitutional torts. *APU*, 709 F.3d at 590.

In short, having persuaded the court that "UMMS is a governmental entity"—thereby providing both the necessary state action and a response to St. Joseph's RFRA defense—Hammons cannot walk back that position now. JA72, JA1016. Again, if UMMS stands apart from Maryland, the claims fail for lack of state action. Whether Defendants are part of the State of Maryland or not, there is thus simply no § 1983 claim to be had against them. Defendants cannot be "enough of a government agency to be sued for violating the First Amendment, but not enough of a government agency for [*Will*] to apply and bar constitutional suits for monetary damages." *APU*, 709 F.3d at 588.

**2.**     Hammons never mentions this fundamental problem. Indeed, the sole reference to § 1983 in the opening brief appears in the jurisdictional statement. Br. 1. For its part, the district court leapfrogged the § 1983 inquiry to go straight to sovereign immunity, quoting a nearly-30-year-old footnote from this Court directing that "federal courts should approach these issues solely under the rubric of the Eleventh Amendment." *Harter v. Vernon*, 101 F.3d 334, 338 n.1 (4th Cir. 1996); JA72-73. But that statement is neither controlling nor correct under current law. And, here, it makes far more sense to begin (and end) with the § 1983 personhood inquiry.

24

The *Harter* footnote was dictum, because "the only issue presented" in that case was whether "the Eleventh Amendment did not bar claims" against a county sheriff.  101 F.3d at 336.  And there is no indication that anyone had suggested there was any daylight between whether the sheriff was a § 1983 "person" and whether he enjoyed Eleventh Amendment immunity.  Instead, the footnote was expressly intended to address "confusion" in *other* cases over "whether a defendant state official can claim immunity from suit in federal court because he is not a 'person' under § 1983." *Id.* at 338 n.1.  Since that aside was admittedly not "necessary to the outcome," this Court is "not … bound" to follow it.  *Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021).

Even if the *Harter* footnote previously had binding effect, "subsequent Supreme Court decisions" have "'clearly undermined'" it, meaning this Court should "not follow that panel precedent." *Id.* at 655 n.4.  *Harter* dismissed the "need to consider 'personhood'" on the premise that "[t]he Eleventh Amendment is a bar to the jurisdiction of a federal court, and as such, it precedes the statutory question of 'personhood' under § 1983."  101 F.3d at 338 n.1.  But as the Supreme Court later clarified, courts can decide "whether the statute itself *permits* [a] cause of action … against States" even "*before* the question whether the Eleventh Amendment forbids" such an action from proceeding. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S.

25

765, 779 (2000). As the Court explained, "not only is the statutory question 'logically antecedent to the existence of' the Eleventh Amendment question, but also there is no realistic possibility that addressing the statutory question will expand the Court's power beyond the limits that the jurisdictional restriction has imposed." *Id.* at 779. In fact, tackling the statutory issue first may allow courts to "avoid difficult constitutional questions." *Id.* at 787; *see, e.g.*, *Strawser v. Atkins*, 290 F.3d 720, 730 (4th Cir. 2002) (answering "easy" "statutory question" rather than "complicated" "Eleventh-Amendment" one). It is therefore now clear that "Eleventh Amendment immunity ... is not the kind of Article III limitation on subject-matter jurisdiction" that must be resolved "before addressing" other threshold issues. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 (4th Cir. 2005).

*Harter* also thought there was "no need to consider 'personhood'" on top of "the Eleventh Amendment inquiry" based on the premise that "[i]f an official or entity is not immune from suit under the Eleventh Amendment that official or entity *is* a 'person' subject to suit under § 1983." 101 F.3d at 338 n.1. But the year after *Harter*, the Supreme Court explained that there is in fact a delta between "the rubric of the Eleventh Amendment" and the scope of "'personhood' under § 1983." *Id.* In *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997), the Court explained that even when a State

26

"'expressly waive[s] its right to assert the Eleventh Amendment as a defense,'" it still cannot be sued under § 1983, for that statute "creates no remedy against a State." *Id.* at 69. Courts—including within this Circuit—therefore regularly reject § 1983 claims even when a State has waived its immunity, recognizing that "even a state's express waiver of sovereign immunity cannot render it amenable to suit under Section 1983." *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 538 (D. Md. 2019).

