**23-1394, 23-1452**

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

❖

JESSE HAMMONS,

*Plaintiff-Appellant,*

—v.—

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION; UMSJ HEALTH SYSTEM, LLC; UNIVERSITY OF MARYLAND ST. JOSEPH MEDICAL CENTER, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

## RESPONSE/REPLY BRIEF FOR PLAINTIFF-APPELLANT

JOSHUA A. BLOCK
LESLIE COOPER
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 17th Floor
New York, New York 10004
(212) 549-2500

DANIEL MACH
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005
(202) 393-4930

ARON FISCHER
ANDREW D. COHEN
JOSHUA M. GOLDMAN
SEAN M. LAU
PATTERSON BELKNAP WEBB
  & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

LOUIS EBERT
ROSENBERG, MARTIN
  & GREENBERG, LLP
25 South Charles Street
Baltimore, Maryland, 21201
(410) 727-6600

*Attorneys for Plaintiff-Appellant*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 7

I.   THIS APPEAL IS NOT "MOOT," AND DEFENDANTS'
IMPROPER ATTEMPT TO SUPPLEMENT THEIR MOTIONS TO
DISMISS SHOULD BE DISREGARDED. ................................................. 7

II.  THE DISTRICT COURT'S DISMISSAL OF MR. HAMMONS'S
CONSTITUTIONAL CLAIMS SHOULD BE REVERSED. ...................... 7

     A.    UMMS Lacks Sovereign Immunity Because It Is Not an "Arm
of the State." ................................................................................. 7

     B.    Because UMMS Is Not an "Arm of the State," UMMS Is a
"Person" Under 42 U.S.C. § 1983. .............................................. 14

III.  THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT
ON THE SECTION 1557 CLAIMS SHOULD BE AFFIRMED. ................ 19

     A.    Defendants' Policies Would Still Violate Section 1557 Even if
*Kadel* Is Overturned. ................................................................... 19

     B.    UMMS Is Being Held Liable for Its Own Misconduct ................. 22

     C.    UMMS Is Liable Under Section 1557 for Requiring Its
Subsidiary to Adopt and Adhere to a Discriminatory Policy. ...... 25

CONCLUSION ................................................................................................... 29

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*,
  958 F. Supp. 1045 (D. Md. 1997) .................................................................... 24

*Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*,
  709 F.3d 584 (6th Cir. 2013) ................................................................. 16, 17

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997) ................................................................................... 18

*Avery v. Midland Cnty., Tex.*,
  390 U.S. 474 (1968) ................................................................................... 9

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ................................................................................ 20

*B.P.J. by Jackson v. W. Va. State Bd. of Educ.*,
  98 F.4th 542 (4th Cir. 2024) ......................................................... 6, 25, 26

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ........................................................................ 12, 13

*Billard v. Charlotte Cath. High Sch.*,
  101 F.4th 316 (4th Cir. 2024) ................................................................ 21

*Bivens v. Six Unknown Fed. Narcotics Agents*,
  403 U.S. 388 (1971) ................................................................................ 16

*Bolden v. Se. Penn. Transp. Auth.*,
  953 F.2d 807 (3d Cir. 1991) .................................................................... 16

*Christy v. Penn. Turnpike Comm'n*,
  54 F.3d 1140 (3d Cir. 1995) ................................................................... 11

*Doe One v. CVS Pharmacy, Inc.*,
  No. 18-cv-01031, 2022 WL 3139516 (N.D. Cal. Aug. 5, 2022) .................... 28

*Durning v. Citibank, N.A.*,
  950 F.2d 1419 (9th Cir. 1991) ............................................................. 8, 11

ii

*Edelman v. Jordan*,
　415 U.S. 651 (1974)...............................................................9

*Equal Rights Ctr. v. Equity Residential*,
　No. CCB-06-1060, 2016 WL 1258418 (D. Md. Mar. 31, 2016)......................24

*FDIC v. Meyer*,
　510 U.S. 471  (1994)............................................................16

*Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean
　Cardiovascular Ctr. Corp.*,
　322 F.3d 56 (1st Cir. 2003)..............................................10, 13, 14

*Good v. Am. Water Works Co., Inc.*,
　No. CV 2:14-01374, 2016 WL 5402230 (S.D. W. Va. Sept. 26,
　2016) .........................................................................24

*Good v. Dep't of Educ.*,
　121 F.4th 772 (10th Cir. 2024) .............................................*passim*

*Grajales v. P.R. Ports Auth.*,
　831 F.3d 11 (1st Cir. 2016).................................................8, 14

*Grove City College v. Bell*,
　465 U.S. 555 (1984)..........................................................28

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
　No. 20-cv-2088-DKC, 2022 WL 1027777 (D. Md. Apr. 6, 2022) ...................22

*Heart of CarDon, T. S. by & through T.M.S. v. Heart of CarDon,
　LLC*,
　No. 120-cv-01699, 2021 WL 981337 (S.D. Ind. Mar. 16, 2021)......................27

*Hennessey v. Univ. of Kan. Hosp. Auth.*,
　53 F.4th 516 (10th Cir. 2022) ..............................................11, 13, 14

*Hopkins v. Clemson Agric. Coll. of S.C.*,
　221 U.S. 636 (1911)..........................................................9

*Kadel v. Folwell*,
　100 F.4th 122 (4th Cir. 2024) ..............................................*passim*

*Keifer & Keifer v. Reconstruction Fin. Corp.*,
   306 U.S. 381 (1939)..............................................................................18

*Kitchen v. Upshaw*,
   286 F.3d 179 (4th Cir. 2002) .............................................................17

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374 (1995)......................................................................*passim*

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977)..............................................................................19

*United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*,
   804 F.3d 646 (4th Cir. 2015) ........................................................*passim*

*United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*,
   681 F.3d 575 (4th Cir. 2012) .............................................................15

*Obergefell v. Hodges*,
   576 U.S. 644 (2015)..............................................................................22

*Parrett v. Se. Boll Weevil Eradication Found., Inc.*,
   155 F. App'x 188 (6th Cir. 2005) .......................................................18