And this gap between the scope of § 1983 and the scope of the Eleventh Amendment bears directly on this appeal, in a way that makes "personhood" a cleaner ground for affirmance. As explained below, Hammons focuses on Maryland's statutory disavowal of UMMS' agency status. *See infra* Part II.B. But even if that disclaimer amounted to "a waiver of sovereign immunity," Defendants still could not "be sued" under § 1983. *APU*, 709 F.3d at 590; *see also Arizonans*, 520 U.S. at 69. After all, a "State may not, by statute or common law, create a cause of action under § 1983 against an entity whom Congress has not subjected to liability." *Howlett*, 496 U.S. at 376.[1]

---

[1] True, the § 1983 and Eleventh Amendment inquiries overlap insofar as *Will* "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." 491 U.S. at 70. For instance, because municipalities "'are not considered part of the State for Eleventh Amendment purposes,'" they are not "'persons' under § 1983." *Id.* But that is beside the point here given Hammons' success below in designating Defendants as "part of the State of Maryland" itself. JA65.

27

Threshold consideration of the § 1983 issue therefore streamlines this appeal. If Defendants are indeed "the government" of Maryland for purposes of state action and RFRA, they remain "the government" of Maryland for purposes of § 1983. Br. 1. And that forecloses proceeding against them under § 1983. So while the district court correctly held that sovereign immunity bars the constitutional claims, *see infra* Part II.B, it did not even need to go that far. Either way, the State of Maryland is not a "person" under § 1983, and that straightforward analysis should end this appeal.

## B. Defendants are protected by sovereign immunity from Hammons' constitutional claims.

In any event, the Eleventh Amendment commands the same result—and this too follows from Hammons' central conceit. As the district court recognized, if "UMMS is part and parcel of the government" under *Lebron*, then it also shares in the government's "sovereign immunity." JA76. Again, under the framework Hammons invoked, UMMS is "no different from" the Maryland Health Department, *Lebron*, 513 U.S. at 398, and it is blackletter law that "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Hammons raises two objections to this straightforward application of the Eleventh Amendment, but neither one holds up.

28

**1.** Hammons principally argues that UMMS never had "sovereign immunity in the first place." Br. 24. Yet while Hammons invokes an offhand line from *Lebron* for that head-scratching assertion, the Court's decision can only be read to hold the exact opposite. The sentence Hammons relies on just recognized the well-established rule that immunity can be *waived*—but Hammons advances no meaningful waiver argument on appeal, after the district court roundly rejected the one pressed below.

In holding that Amtrak was bound by the Constitution, *Lebron* rejected reliance on a statutory "disclaimer" directing that Amtrak "'will not be an agency or establishment of the United States Government.'" 513 U.S. at 391-92. "[I]t is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens." *Id.* at 392. The Court then added that such a disclaimer "*can* suffice to deprive Amtrak of all those inherent powers and immunities of Government agencies that it is within the power of Congress to eliminate." *Id.* (emphasis added). And then, in a half-sentence "example," the Court said that "the statutory disavowal of Amtrak's agency status *deprives* Amtrak of sovereign immunity." *Id.* at 392 (emphasis added). Comparing this line to a similar statutory disavowal of UMMS' agency status, Hammons argues that Defendants never had sovereign immunity in the first place. Br. 20-26.

That flips the Court's rationale on its head. *Lebron*'s framing itself implies that Amtrak originally possessed immunity, thus refuting Hammons' position: If Congress could *take away* Amtrak's immunity, Amtrak must have *had* that protection to begin with. Indeed, it was among "those *inherent* powers and immunities of Government agencies" that Amtrak enjoyed as "an agency or instrumentality of the United States," albeit one that it was "within the power of Congress to *eliminate*." 513 U.S. at 392, 394 (emphases added). The Court's language stands only for the proposition that Congress could *waive* Amtrak's sovereign immunity—not that it *lacked* that immunity "in the first place." Br. 24; *see also APU*, 709 F.3d at 588 (noting that *Lebron* stated the "disclaimer sufficed to strip Amtrak of sovereign immunity"); *id.* at 590 (referring to "statutory waiver of sovereign immunity" for Amtrak).

That reading of *Lebron* makes much more sense than Hammons' view. The thrust of *Lebron* was that a corporate mask does not transform the State into something else. Put differently, the fact "'[t]hat the Congress chose to call [Amtrak] a corporation does not alter its characteristics so as to make it something other than what it actually is.'" 513 U.S. at 393. Otherwise, racial segregation could "be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak." *Id.* at 397.

*Lebron* thus confirms that when it comes to a public corporation's "status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 55 (2015) (*AAR*). And that means while Congress can effectuate a "statutory *waiver* of sovereign immunity," it "cannot strip an agency of its *status*" as the sovereign under the Constitution. *APU*, 709 F.3d at 590 (emphases added).