*Pearson v. Component Tech. Corp.*,
   247 F.3d 471 (3d Cir. 2001) ...............................................................24

*Ram Ditta v. Md. Nat'l Cap. Park & Planning Comm'n*,
   822 F.2d 456 (4th Cir. 1987) ........................................................*passim*

*Regents of the Univ. of Cal. v. Doe*,
   519 U.S. 425 (1997)................................................................................8

*Rumble v. Fairview Health Servs.*,
   No. 14-CV-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015).....................28

*Silva v. Baptist Health S. Fla., Inc.*,
   856 F.3d 824 (11th Cir. 2017) ............................................................27

*Stokes v. Stirling*,
   64 F.4th 131 (4th Cir. 2023) ................................................................2

iv

*T.S. by & through T.M.S. v. Heart of CarDon, LLC*,
   43 F.4th 737 (7th Cir. 2022) ....................................................26, 27, 28

*Takle v. Univ. of Wis. Hosp. & Clinics Auth.*,
   402 F.3d 768 (7th Cir. 2005) ...........................................................10, 13

*Tomei v. Parkwest Medical Center*,
   No. 3:19-CV-00041, 2022 WL 703656 (E.D. Tenn. Mar. 8, 2022)..................27

*United States v. Bestfoods*,
   524 U.S. 51 (1998)........................................................................6, 23, 24

*United States v. Windsor*,
   570 U.S. 744 (2013).................................................................................22

*Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*
   529 U.S. 765 (2000)................................................................................15

*White Coat Waste Project v. Greater Richmond Transit Co.*,
   35 F.4th 179 (4th Cir. 2022)..................................................................13

*Will v. Michigan Department of State Police*,
   491 U.S. 58 (1989)........................................................................4, 14, 15

**Statutes and Regulations**

31 U.S.C. § 3729 ............................................................................................15

42 U.S.C. § 1983 ...................................................................................*passim*

42 U.S.C. § 18116 .................................................................................*passim*

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28
   (1988) ....................................................................................................26

45 C.F.R. § 92.3(b) ......................................................................................27

81 Fed. Reg. 31375 .......................................................................................27

85 Fed. Reg. 37160 .......................................................................................27

Kan. Stat. §§ 76-3301-3323 .........................................................................11

55 Pa. Stat. Ann. § 600.303(a) .....................................................................16

24 P.R. Laws § 343 ...................................................................................10

Wis. Stat. §§ 233.01-233.42 ....................................................................11

Wyo. Stat. §§ 9-7-101-125.......................................................................11

**Constitutional Provisions**

U.S. Const. Amend. XI ......................................................................*passim*

U.S. Const. Amend. XIV ............................................................................8

## INTRODUCTION

The University of Maryland Medical System Corporation ("UMMS") is a state entity that operates the University of Maryland St. Joseph Medical Center ("St. Joseph" and together, "Defendants") based on Catholic religious doctrine, in flagrant violation of the Establishment Clause and Equal Protection Clause of the Constitution. UMMS signed an agreement with the Catholic Archdiocese of Baltimore promising that St. Joseph would operate as a Catholic institution and be audited by the National Catholic Bioethics Center. Pursuant to the National Catholic Bioethics Center's interpretation of Catholic doctrine, St. Joseph cancelled Plaintiff-Appellant Jesse Hammons's gender-affirming hysterectomy based on the religious belief that transgender people are "intrinsically disordered" and "cannot conform to the true good of the human person." JA825.

To this day, Defendants refuse to acknowledge they are governmental entities subject to the Constitution. Yet at the same time, Defendants seek to use their governmental status as a shield, asserting for purposes of this case—and this case only—that sovereign immunity protects them from liability. Playing this shell game, Defendants convinced the district court that Mr. Hammons's constitutional claims were barred by sovereign immunity and must be dismissed.

That erroneous dismissal should be reversed. As Mr. Hammons explained in his opening brief, Defendants lack sovereign immunity for two independent reasons.

First, under *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), when the government creates a state corporation while disclaiming the entity's governmental status, that statutory disclaimer conclusively establishes that the entity lacks sovereign immunity. *See* Hammons Br. 19-24. Second, under *Ram Ditta v. Maryland National Capital Park & Planning Commission*, 822 F.2d 456, 457-68 (4th Cir. 1987), UMMS does not satisfy this Court's four-factor test for determining whether a governmental entity is an "arm of the state" that is entitled to sovereign immunity. *See* Hammons Br. 26-45. If Mr. Hammons prevails on either of these arguments, then Defendants' claims of sovereign immunity must fail, and the district court's dismissal of Mr. Hammons's constitutional claims must be reversed.

Now, in their response brief, Defendants have dramatically narrowed the issues in dispute by abandoning any argument that UMMS is an "arm of the state" under *Ram Ditta*. Defendants' response brief does not attempt to defend the district court's erroneous application of the *Ram Ditta* factors to UMMS at all, thus waiving the argument. *See Stokes v. Stirling*, 64 F.4th 131, 137 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 377 (2023) ("Even appellees waive arguments by failing to brief them.") (citation omitted). On that basis alone, the district court's dismissal of Mr. Hammons's constitutional claims must be reversed.

Instead of defending the district court's erroneous holding that UMMS is an "arm of the state" under *Ram Ditta,* Defendants double down on a sweeping

2

argument that the district court rejected. According to Defendants, if an entity is "part of" the State under *Lebron*, then "no further work is necessary" and the entity must automatically be invested with the State's sovereign immunity. Defs.' Br. 38; *but see* JA 94 (stating that the court had "completed the arm-of-state analysis [from *Ram Ditta*] independent from the state action analysis [from *Lebron*]").