There is no reason why a state legislature should be treated differently. Thus, if a state-created corporation satisfies the *Lebron* test, it is inherently entitled to sovereign immunity. The only remaining question is whether the State "deprive[d]"—that is, *waived*—that "immunity from suit" in federal court. 513 U.S. at 392.[2] While Hammons argued below that "the Maryland legislature explicitly waived sovereign immunity" for Defendants through a statutory disclaimer, the district court repeatedly held that the statute lacked any "express and unequivocal" waiver (indeed, the statute never refers to "the term 'sovereign immunity'" or "suit in federal court" at all). JA81-83 (motion to dismiss); JA95-97 (motion for reconsideration).

---

[2] As explained above, the answer to that question actually does not matter to the outcome of this case, because even if Maryland had expressly waived sovereign immunity for Defendants, they still would not be "persons" subject to suit under § 1983. *See supra* Part II.A.2. That is why an affirmance based on § 1983 may be the simpler path here.

31

On appeal, Hammons makes no developed argument for why that waiver analysis was wrong on its own terms. Instead, Hammons contends that "whether Maryland 'waived' UMMS' sovereign immunity is the wrong question." Br. 24. That is mistaken. The district court asked the right (and only) question given Hammons' successful invocation of *Lebron*'s test. And Hammons never argues that the court gave the wrong answer. At most, the opening brief contains a throwaway sentence complaining that "the district court never explained why the statutory language for Amtrak in *Lebron* was sufficient to constitute such a waiver while the statutory language for UMMS in this case is not." Br. 25-26. That lone "declarative sentence"—unadorned by argument or explanation—asks this Court to do a litigant's work, meaning Hammons has "waived" any waiver argument on appeal. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009).

To be fair, Hammons' abandonment is understandable, given the very high standard for finding waiver here. "As the Supreme Court has made clear, a State must *expressly* consent to suit *in federal court* to waive its immunity under the Eleventh Amendment." *Allen v. Cooper*, 895 F.3d 337, 347 (4th Cir. 2018). Under this "'stringent' test," a purported waiver of immunity must "'leave no room for any other reasonable construction.'" *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 101 (4th Cir. 2019).

Nothing in the statute disavowing UMMS' agency status comes close. When Maryland *has* meant to waive its sovereign immunity in state court, it has done so in express and specific terms. *E.g.*, Md. Cts. & Jud. Proc. Code. § 5-518(c) ("A county board of education may not raise the defense of sovereign immunity to any claim of $400,000 or less."); Md. State Gov't Code § 20-903 ("The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title."). The statute here, by contrast, just says UMMS "shall not be a State agency, political subdivision, public body, public corporation, or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities." Md. Educ. Code § 13-303(a)(2).

That leaves Hammons' analogy to Amtrak: If the disavowal sufficed to waive immunity there, why not here? But, as other circuits have recognized, *Lebron*'s observation about Amtrak's immunity waiver was "dictum." *Wood ex rel. United States v. Am. Inst. in Taiwan*, 286 F.3d 526, 531, 532 (D.C. Cir. 2002); *accord Parrett v. Se. Boll Weevil Eradication Found., Inc.*, 155 Fed. App'x 188, 192 (6th Cir. 2005). The only question in *Lebron* was "whether actions of ... Amtrak[] are subject to the constraints of the Constitution." 513 U.S. at 376. Nothing about the Court's affirmative answer turned on its aside about Congress's supposed waiver of Amtrak's immunity. *Id.* at 400.

33

Hammons nevertheless urges this Court to break with its sister circuits and deem this comment on "sovereign immunity ... an indispensable part of the Court's holding." Br. 22. But the sole support offered for this revisionist reading is a paragraph discussing *Bank of United States v. Planters' Bank of Georgia*, 22 U.S. 904 (1824), in a separate portion of the opinion many pages later. *Compare Lebron*, 513 U.S. at 392 (dictum on statutory disclaimer), *with id.* at 398-99 (paragraph on *Planter's Bank*). While Hammons cobbles together these sections of *Lebron* to create a precedential Frankenstein, one will search the relevant paragraph in vain for any such holding. To the contrary, *Lebron* explained that *Planters' Bank* had held that the bank could "be sued in federal court despite the Eleventh Amendment" even though the State of Georgia "held a noncontrolling interest" in the company. *Id.* at 398. It then distinguished Planters' Bank from Amtrak on the basis that Congress had "specifically created [the latter] for the furtherance of governmental objectives, and not merely holds some shares but controls the operation of the corporation through its appointees." *Id.* at 399.

Hammons' reliance on this discussion is hard to follow. That an entity which *did not* satisfy *Lebron* (Planters' Bank) *lacked* sovereign immunity obviously says nothing about whether an entity which *did* satisfy *Lebron* (Amtrak, or Defendants here) had *waived* it.