While that proposition may sound simple, it is simply wrong. Defendants' argument that every "part of" a State is automatically invested with sovereign immunity conflicts with this Court's binding precedent in *United States ex rel. Oberg v. Kentucky Higher Education Student Loan Corp. ("Oberg III")*, 804 F.3d 646 (4th Cir. 2015), and with decisions from the First, Seventh, and Tenth Circuits, which have all held that state-created corporations—with corporate structures strikingly similar to UMMS—are part of the state government for purposes of liability but not "arms of the state" invested with sovereign immunity. Indeed, shortly after Mr. Hammons submitted his opening brief (but before UMMS submitted its response), the Tenth Circuit held in *Good v. Department of Education* that a state-created corporation was not an "arm of the state" for purposes of sovereign immunity even though the Supreme Court had recently held that the same corporation is part of the state for purposes of Article III standing based on *Lebron*. 121 F.4th 772 (10th Cir. 2024). Defendants fail to even mention the case.

Having abandoned the district court's reasoning, Defendants pivot to asserting that the judgment should be affirmed on the alternate ground that UMMS is not a "person" under 42 U.S.C. § 1983. But Defendants' abandonment of *Ram Ditta* also forecloses their personhood argument. The Supreme Court held in *Will v. Michigan Department of State Police* that "a State is not a 'person' within the meaning of § 1983," but made clear that its holding "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." 491 U.S. 58, 69-70 (1989). Thus, because UMMS is *not* an "arm of the state" under *Ram Ditta*, UMMS *is* a person under *Will*. *See Oberg III*, 804 F.3d at 677 (holding that PHEAA is a "person" under the False Claims Act because it is not an arm of the state under *Ram Ditta*).

In addition to reversing the dismissal of Mr. Hammons's constitutional claims, this Court should affirm the district court's judgment in favor of Mr. Hammons on his claim under Section 1557 of the Affordable Care Act. Section 1557 prohibits discrimination on the basis of race, sex, age, or disability in "any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Defendants concede that policies excluding gender-affirming medical care facially discriminate based on sex under this Court's binding precedent in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), *petitions for cert. filed*, July 30th, 2024 (Nos. 24-90, 24-99). Defendants' categorical exclusion of gender-

affirming medical care thus violated Section 1557, and the district court's entry of summary judgment should be affirmed.

Defendants nevertheless assert that "reversal would be required" if the Supreme Court vacates the *Kadel* decision. Defs.' Br. 42. But even if *Kadel* were some day overturned and such policies were deemed to be facially neutral, plaintiffs could still challenge facially neutral exclusions of gender-affirming medical care with "evidence" that the exclusion "was really based on gender stereotypes or some other discriminatory purpose." *Kadel*, 100 F.4th at 176 n.16 (Richardson, J., dissenting). Here, Defendants' discriminatory purpose is blatant and undisputed. Defendants canceled Mr. Hammons's surgery based on the belief that transgender people "cannot conform to the true good of the human person" and that people "should stay the way you were born no matter what." JA825; JA1427. Even if a private entity had a religious right to discriminate on that basis, the government cannot.

Nor can UMMS escape liability by blaming the discriminatory conduct on its subsidiary, UMSJ (St. Joseph's corporate name). Despite Defendants' attempts to mischaracterize the record, UMMS is not being held vicariously liable for the actions of its subsidiary. Instead, UMMS is being held directly liable for *its own* conduct in signing the Asset Purchase Agreement and Catholic Identity Agreement, in which UMMS promised that St. Joseph would operate as a Catholic institution and follow

the Catholic Ethical and Religious Directives ("ERDs") as interpreted by the National Catholic Bioethics Center. Whether based on background principles of corporate law or based on court precedents governing "Spending Clause" statutes, UMMS can be held directly liable for requiring its subsidiary to adopt an illegal policy. *See United States v. Bestfoods*, 524 U.S. 51, 64-65 (1998) (explaining that a "parent [corporation] is directly liable for its own actions" when the subsidiary's violation is "traced to the parent through the conduit of its own personnel and management"); *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 554 (4th Cir. 2024), *cert. denied sub nom.*, *W. Va. Secondary Sch. Activities Comm'n v. B.P.J. Next Friend Jackson*, 145 S. Ct. 568 (2024) ("Title IX's prohibitions are not limited to organizations that directly receive federal funds: the statute also covers organizations that control and manage direct funding recipients.").

Ultimately, Defendants' arguments rest on glib oversimplifications that either lack legal support or conflict with binding precedent. The district court's dismissal of Mr. Hammons's constitutional claims should be reversed, and its grant of summary judgment on Mr. Hammons's Section 1557 claim should be affirmed.

## ARGUMENT

## I. THIS APPEAL IS NOT "MOOT," AND DEFENDANTS' IMPROPER ATTEMPT TO SUPPLEMENT THEIR MOTIONS TO DISMISS SHOULD BE DISREGARDED.

Before turning to the merits of the appeal, Defendants attempt to submit further briefing on their previous motions to dismiss the appeal as moot. *See* Defs.' Br. 17-18. Those portions of the brief should be disregarded as procedurally improper. As set forth in Mr. Hammons's opposition to the motions to dismiss, *see* ECF Nos. 21, 37, 48, Mr. Hammons's claims for nominal damages are not "mooted" by the payment of compensatory damages on Mr. Hammons's statutory claim nor by the attempt to tender $2.00 in cash without entry of a court judgment. To terminate the litigation over Mr. Hammons's constitutional claims, Defendants must submit to entry of *a judgment* in Mr. Hammons's favor. Defendants refuse to do so.

## II. THE DISTRICT COURT'S DISMISSAL OF MR. HAMMONS'S CONSTITUTIONAL CLAIMS SHOULD BE REVERSED.

### A. UMMS Lacks Sovereign Immunity Because It Is Not an "Arm of the State."

While UMMS is a state instrumentality under *Lebron*, it is not an "arm of the state" under *Ram Ditta*. Hammons Br. 26-28. Defendants do not challenge the district court's holding under *Lebron* (*i.e.*, that UMMS is part of the state for purposes of constitutional claims) but assert in sweeping fashion that "if a state-created corporation satisfies the *Lebron* test, it is inherently entitled to sovereign immunity." *See* Def. Br. at 31. That superficial claim squarely conflicts with this

7

Court's decisions in *Oberg III* and with the analogous decisions from the First, Seventh, and Tenth Circuits.