34

Regardless, even if Congress *did* waive Amtrak's immunity through a statutory disavowal of agency status, that would not mean Maryland did so for UMMS. Amtrak is a *federal* agency, so waiving its immunity would mean exposing it to lawsuits in *federal* court. Drawing a parallel here would mean that Maryland's disavowal exposed UMMS to lawsuits in *state* court. As the district court recognized, that is at minimum an alternative "reasonable construction" of UMMS's organic statute. JA95-97. And this Court has held that a law that could be read to show only "'a State's consent to suit in its own courts'" is not enough for waiver; there must be "consent to suit specifically in federal court." *Pense*, 926 F.3d at 101. Hammons' waiver argument is thus not only irrelevant (due to the § 1983 personhood problem) and waived (due to the failure to develop it on appeal), but also meritless.

**2.** Because *Lebron* confirms that a State cannot cloak an agency's sovereign status in statutory disclaimers, Hammons eventually chucks that case overboard and contends that UMMS lacks "sovereign immunity under this Court's four-factor test" from *Ram Ditta v. Maryland National Capital Park & Planning Commission*, 822 F.2d 456 (4th Cir. 1987). Br. 26. But the opening brief never explains *why* this Court should shift to the *Ram Ditta* framework to decide whether "an entity is the *alter ego* of the state," when the *Lebron* test has *already* answered that question. 822 F.2d at 457.

No good explanation exists.  The whole point of the *Lebron* inquiry is to answer the "basic question" of "[w]hat is the government" when it comes to public corporations.  *White Coat*, 35 F.4th at 190.  And to do so "*for all purposes.*"  *Id.* at 191 n.4 (emphasis added).  That is why the Supreme Court in *AAR* had no trouble applying *Lebron* to a "'separation of powers'" challenge against Amtrak, as *Lebron* resolved "Amtrak's status as a federal actor or instrumentality under the Constitution."  575 U.S. at 55.  And it is why the Court in *Biden v. Nebraska*, 600 U.S. 477 (2023), drew on *Lebron* (and *AAR*) to hold that MOHELA, a Missouri public corporation, was part of the State of Missouri for purposes of Article III.  *Id.* at 492-94.  So while the *Nebraska* dissent (like Hammons, *see* Br. 21-22) thought the only thing "*Lebron* tells us about MOHELA is that it must comply with the Constitution," that view did not prevail.  600 U.S. at 531 (Kagan, J., dissenting),

Hammons never articulates why the Eleventh Amendment should be singled out for special exclusion from the *Lebron* framework.  The text of the Constitution, for instance, does not suggest that an entity can qualify as a "State" for purposes of the Fourteenth Amendment but not for purposes of the Eleventh.  *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 579-80 (2008) ("the people" carries same meaning across the Bill of Rights); *see also Martin v. Hunter's Lessee*, 14 U.S. 304, 329-30 (1816) (Story, J.).

36

Nor does precedent. Hammons purports to cite a plethora of cases that refute the decision below. In fact, not a single one treats a state entity as "enough of a government agency to be sued for violating the" Constitution, "but not enough" of one for the Eleventh Amendment to "bar constitutional suits"—a duality the Sixth Circuit rejected. *APU*, 709 F.3d at 588.

Most of Hammons' cases did not involve constitutional claims at all, so the plaintiffs never had to argue that the defendants were state actors. *See Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 426 (1997) (breach of contract); *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico*, 322 F.3d 56, 59 (1st Cir. 2003) (same); *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 523 (10th Cir. 2022) (negligent supervision); *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 650 (4th Cir. 2015) (False Claims Act); *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 768 (7th Cir. 2005) (Americans With Disabilities Act).

The lone exception is *Grajales v. Puerto Rico Ports Authority*, 831 F.3d 11 (1st Cir. 2016), which held that the Eleventh Amendment did not shield a public corporation from a "political discrimination claim" under § 1983. *Id.* at 14 n.2. Yet even there, the court did not address *Lebron*, nor did it discuss whether the corporation engaged in the necessary state action. It thus offers zero support for Hammons' State-but-not-the-State theory.

Hammons provides no good reason to break new ground. The claim that *Lebron* and *Ram Ditta* "frequently point in opposite directions" (Br. 28), even if true, does not counsel in favor of ignoring the former—especially after Hammons successfully invoked it. If anything, this Court seeks to harmonize its precedents with the Supreme Court's. *See Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) ("If it is 'possible for us to read our precedent harmoniously' with Supreme Court precedent, we must do so.").