"[N]ot all non-local, governmental entities are 'arms' of the sovereign," and an entity's designation as a "government instrumentality" is not "dispositive on arm-of-the-state questions." *Grajales v. P.R. Ports Auth.*, 831 F.3d 11, 22 (1st Cir. 2016); *accord Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir. 1991) ("Despite the breadth of the Eleventh Amendment's reach, not all state-created or state-managed entities are immune from suit in federal court."). Rather, even when a state instrumentality is at issue, courts must still "decid[e] whether [the] state instrumentality may invoke the State's immunity" by looking more closely "into the relationship between the State and the entity." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

Defendants' contrary argument fundamentally misunderstands the relationship between state action and sovereign immunity. Defendants assert that "[t]he text of the Constitution . . . does not suggest that an entity can qualify as a 'State' for purposes of the Fourteenth Amendment but not for purposes of the Eleventh." Defs.' Br. 36. To the contrary, it is well established that the definitions of "State" in the Eleventh and Fourteenth Amendments are not coextensive. Thus, "while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of

8

the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 668 n.12 (1974); *compare Avery v. Midland Cnty., Tex.*, 390 U.S. 474, 479-80 (1968) (explaining that for purposes of the Fourteenth Amendment "actions of local government are the actions of the State"), *with Hopkins v. Clemson Agric. Coll. of S.C.*, 221 U.S. 636, 645 (1911) ("[N]either public corporations nor political subdivisions are clothed with [Eleventh Amendment] immunity from suit which belongs to the state alone by virtue of its sovereignty."). All State-created instrumentalities are bound by the Fourteenth Amendment, but only some of them are "arms of the state" for purposes of the Eleventh.

With respect to *Lebron* corporations in particular, this Court's precedents have made clear that *Lebron* corporations are not inherently "arms of the state" entitled to sovereign immunity. In the trilogy of *Oberg* cases, this Court examined the Pennsylvania Higher Education Assistance Agency ("PHEAA"), a state-created entity that satisfied all three elements of *Lebron*'s test for whether a state-created corporation is "part of" the state. First, PHEAA was created by special law. *See Oberg III*, 804 F.3d at 654 (citing 24 Pa. Stat. § 5101). Second, PHEAA was created for the public purpose of "'improv[ing] the higher educational opportunities of Pennsylvania residents who are attending approved institutions of higher education by assisting them in meeting their expenses of higher education." *Id.* (quoting 4 Pa. Stat. § 5102) (alterations incorporated). And third, all of PHEAA's

9

board of directors were appointed by either the governor or state legislators. *See id.* (citing 24 Pa. Stat. § 5103(a)). However, unlike Amtrak in *Lebron* or UMMS in this case, the statute authorizing PHEAA did not disclaim the entity's governmental status. Instead, the statute affirmatively declared that PHEAA was a "government instrumentality" and that it performs an "essential governmental function." *See id.* at 654-55 (quoting 24 Pa. Stat. § 5101 and 24 Pa. Stat. § 5105.6).

Despite all that, this Court held in *Oberg III* that PHEAA was not an "arm of the state" for purposes of invoking the State's sovereign immunity. "Arm-of-the-state status," this Court explained, "is a question of balance, not math." *Id.* at 676. And considering all the *Ram Ditta* factors holistically, this Court concluded that "[i]n light of PHEAA's intended and actual independence from the Commonwealth, we cannot conclude that it would be an affront to Pennsylvania's sovereign dignity to permit this action to proceed against PHEAA." *Id.* at 677.

The First, Seventh, and Tenth Circuits have all reached the same conclusion on strikingly similar facts. *See Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 68, 70-71 (1st Cir. 2003) (concluding that state-created hospital system was not an "arm of the state" even though it was created by special statute (24 P.R. Laws § 343) for a public purpose (*id.* § 343b) and the governor appoints the board of directors (*id.* § 343c)); *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 770 (7th Cir. 2005) (concluding

10

that state-created hospital system was not arm of the state even though it was created by special statute (Wis. Stat. §§ 233.01-233.42) for a public purpose (*id.* § 233.04) and board members were appointed by government officials (*id.* § 233.03)); *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 528 (10th Cir. 2022) (concluding that state-created hospital system was not an arm of the state even though it was created by special statute (Kan. Stat. §§ 76-3301-3323) for a public purpose (*id.* § 76-3302) and a majority of the board members were appointed by the governor (*id.* § § 76-3304)).[1]

The Tenth Circuit's recent decision in *Good v. Department of Education* is particularly devastating for Defendants' argument. There, the Tenth Circuit explicitly discussed the differences between the *Lebron* test for government status and the arm-of-the-state test when determining whether the Higher Education Loan Authority of the State of Missouri ("MOHELA") was entitled to sovereign immunity. *See Good*, 121 F.4th at 797-98. Just prior to that decision, the Supreme

---

[1] *See also Durning*, 950 F.2d at 1426-28 (pre-*Lebron* decision concluding that state-created business development authority was not an arm of the state even though it was created by special statute (Wyo. Stat. §§ 9-7-101-125) for a public purpose (*id.* § 9-7-102(a)(i)-(ii)) and a majority of the board members were appointed by the governor (id. § 9-7-104(a)); *Christy v. Penn. Turnpike Comm'n*, 54 F.3d 1140, 1142, 1145, 1149 (3d Cir. 1995) (pre-*Lebron* decision concluding that state-created turnpike authority was not an arm of the state even though it was created by special statute for a public purpose and a majority of the board members were appointed by the governor).

Court in *Biden v. Nebraska* held that MOHELA is part of Missouri for purposes of Article III standing based on *Lebron*.  143 S. Ct. 2355, 2367 (2023).  Yet the Tenth Circuit held that MOHELA was nonetheless *not* an arm of the state for purposes of sovereign immunity:

> [T]he *Biden* majority—as well as the *Biden* dissent—noted that "a public corporation can count as part of the State for some but not 'other purposes.'" *Biden*, 143 S. Ct. at 2368 n.3; *see also id.* at 2390 & n.1 (Kagan, J., dissenting). And *Biden* itself relied on *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), in which the Supreme Court concluded that Amtrak was an agency or instrumentality of the United States for purposes of complying with the First Amendment but observed that, by statute, it did not share in the United States' sovereign immunity. Thus, although *Biden* concluded that MOHELA was part of Missouri for purposes of standing, it does not necessarily follow that MOHELA is a part of Missouri for purposes of the Eleventh Amendment, and we do not read *Biden* as making that determination.