It is easy to reconcile the two here. The point of *Ram Ditta* is to help resolve edge cases. Because the Eleventh Amendment does not shield *every* entity that "exercise[s] a 'slice of state power'"—"municipalities" being the classic exclusion—this Court uses a multifactor test to determine whether an entity wielding state power "is the *alter ego* of the state." *Ram Ditta*, 822 F.2d at 457. That is why *Ram Ditta* asks, for instance, whether the entity "is involved with local versus statewide concerns." *Id.* at 458; *see* JA76. But it makes no sense to pursue a complicated *alter ego* inquiry when an entity has already been deemed "part of the Government itself" under *Lebron*. 513 U.S. at 397. If an entity, by virtue of being "established" by the State "for the very purpose of pursuing … governmental objectives, under the direction and control of … governmental appointees," is deemed to be "no different from" other "regulatory agencies," no further work is necessary. *Id.* at 398.

38

Imagine, for example, that Hammons sued the Maryland Department of Human Resources. That case would be dismissed on immunity grounds without any need to apply *Ram Ditta*. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 398 (4th Cir. 1990) (dismissing claims against this agency without using *Ram Ditta*). Corporations that are deemed "part of the State" under *Lebron* should be treated the same. JA73.

In any event, there is significant "overlap between the two tests," as the district court observed. JA94. Not only do *Lebron* and *Ram Ditta* ask the same question—"What is the government?"—but they also use similar tools to answer it. *White Coat*, 35 F.4th at 190. For instance, the fact that all or most of a corporation's "decisionmakers are appointed by" the State is a "key" consideration under both tests. *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 264 (4th Cir. 2005); *see also White Coat*, 35 F.4th at 195. And if the State created the entity "for the furtherance of governmental objectives" under *Lebron*, 513 U.S. at 399, that likely means it is involved with "statewide concerns" under *Ram Ditta*, 822 F.2d at 458; *see also Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 226 (4th Cir. 2001) (noting *Ram Ditta*'s "final factor … overlaps with [the] analysis of State control versus local autonomy"); *cf. Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) (Police Board of *St. Louis* "does not share the immunity of the State of Missouri").

To be sure, an entity that qualifies as the government under *Lebron* may not satisfy the first *Ram Ditta* factor—that "the state treasury will be responsible for paying any judgment that might be awarded." 822 F.3d at 457. That is why Hammons devotes so much space to *Ram Ditta*. JA77. But as this Court has acknowledged, that factor enjoys no "preeminence." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 395 n.5 (4th Cir. 2014). Rather, the treasury factor is a test of *inclusion*: "if the State treasury will be called upon to pay a judgment against a governmental entity, ... consideration of any other factor becomes unnecessary." *Oberg*, 804 F.3d at 651 (cleaned up). That is because "'when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest.'" *Doe*, 519 U.S. at 429. But the *converse* is not true: "If the state treasury will not be liable for a judgment rendered against the entity, [courts] must consider the remaining factors." *Oberg*, 804 F.3d at 651. To hold otherwise would "inappropriately convert a *sufficient* condition for sovereign immunity into the single *necessary* condition." *P.R. Ports Auth. v. Fed. Maritime Comm'n*, 531 F.3d 868, 879 (D.C. Cir. 2008) (Kavanaugh, J.). After all, "the primary function of sovereign immunity is not to protect state treasuries, ... but to afford the States the dignity and respect due sovereign entities." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 769 (2002).

For these reasons, the supposed tension between the two tests is overblown, and there is no sound reason to cast *Lebron* aside for sovereign immunity purposes after applying it to identify an arm of the state.

\*     \*     \*

Ultimately, this appeal is about a plaintiff who will not take the bitter with the sweet. Having convinced the district court that "UMMS is, in fact, part of the Maryland government" during the first half of this litigation, SA9, Hammons now insists that Defendants cannot "distinguish UMMS from any other private entity," Br. 35. This Court should decline that invitation to become the first in the country to "declare a new third category" of corporations that are state entities "for the purpose of individual rights guaranteed against the government" but "private corporation[s]" when it comes to being "sued for damages for constitutional violations." *APU*, 709 F.3d at 590. Put simply, Hammons "cannot have it both ways." *Id.*

## III. THE COURT SHOULD DISMISS THE SECTION 1557 CLAIMS.

Moving on to the cross-appeal, this Court should reverse the judgment that Defendants discriminated on the basis of sex under Section 1557 by refusing to perform a direct sterilization operation that St. Joseph will not do for a patient of *any* sex or gender identity. And even if the Court agrees with this application of Section 1557 to St. Joseph, it should at least reverse the judgment against UMMS, which was never a proper defendant.