*Good*, 121 F.4th at 797-98 (citations omitted).  After independently reviewing all the factors relevant to the arm-of-the-state analysis, the Tenth Circuit cited approvingly to this Court's decision in *Oberg III*, stating that "'we cannot conclude that it be an affront' to Missouri's 'sovereign dignity to permit this action to proceed.'"  *Id.* at 821 (quoting *Oberg III*, 804 F.3d at 677).  "Indeed," the Tenth Circuit continued, "in light of the conflicting signals as to MOHELA's status, our approach is actually protective of Missouri's dignitary interests."  *Id.*

Defendants fail to acknowledge *Good* [2] and unsuccessfully try to distinguish *Fresenius*, *Takle*, and *Hennessey* by noting that those cases "did not involve constitutional claims . . . so the plaintiffs never had to argue that the defendants were state actors." Defs.' Br. at 37. That's a non sequitur. An entity's status as an "arm of the state" does not switch on and off depending on whether constitutional claims are at issue. *See Fresenius*, 322 F.3d at 63. Moreover, all the entities in these cases were unquestionably state actors under either their authorizing statutes or *Lebron*, and a corporation that satisfies the *Lebron* test "is part of the government itself and is a state actor for all purposes." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 191 n.4 (4th Cir. 2022).[3]

Defendants also misleadingly imply that these arm-of-the-state cases somehow turned exclusively on whether a judgment would be paid by the state treasury and did not adequately consider States' dignitary interests. *See* Defs.' Br. 40 (citing *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 769

---

[2] Defendants' failure to acknowledge the Tenth Circuit's decision in *Good* is particularly striking because Defendants argued in their brief that the Supreme Court's decision in *Biden v. Nebraska* demonstrates that *Lebron* establishes that an entity must be treated as a State for all purposes. *See* Defs' Br. at 36. *Good* refutes that assertion.

[3] Defendants misinterpret this quote from *White Coat* as supporting their argument that a state entity under *Lebron* is automatically an "arm of the state" for purposes of sovereign immunity. *See* Defs.' Br. 22 (citing *White Coat*). But, as the quote makes clear, *Lebron* establishes that an entity is "a state actor" for all purposes, not that it is an "arm of the state."

13

(2002)).  To the contrary, the arm-of-the-state cases considered the States' dignitary interests at length and concluded that "[i]t would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty."  *Fresenius*, 322 F.3d at 63; *accord Good*, 121 F.4th at 794; *Hennessey*, 53 F.4th at 529; *Grajales*, 831 F.3d at 30.

Because UMMS is not an "arm of the state" under *Ram Ditta*—as Defendants have conceded by abandoning any argument otherwise—Defendants' sovereign immunity defense must fail, and the district court's dismissal of Mr. Hammons's constitutional claims should be reversed.

### B.    Because UMMS Is Not an "Arm of the State," UMMS Is a "Person" Under 42 U.S.C. § 1983.

Defendants also ask this Court to affirm the district court's dismissal on the alternate ground that UMMS is not a "person" under 42 U.S.C. § 1983, which provides a cause of action against any "person" who violates a plaintiff's constitutional rights "under color of" state law.  Defs.' Br. 19-24.  The Supreme Court held in *Will v. Michigan Department of State Police* that "a State is not a 'person' within the meaning of § 1983."  491 U.S. at 65.  Thus, according to Defendants, if UMMS is "part of" Maryland under *Lebron*, then it is not a "person" under section 1983.  *See* Defs.' Br. at 20.

14

As with their underlying argument about sovereign immunity, Defendants' argument about section 1983 erroneously assumes that being "part of" a state for purposes of *Lebron* automatically means that a state-created corporation is the state for purposes of *Will*. To the contrary, the Supreme Court made clear in *Will* that its holding "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Will*, 491 U.S. at 70. Thus, because UMMS is *not* an "arm of the state" under *Ram Ditta*, UMMS *is* a person under *Will*.

Once again, this Court's *Oberg* cases are decisive. The question in the *Oberg* cases was whether several state-created corporations like PHEEA were "person[s]" under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). In interpreting the False Claims Act, the Supreme Court in *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens* applied its "longstanding interpretive presumption that 'person' does not include the sovereign"—the same presumption that guided the Court's interpretation of section 1983 in *Will*—and concluded that States are not "persons" under the False Claims Act. 529 U.S. 765, 780-81 (2000) (citing *Will*, 491 U.S. at 64). In *Oberg I*, this Court held that when determining whether a state-created entity is a "person" under the False Claims Act, courts should apply the same four-factor test from *Ram Ditta* for determining whether an entity is an "arm of the state" for purposes of sovereign immunity. *See United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir. 2012) ("*Oberg I*") (listing the four factors

15

from *Ram Ditta*). Thus, when this Court ultimately held in *Oberg III* that the PHEAA was not an "arm of the state" under *Ram Ditta*, that conclusion meant that the PHEAA was a "person" subject to liability under the False Claims Act. *Oberg III*, 804 F.3d at 677. And because the False Claims Act and section 1983 both apply the same definition of "person," *Oberg III* establishes that a state corporation can satisfy all the elements of *Lebron* and still qualify as a "person" under section 1983. *See id.*; *see also Bolden v. Se. Penn. Transp. Auth.*, 953 F.2d 807, 817 (3d Cir. 1991) (Alito, J.) ("Since SEPTA is a "separate body corporate and politic" (55 Pa. Stat. Ann. § 600.303(a)), it falls squarely within [section 1983's] definition [of a person].")