### A.     Defendants have not engaged in sex discrimination.

Section 1557 extends Title IX's prohibition on sex "discrimination" to any federally funded "health program or activity." 42 U.S.C. § 18116(a); 20 U.S.C. § 1681(a). No such discrimination occurred here. To the contrary, St. Joseph applies the ERDs neutrally to all patients. St. Joseph will provide a hysterectomy for approved purposes *regardless* of a patient's gender identity, but will not perform one for *any* patient for gender-transition purposes. That is no more sex-based discrimination than excluding pregnancy from a disability-benefits plan. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976).

To be sure, this Court recently held otherwise in its en banc decision in *Kadel*. 100 F.4th at 164. But the States have sought further review of that ruling from the Supreme Court, which appears to be holding the petitions for its decision in *United States v. Skrmetti*, No. 23-477 (argued Dec. 4, 2024). *See Crouch v. Anderson*, No. 24-90 (conferenced Dec. 6, 2024); *Folwell v. Kadel*, No. 24-99 (conferenced Dec. 6, 2024). Defendants respectfully preserve their argument that they have not engaged in discrimination under Section 1557 to account for the possibility that the Supreme Court may grant those petitions and vacate this Court's ruling in *Kadel* following its decision in *Skrmetti*. If that occurs, reversal would be required, and supplemental briefing on this issue may be warranted at that time.

42

### B.    At a minimum, UMMS is not liable under Section 1557.

In all events, even if *St. Joseph* engaged in actionable discrimination in its own federally funded "health program or activity," 42 U.S.C. § 18116(a), that would not expose *UMMS* to liability.  While the district court thought otherwise on the ground that UMMS is St. Joseph's "parent corporation," JA999, nothing in Section 1557 purports to reach every link in the corporate-ownership chain.  Rather, as Spending Clause legislation, Section 1557 limits liability to the recipient of funds used in the allegedly discriminatory health program—here, St. Joseph's surgery department.

1.    Section 1557 imposes a straightforward "'condition on the grant of federal moneys.'"  *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022).  If an entity accepts federal funds for "any part of" its "health program or activity," it thereby commits that no person will "be subject to discrimination" in that "health program or activity."  42 U.S.C. § 18116(a).  If the entity fails to hold up its end of the bargain, then Section 1557 (following Title IX) "allows the victims of discrimination a private right of action to sue the funding recipient in federal court."  *Cummings*, 596 U.S. at 218.

This "'contract-law analogy,'" however, "limits 'the scope of available remedies' in actions" to enforce Section 1557.  *Id.* at 219.  As relevant here, "a recipient of federal funds may be liable in damages under Title IX"—and

hence Section 1557—"only for its own misconduct" occurring within its own federally funded "'programs or activities.'" *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640-41 (1999) (brackets omitted). That makes sense. Only the funding recipient has agreed to the statutory conditions; those conditions extend only to the recipient's own "programs or activities"; and only the recipient could be liable for breach of contract if it fails to adhere to those obligations. Accordingly, Section 1557, like other Spending Clause legislation, "may only be exercised against the funding recipient" for the program in which the discrimination has occurred. *Id.* at 641.

Importantly, it does not matter if another person or entity was involved in, or in some sense could be deemed culpable for, the alleged misconduct. For example, courts have refused to hold liable school officials or outside organizations who participated in or overlooked sex discrimination in federally funded schools "because they are not grant recipients." *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999); *see also, e.g.*, *Cureton v. NCAA*, 198 F.3d 107, 118 (3d Cir. 1999); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018 (7th Cir. 1997). Only the school district itself, as a recipient of federal funds for the education program where the alleged discrimination occurred, could be on the hook—and "only for its own misconduct." *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001).

44

Both UMMS and St. Joseph independently received federal funds, and each agreed to not discriminate in its own respective "health program[s]." 42 U.S.C. § 18116(a); *see* JA158, JA204. But the alleged discrimination here occurred in *St. Joseph's* "health program"—its surgery department—based on a decision by *St. Joseph's* chief medical officer to cancel the hysterectomy. *See* JA35-36. Because only St. Joseph's "health program" engaged in the alleged discrimination, Hammons could only sue "the funding recipient" for *that program*—which was St. Joseph. *Davis*, 526 U.S. at 641.

**2.** The district court thought otherwise. It principally reasoned that "St. Joseph is a wholly owned subsidiary of UMMS," and thus that UMMS can be liable in its capacity as the funding recipient's "parent corporation." JA999, JA1002. But that ignores the "general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). The Supreme Court has made clear that, if Congress wishes "to reject this bedrock principle" and "venerable common-law backdrop," it "'must speak directly to the question.'" *Id.* at 62-63.