Ignoring this Court's own precedent in the *Oberg* cases, Defendants rely almost exclusively on the Sixth Circuit's decision in *American Premier Underwriters, Inc. v. National Railroad Passenger Corp.*, 709 F.3d 584, 587-88 (6th Cir. 2013) ("*APU*"). But that case has nothing to do with sovereign immunity or the statutory definition of "person." The issue in *APU* was whether Amtrak could be sued under the implied private right of action for constitutional claims created by the Supreme Court in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). In *FDIC v. Meyer*, the Supreme Court held that it would not "expand the category of defendants against whom *Bivens*-type actions may be brought to include not only federal *agents*, but federal *agencies* as well." 510 U.S. 471, 484 (1994).

16

Applying *Meyer*, the Sixth Circuit in *APU* held that even though Amtrak "lacks sovereign immunity," it still could not be sued under *Bivens* because "[t]he limitation on suing federal agencies for damages in constitutional rights violation cases is not related to immunity, but is merely the absence of an implied cause of action." *APU*, 709 F.3d at 590.

On its own terms, *APU*'s holding with respect to *implied* causes of action under *Bivens* has nothing to say about whether an entity that satisfies *Lebron* is an "arm of the state" or a "person" under section 1983 and other statutes providing an *express* cause of action. Defendants seize on the Sixth Circuit's statement that "APU cannot have it both ways" and that the Sixth Circuit would not "declare a new third category of federal-private-agency-corporations" that are part of the government for purposes of *Lebron* but can nevertheless be sued under *Bivens*. *APU*, 709 F.3d at 590. Whatever the merits of that reasoning with respect to the *federal* government, it has no application to *state* governments, which—as discussed above—already divide state power across an array of different and diverse entities, such that "[t]here is no clear line separating those state instrumentalities that are entitled to sovereign immunity from those that are not." *Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002); *see Good*, 121 F.4th at 797-98. In any event, to the extent that there is any tension between this Court's precedent and *APU*, an out-of-circuit case, the *Oberg* cases control.

17

Moreover, because Defendants have conceded through abandonment that UMMS is not an "arm of the state" under *Ram Ditta*, the parties' disagreement over whether to characterize *Lebron*'s discussion of Amtrak's sovereign immunity as a "waiver" or a "disclaimer" is ultimately beside the point. *Compare* Hammons Br. 24-26, *with* Defs.' Br. 31-33. Defendants go to great lengths to characterize the statutory disavowal of agency status for Amtrak in *Lebron* as merely a "waiver" of sovereign immunity because Defendants want to argue that Maryland's statutory disavowal of UMMS's agency status is also merely a "waiver," which would be insufficient to make a State a "person" under 1983. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997). By contrast, as Mr. Hammons has explained, the best reading of *Lebron* is that when an authorizing statute disavows an entity's status as an agency, that statutory disavowal conclusively establishes that the entity has not been invested with sovereign immunity and, thus, has no sovereign immunity to "waive." *See* Hammons Br. 24-26.[4]

---

[4] Indeed, *Lebron* never uses the phrase "waiver," and other decisions conspicuously avoid that phrase. *See Good*, 121 F.4th at 797 (characterizing *Lebron* has holding that Amtrak "did not share in the United States' sovereign immunity"); *Parrett v. Se. Boll Weevil Eradication Found., Inc.*, 155 F. App'x 188, 192 (6th Cir. 2005) (characterizing *Lebron* as stating that Amtrak "would not be entitled to sovereign immunity"); *see also Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 388-89 (1939) (noting that the "government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work" but rather the legislature must "endow a governmental corporation with the government's immunity").

But that dispute is no longer relevant because Defendants have now conceded through abandonment that UMMS is not an arm of the state under *Ram Ditta*. As discussed above, Mr. Hammons's brief made two independent arguments: (a) that Maryland's disavowal of UMMS's agency status means that UMMS was never invested with sovereign immunity, and (b) that UMMS was never invested with sovereign immunity because it is not an "arm of the state" under *Ram Ditta*. Thus, even if Defendants were able to convince the Court that a disavowal of agency status is merely a waiver (as opposed to a dispositive indication that the entity never had sovereign immunity to begin with), UMMS would still have no sovereign immunity to waive because it is not an "arm of the state." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). UMMS is thus a "person" under section 1983 regardless of how the statutory disavowal in *Lebron* is characterized.

## III. THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT ON THE SECTION 1557 CLAIMS SHOULD BE AFFIRMED.

### A. Defendants' Policies Would Still Violate Section 1557 Even if *Kadel* Is Overturned.

Defendants' categorical refusal to provide medically necessary gender-affirming medical care at St. Joseph—despite providing the same medical care to treat other conditions—facially discriminates on the basis of sex, in violation of Section 1557 of the Affordable Care Act. Section 1557 prohibits discrimination on the basis of race, sex, age, or disability in "any health program or activity, any part

of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).  In *Bostock v. Clayton County*, the Supreme Court held that discrimination "because of . . . sex" under Title VII includes discrimination based on transgender status.  590 U.S. 644, 660 (2020).  And in *Kadel v. Folwell*, this Court held that *Bostock*'s reasoning applies to discrimination on the basis of sex under Section 1557.  100 F.4th at 164.

Defendants concede—as they must—that their policy is facially discriminatory under *Kadel*.  As *Kadel* explained, allowing or disallowing treatment based on whether the treatment aligns with a person's sex assigned at birth "is textbook sex discrimination" under *Bostock*, and thus under Section 1557 for two reasons.  *Id.* at 153, 164.  First, determining whether medical care is prohibited by Defendants' policy "is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity."  *Id.* at 147.  "Second, a policy that conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes."  *Id.* at 154.

Defendants nevertheless argue that "reversal would be required" if the Supreme Court grants petitions for certiorari in *Kadel* and subsequently vacates this Court's decision.  Defs.' Br. 42.  But this Court must resolve the appeal based on *current* controlling precedent, not based on speculation about what the Supreme

20

Court may do in the future. Moreover, even if *Kadel* were some day vacated and categorical exclusions of gender-affirming medical care were deemed to be facially neutral, plaintiffs could still challenge facially neutral exclusions with "evidence" that the exclusion "was really based on gender stereotypes or some other discriminatory purpose." *Kadel*, 100 F.4th at 176 n.16 (Richardson, J., dissenting).