The district court identified nothing in Section 1557 that even touches on the principle of corporate separateness, let alone clearly displaces it. At most, the court noted that "regulations" define the statutory term "health

program or activity" to include "'all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance.'" JA999-1000. But that simply begs the question—it remains the case, under background corporate-law principles, that the "operations" of a subsidiary are not the "operations" of its parent. Indeed, even the court's own cited authority admitted that "the statutory language … does not clearly convey whether 'operations' may encompass the activities of separate subsidiary entities of a business engaged in providing healthcare." *Doe One v. CVS Pharmacy, Inc.*, 2022 WL 3139516, at *7 (N.D. Cal. Aug. 5, 2022); *see* JA1000 n.19. It thus cannot displace the common law.

The district court also pointed to *Grove City College v. Bell*, 465 U.S. 555 (1984), which held that the "program-specific language" of Title IX—namely, its prohibition on discrimination in "'any education program or activity receiving Federal financial assistance'"—covered only Grove City's "financial aid program," not the college as a whole. *Id.* at 557, 571-72. As the district court noted, Congress then amended Title IX to provide that "'if any part of an educational institution receive[s] federal funds, the institution as a whole must comply with Title IX's provisions.'" JA1001. In the court's view, this congressional response indicates that liability can extend beyond "the parties to the federal 'contract.'" JA1001.

46

Once again, not so. This history suggests that Section 1557 applies to *all of St. Joseph's activities*, not merely its programs receiving federal funds. But that in no way establishes that Section 1557 applies to *St. Joseph's parent*. Even the district court admitted that "a program within an entity is different from an entity's subsidiary." JA1001 And while it thought this "history undermines" an attempt to "limit the scope" of liability to "the direct recipient" of federal funds, the opposite is true: Just as Congress had to amend Title IX to reach an entity "as a whole," so too it would have to alter Section 1557 to reach beyond that entity to its corporate parent. JA1001.

Next, the district court sought to distinguish *Davis* as holding only that a "school board could not be held liable for the conduct of third parties who did not receive federal funds (i.e., students)," whereas UMMS itself "received federal funds" in its own right. JA1002. That does not make sense. Yes, UMMS received federal funds. But those funds were not for the program that allegedly engaged in the discrimination, so they are irrelevant for these purposes. To be clear, it cannot be that *any* funding is enough; rather, the statute demands a link between the funding and the alleged discrimination. A very particular link, aligned with the contract-like framework of Spending Clause legislation: the discrimination must have occurred *in the programs for which the defendant received federal funds*.

47

To bridge the gap, the district court reasoned that, under *Davis*, "a school district *can* be held liable" for sexual harassment by its teachers or students, if the school is deliberately indifferent to the discrimination. JA1003. That misses the point. Setting aside who may be *responsible* for discrimination, the contract-like framework of Spending Clause legislation means that the only entity *exposed to liability* for that discrimination is the funding recipient for the program where the discrimination took place. That is why school officials are not on the hook even if they are complicit in discrimination at school; only the school district itself has breached its funding agreement. For the same reason, only St. Joseph faces liability for discrimination in its own hospital—regardless of whether UMMS or anyone else may have been deliberately indifferent to it.

In all events, the district court also got this wrong factually. The stringent "deliberate indifference" standard is met only in "circumstances wherein the [defendant] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 641, 645. UMMS does not maintain that sort of control over St. Joseph or its surgery decisionmaking. St. Joseph operates "independently," without any "direct connection" to UMMS. JA317, JA275. UMMS does not control St. Joseph's patient scheduling or treatment decisions. JA305. It does not

create or update the ERDs. *See* JA748-749. It does not interpret those ERDs or monitor St. Joseph's compliance with them. *See* JA752, JA754. And it does not decide which specific surgeries or treatments the ERDs permit; St. Joseph has "final say over whether a surgery can take place." JA776. In short, UMMS has "nothing to do" with St. Joseph's application of the ERDs or its daily operations more generally. JA185-186.

The district court nevertheless thought UMMS was "responsible for[] St. Joseph's adherence to the ERDs" because UMMS knew of St. Joseph's Catholic identity and allowed it to be retained. JA1003. But the court's analogy to *Davis* and other deliberate-indifference cases does not hold up, because it (again) fails to account for UMMS' corporate separateness. It is one thing to say that a school is responsible for in-school student-on-student discrimination that it knows about and fails to remedy; it is another thing entirely to say that a *parent corporation* is liable for the acts of its subsidiary simply by virtue of knowing about a problem and failing to remedy it. The latter notion is unprecedented and, if taken seriously, would demolish the rule that a "parent corporation … is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61. After all, it is always true that a controlling parent "could remedy" its subsidiary's conduct "if it chose to do so." JA1003-1004. That right of ownership alone cannot possibly suffice.