Here, Defendants' discriminatory purpose is blatant and undisputed. Defendants cancelled Mr. Hammons's surgery pursuant to the National Catholic Bioethics Center's instructions that transgender people and gender transition are "intrinsically disordered because [they] cannot conform to the true good of the human person." JA825. The policy is based on a religious belief that "a body-soul union [is] unalterably created male or female," *id.*, and that people "should stay the way you were born no matter what," JA1427. Instead of relying on sex-neutral motivations, Defendants' policy is thus explicitly based on disapproval of the fact that gender-affirming surgery fails to conform to a person's sex assigned at birth. Denying medical care on that basis violates Section 1557 regardless of whether the policy is deemed to be facially neutral. *See Kadel*, 100 F.4th at 176 n.16 (Richardson, J., dissenting).

To be sure, in some instances, protections for free exercise of religion may provide defenses to some forms of prohibited discrimination. But whether those defenses would apply to similar litigation against a private hospital, *cf. Billard v.*

21

*Charlotte Cath. High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024) (discussing circuit split over whether Religious Freedom Restoration Act applies to suits between private parties), Defendants are government instrumentalities and have no free exercise rights of their own. *See Hammons v. Univ. of Md. Med. Sys. Corp.*, No. 20-cv-2088-DKC, 2022 WL 1027777, at *1 (D. Md. Apr. 6, 2022). When religious beliefs about transgender people "become[] enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015); *see also United States v. Windsor*, 570 U.S. 744, 771 (2013) (explaining that "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo–Christian) morality" constitutes an unconstitutional discriminatory purpose).

### B.    UMMS Is Being Held Liable for Its Own Misconduct.

The district court properly held UMMS liable for violating Section 1557. Despite Defendants' attempts to mischaracterize the record, UMMS is not being held vicariously liable for the actions of its subsidiary, *see* Defs.' Br. 43-50, but directly liable for its own illegal conduct. UMMS signed an asset purchase agreement promising that "UMMS . . . shall continue to operate [St. Joseph] in a manner consistent with Catholic values and principles." JA1036. UMMS specifically promised as part of that agreement that it would require St. Joseph's to adhere to the

22

ERDs.  *Id.*  And UMMS further promised in a separate "Catholic Identity Agreement" that it would ensure that St. Joseph's compliance with the ERDs would be regularly audited by National Catholic Bioethics Center.  JA1047.

In light of this undisputed documentary evidence, it is difficult to fathom how Defendants can brazenly assert that UMMS "has 'nothing to do' with St. Joseph's application of the ERDs to Hammons or otherwise."  Defs.' Br. 52.  UMMS did not "create . . . the ERDs," Defs.' Br. 49, but UMMS *did* require St. Joseph's to adhere to them.  UMMS does not itself "interpret those ERDs or monitor St. Joseph's compliance with them," *id.*, but UMMs *does* require St. Joseph to submit to the interpretations and monitoring of the National Catholic Bioethics Center.  Thus, through its own actions and conduct, UMMS is directly responsible for St. Joseph's facially discriminatory policy of refusing to provide any form of gender-affirming care.

Because UMMS is being held directly liable for its own misconduct, none of Defendants' arguments about corporate separateness applies to the actual facts of this case.  Defendants invoke *United States v. Bestfoods*, 524 U.S. 51, 61 (1998), for the proposition that it is a "general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation … is not liable for the acts of its subsidiaries."  Defs.' Br. 45.  But *Bestfoods* goes on to explain that, under those same general principles of corporate law, a "parent [corporation] is directly liable

for its own actions" when "the alleged wrong [at a subsidiary] can seemingly be traced to the parent through the conduct of its own personnel and management" and "the parent is directly a participant in the wrong complained of."  524 U.S. at 64-65; *accord Equal Rights Ctr. v. Equity Residential*, No. CCB-06-1060, 2016 WL 1258418, at *4 (D. Md. Mar. 31, 2016).  In particular, "by 'forcing' a subsidiary to take a particular action . . . a parent company is liable in the same way as any tortfeasor who causes harm by acting in concert with others."  *Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5402230, at *9 (S.D. W. Va. Sept. 26, 2016)); *see Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001) (explaining that direct parent liability attaches if parent "has forced the subsidiary to take the complained-of action" or is "specifically responsible for the . . . practice at issue in the litigation"); *In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*, 958 F. Supp. 1045, 1051 (D. Md. 1997) (parent company liable "as a principal" where it "expressly authorized and directed the subsidiary's wrongful acts").

Thus, under *Bestfoods*—and background principles of corporate law— UMMS is directly liable for its own conduct in requiring its wholly owned subsidiary to operate as a Catholic institution and to follow the ERDs as interpreted by the National Catholic Bioethics Center.

24

### C.    UMMS Is Liable Under Section 1557 for Requiring Its Subsidiary to Adopt and Adhere to a Discriminatory Policy.

These general principles of corporate law also apply in the context of Spending Clause statutes (like Section 1557) that prohibit recipients of federal financial assistance from engaging in discrimination.    As this Court recently reaffirmed in *B.P.J. by Jackson v. West Virginia State Board of Education*, "Title IX's prohibitions are not limited to organizations that directly receive federal funds: the statute also covers organizations that control and manage direct funding recipients." 98 F.4th 542, 554 (4th Cir. 2024).  Thus, in *B.P.J.*, an athletic organization was held directly liable under Title IX because the athletic organization enforced discriminatory rules in interscholastic athletic competitions even though the athletic organization itself (unlike the schools who participated in the competitions) did not directly receive any federal funds.  *See id.*[5]

Like the athletic association in *B.P.J.*, UMMS would be directly liable for violating Section 1557 for requiring St. Joseph's to follow the ERDs even if UMMS did not also receive its own federal funding.  Remarkably, Defendants fail to mention *B.P.J.* even though it directly refutes Defendants' unsupported assertion that "the contract-like framework of Spending Clause legislation means that the only entity

---

[5] Although the panel in *B.P.J.* divided 2-1 on other issues, all three members of the panel joined this portion of the Court's holding, *see* 98 F.4th at 565 (Agee, J., concurring in part), and the Supreme Court recently denied the athletic association's petition for a writ of certiorari, *see* 145 S. Ct. 568 (2024).

exposed to *liability* for [the] discrimination is the funding recipient for the program where the discrimination took place."  Defs.' Br. 48.  As *B.P.J.* makes clear, liability also extends to the "organizations that control and manage direct funding recipients." *B.P.J.*, F.4th at 554 (internal quotation marks and citation omitted).