49

At minimum, it should take much more than passive acceptance of a subsidiary's long-held heritage to saddle a parent corporation with liability. So while it may well be true that UMMS could "cease allowing St. Joseph to operate within its network," JA1004, that is neither here nor there. Just as a school need not adopt a policy of "'expulsion of every student accused of misconduct,'" *Davis*, 526 U.S. at 648, UMMS does not have to purge Catholic hospitals from its ranks to shield itself from Section 1557 liability.

**3.** The district court tried to shore up its expansive view of Section 1557 with a trio of decisions from other courts. JA1004-1005. But one of them addressed only who "is a permissible *plaintiff*" within Section 1557's zone of interests, not who is a permissible *defendant*. *T.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 738-39 (7th Cir. 2022) (emphasis added). That case thus says nothing about whether a corporate parent can be liable for discrimination in a subsidiary's federally funded program. Indeed, there, the sole funding recipient had allegedly "designed and controlled" its discriminatory health insurance plan, which was thus "part of [the provider's] operations." *Id.* at 741, 744. In suggesting that the health plan was a separate LLC, JA1004-1005, the district court appears to have misunderstood *T.S.*'s facts: The company was the only LLC, and the company

50

operated its own self-funded plan, which simply bore the name of the company's LLC. *See* 43 F.4th at 739.

The district court also cited *Silva v. Baptist Health South Florida, Inc.*, 856 F.3d 824 (11th Cir. 2017), which did say that a parent corporation could be liable under the Americans with Disability Act (ADA) and Rehabilitation Act (RA) for discrimination at its subsidiary hospitals. *See id.* at 842. But *Silva* erred legally because it completely overlooked the critical "'contract-law'" distinction between "ordinary legislation" and "Spending Clause legislation." *Cummings*, 596 U.S. at 219. Notably, the court relied on the fact that "the ADA addresses itself to those who own, lease, or operate a place of public accommodation," to conclude that "[t]here is no rule that a covered entity under the ADA or RA must be the direct service-provider." 856 F.3d at 842 (citing 42 U.S.C. § 12182(a)). In doing so, it missed that the RA—like Section 1557 but unlike the ADA—covers discrimination only in the federally funded "program or activity," which the RA then defines to cover only the "corporation" receiving the funds. 29 U.S.C. § 794(a), (b)(3). And even if the RA itself did not limit liability to the "direct service-provider," *Silva*, 856 F.3d at 842, the Spending Clause limits liability to the *funding recipient*.

Anyway, *Silva* is factually distinguishable, because the parent company had "applie[d]" the relevant "policies and procedures" to its subsidiaries, and

even "house[d] the network" for the malfunctioning video-interpreting system at the heart of the discrimination that was alleged. *Id.* Nothing like that is present here. The same goes for the district court ruling in *Doe*. Even setting aside the court's legal error in refusing to respect the background principle of corporate separateness, the defendant corporate entities in *Doe* had "collectively designed and implemented the allegedly discriminatory program." 2022 WL 3139516, at *1. Here, by contrast, UMMS is merely a corporate parent; it has "nothing to do" with St. Joseph's application of the ERDs to Hammons or otherwise. JA185-186; *see supra* Part III.B.2.

*   *   *

At the end of the day, the statutory claim here is no more viable than the constitutional ones, especially as against UMMS. Yet rather than take a win on the former and the full relief it provides, Hammons has pursued this moot appeal as part of a lawfare campaign against Defendants. If this Court does not dismiss, it should make clear that no claim can survive.

**CONCLUSION**

This Court should dismiss the appeal for lack of jurisdiction. In the alternative, it should affirm the dismissal of the constitutional claims and reverse the judgment on the statutory claim.


Dated: January 22, 2025                 Respectfully submitted,

                                        */s/ Yaakov M. Roth*
                                        Yaakov M. Roth
                                        Brinton Lucas
                                        Joshua S. Ha
                                        Caleb P. Redmond
                                        JONES DAY
                                        51 Louisiana Avenue, NW
                                        Washington, DC 20001
                                        (202) 879-3939
                                        yroth@jonesday.com

                                        *Counsel for Defendants-*
                                        *Appellees-Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B) and 32(a)(7)(B) because it contains 12,031 words, excluding the parts of the brief exempted by those rules, as counted using the word-count function on Microsoft Word software. This brief complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia font.

Dated: January 22, 2025          */s/ Yaakov M. Roth*
                                 Yaakov M. Roth

                                 *Counsel for Defendants-*
                                 *Appellees-Cross-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of January 2025, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 22, 2025            */s/ Yaakov M. Roth*
                                   Yaakov M. Roth

                                   *Counsel for Defendants-*
                                   *Appellees-Cross-Appellants*