But UMMS's liability is even more clear-cut in this case because UMMS not only controls an entity covered by Section 1557, but also directly receives its own federal financial assistance, making UMMS a covered entity in its own right.  As noted above, Section 1557 prohibits sex discrimination in "any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).  "The ACA does not explicitly define 'health program or activity.'  But when the ACA was enacted in 2010, 'program or activity' was already a term of art with a clear meaning and a broad scope established by the provisions cited in section 1557 that ban discrimination in connection with federal financial assistance."  *T.S. by & through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 742 (7th Cir. 2022).  Under that definition, which was established by the Civil Rights Restoration Act of 1987 (the "CRRA"), "the term 'program or activity' means all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government," and "all of the operations of . . . an entire corporation . . . which is principally engaged in the business of providing . . . health care . . . any part of which is extended Federal financial assistance."  *Civil*

*Rights Restoration Act of 1987*, Pub. L. No. 100-259, §§ 3(a), 4(2), 5(3), 6, 102 Stat. 28, 28 (1988); *see T.S.*, 43 F.4th at 742.[6]

As a covered entity, UMMS is prohibited from engaging in sex discrimination in all its operations, including its own actions when managing its wholly owned subsidiary. For example, in *Tomei v. Parkwest Medical Center*, the court held that a parent corporation could be liable under Section 1557 for its subsidiary's discrimination based on disability because the parent company "created and provided a Deaf and Hard of Hearing Rights and Responsibility Policy for each of its subsidiary hospitals, including Parkwest, and mandated the facilities' compliance with the policy," including mandating which video interpretation services subsidiaries must use. No. 3:19-CV-00041, 2022 WL 703656, at *7 (E.D. Tenn. Mar. 8, 2022); *see also Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 842 (11th Cir. 2017) (reaching same conclusion based on similar fact pattern under Rehabilitation Act). Similarly, in *Heart of CarDon, T. S. by & through T.M.S. v.*

---

[6] The definitions established by the CRRA have been consistently incorporated into the implementing regulations for Section 1557 passed by the Obama, Trump, and Biden administrations. *See* 45 C.F.R. § 92.3(b) (current regulation); 85 Fed. Reg. 37160, 37171 (2020 rule explaining that this definition "align[s] . . . with the standard articulated in the CRRA"); 81 Fed. Reg. 31375, 31386 (2016 rule providing that "the term 'health program or activity' must be interpreted in a manner that uniformly covers all of the operations of any entity that receives Federal financial assistance and that is principally engaged in health services . . . even if only part of the health program or activity receives such assistance. . . . This approach is consistent with the approach Congress adopted in the CRRA.").

*Heart of CarDon, LLC*, the court held that a healthcare entity receiving federal fundings was liable under Section 1557 for discrimination in an ERISA benefit plan that the entity controlled. No. 120-cv-01699, 2021 WL 981337, at *9 (S.D. Ind. Mar. 16, 2021), *aff'd*, 43 F.4th 737 (7th Cir. 2022). And in *Doe One v. CVS Pharmacy, Inc.*, the court held that a parent corporation could be held liable for discriminatory pharmacy benefits implemented through both the parent and the subsidiary. No. 18-cv-01031, 2022 WL 3139516, at *9 (N.D. Cal. Aug. 5, 2022).

Against all this, Defendants assert (without any supporting citation) that to impose liability under Section 1557 "it cannot be that *any* funding is enough; rather the statute demands a link between the funding and the alleged discrimination." Defs.' Br. 47. But as the district court explained, that is precisely the reasoning that Congress rejected when it passed the CRRA. *See* JA 1001 (discussing how the CRRA was passed to overturn *Grove City College v. Bell*, 465 U.S. 555 (1984)). Under the plain terms of Section 1557 and the definitions established by the CRRA, if UMMS receives federal financial assistance for any reason, then the entire corporation is prohibited from engaging in sex discrimination in all its operations regardless of whether there is a link between that discrimination and the receipt of federal funds. *See T.S.*, 43 F.4th at 743; *accord Rumble v. Fairview Health Servs.*, No. 14-CV-2037, 2015 WL 1197415, at *12 (D. Minn. Mar. 16, 2015) (explaining that Section 1557 plaintiffs "need not seek medical care specifically from the part of

28

the organization that receives federal funding" to be protected by the statute). Section 1557 does not allow UMMS or any health care entity to take federal funding with one hand and then use the other hand to sign a contract promising that its wholly owned subsidiary will discriminate against transgender people.

## CONCLUSION

For all these reasons, and the reasons set forth in Mr. Hammons's opening brief, the district court's dismissal of Mr. Hammons's constitutional claims should be reversed, and its grant of summary judgment on Mr. Hammons's Section 1557 claim should be affirmed.

Dated: March 24, 2025                    Respectfully submitted,

                              */s/ Aron Fischer*
                              Aron Fischer
                              Andrew D. Cohen
                              Joshua M. Goldman
                              Sean M. Lau
                              PATTERSON BELKNAP WEBB &
                              TYLER LLP
                              1133 Avenue of the Americas
                              New York, NY 10036
                              (212) 336-2000
                              afischer@pbwt.com
                              acohen@pbwt.com
                              jgoldman@pbwt.com
                              slau@pbwt.com

                              */s/ Joshua A. Block*
                              Joshua A. Block
                              Leslie Cooper

29

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN
GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7) because it contains 7,133 words. This Brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using 14-point Times New Roman font.

*/s/ Aron Fischer*
Aron Fischer
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com


*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Brief for Plaintiff-Appellant Jesse Hammons with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on March 24, 2025. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Aron Fischer*
Aron Fischer
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com

*Counsel for Plaintiff-Appellant*